

**EXHIBIT**

**C**

## HOSPITAL SERVICES AGREEMENT

## TABLE OF CONTENTS

1.0     DEFINITIONS ................................................................................................................3

2.0     HOSPITAL SERVICES AND OBLIGATIONS .................................................7
- 2.1   PROVISION OF SERVICES.................................................................7
- 2.2   NON-DISCRIMINATION ....................................................................7
- 2.3   HOSPITAL REPRESENTATIONS. .......................................................7
- 2.4   HOSPITAL'S INSURANCE. ..................................................................8
- 2.5   PRODUCT PARTICIPATION. ...............................................................8
- 2.6   CONSENTS TO RELEASE MEDICAL INFORMATION .........................8

3.0     COMPANY OBLIGATIONS ................................................................9
- 3.1   COMPANY'S COVENANTS. ................................................................9
- 3.2   COMPANY REPRESENTATIONS. .......................................................10
- 3.3   COMPANY'S INSURANCE ..................................................................10
- 3.4   PHYSICIAN NETWORK ADEQUACY. ................................................10
- 3.5   SILENT PPO ACTIVITY AND PLAN SPONSOR ACCESS TO THIS AGREEMENT .........................................................9

4.0     CLAIMS SUBMISSIONS, COMPENSATION AND MEMBER BILLING ..........................................11
- 4.1   CLAIM SUBMISSION AND PAYMENT. ..............................................11
- 4.2   COORDINATION OF BENEFITS. .........................................................18
- 4.3   MEMBER BILLING. ...........................................................................19
- 4.4   CLAIMS ADMINISTRATION. ..............................................................19
- 4.5   JOINT OPERATING COMMITTEE (JOC) ...........................................19

5.0     COMPLIANCE WITH POLICIES ......................................................19
- 5.1   POLICIES. ..........................................................................................19
- 5.2   NOTICES AND REPORTING. ..............................................................20
- 5.3   INFORMATION AND RECORDS. .........................................................20
- 5.4   ACCREDITATION AND REVIEW ACTIVITIES.....................................22
- 5.5   PROPRIETARY INFORMATION. .........................................................22

6.0     TERM AND TERMINATION .............................................................23
- 6.1   TERM. ...............................................................................................23
- 6.2   TERMINATION FOR SPECIAL CAUSE ...............................................23
- 6.3   TERMINATION FOR BREACH. ...........................................................23
- 6.4   IMMEDIATE TERMINATION OR SUSPENSION. ...................................24
- 6.5   OBLIGATIONS FOLLOWING TERMINATION. ......................................24
- 6.6   OBLIGATIONS DURING DISPUTE RESOLUTION PROCEEDINGS. .........25

7.0     RELATIONSHIP OF THE PARTIES...................................................25
- 7.1   INDEPENDENT CONTRACTOR STATUS. .............................................25
- 7.2   USE OF NAME. ..................................................................................25
- 7.3   INTERFERENCE WITH CONTRACTUAL RELATIONS. ..........................26

8.0     DISPUTE RESOLUTION .....................................................................26
- 8.1   MEMBER GRIEVANCE DISPUTE RESOLUTION. .................................26

TX\Hosp Serv Agreement (10-04)      Page 1 of 32      Printed: 09/14/05
00144627                                                  V.3.0.11.04
DHSA0050

8.2   PROVIDER GRIEVANCE DISPUTE RESOLUTION. ................................................................................26
8.3   ARBITRATION. ........................................................................................................................................26
8.4   DISPUTE RESOLUTION SOLELY BETWEEN PARTIES; NO CONSOLIDATION OR CLASS ACTION. ...................27

**9.0   MISCELLANEOUS** .........................................................................................................................**27**
9.1   AMENDMENTS. .....................................................................................................................................27
9.2   WAIVER. ...............................................................................................................................................27
9.3   GOVERNING LAW. .................................................................................................................................27
9.4   LIABILITY. ............................................................................................................................................27
9.5   SEVERABILITY. .....................................................................................................................................27
9.6   SUCCESSORS; ASSIGNMENT. .................................................................................................................27
9.7   HEADINGS. ...........................................................................................................................................28
9.8   NOTICES. ..............................................................................................................................................28
9.9   REMEDIES. ...........................................................................................................................................28
9.10  NON-EXCLUSIVITY. ..............................................................................................................................28
9.11  FORCE MAJEURE. ..................................................................................................................................28
9.12  SURVIVAL. ...........................................................................................................................................29
9.13  ENTIRE AGREEMENT. ...........................................................................................................................29
9.14  DELEGATION. .......................................................................................................................................29
9.15  JOINT VENTURES AND MANAGEMENT AGREEMENTS ..............................................................................29
9.16  THR JOINT VENTURES WITH BUY DOWN PROVISIONS .............................................................................29
9.17  PRESBYTERIAN HOSPITAL OF DENTON. ..................................................................................................30
9.18  MESSENGER MODEL. .............................................................................................................................30
9.19  NEW FACILITIES. ..................................................................................................................................30

## HOSPITAL SERVICES AGREEMENT

This Hospital Services Agreement ("Agreement") is made and entered into as of September 15, 2005 ("Effective Date") by and between Aetna Health Inc., a Texas corporation, on behalf of itself and its applicable Affiliates (hereinafter "Company"), and Texas Health Resources (THR), a non-profit Texas corporation ("Hospital").

**WHEREAS,** Company offers, issues and administers Full Risk Plans and Plans for Plan Sponsors that provide access to health care services to Members; and

**WHEREAS,** Company contracts with certain health care providers and facilities to provide access to such health care services to Members; and

**WHEREAS,** Hospital provides health care services to patients within the scope of its licensure or accreditation; and

**WHEREAS,** Company and Hospital mutually desire to enter into an arrangement whereby Hospital will become a Participating Provider and render health care services to Members; and

**WHEREAS,** in return for the provision of health care services and other obligations assumed by Hospital under this Agreement, Company, or the applicable Plan Sponsor, will pay Hospital's claims for Covered Services under the terms of this Agreement.

**NOW, THEREFORE,** in consideration of the foregoing and of the mutual covenants, promises and undertakings in this Agreement, the sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

## 1.0   DEFINITIONS

When used in this Agreement, all capitalized terms shall have the following meanings:

1.1   <u>AAA</u>. Defined in Section 8.3.1 of this Agreement.

1.2   <u>Affiliate</u>. Any corporation, partnership or other legal entity (including any Plan) directly or indirectly owned or controlled by, or which owns or controls, or which is under common ownership or control with Company. Companies Ultimate Parent Company, Aetna Inc. includes a list of affiliates as an exhibit to its form 10-K as filed each year with the Securities and Exchange Commission (SEC). Such list is current as of the date of such filing. A copy of such exhibit may be obtained by accessing Aetna's shareholder information at www.aetna.com or the SEC's Edgar Database at www SEC.gov or Company shall provide Hospital with a list upon Hospital's request. A list of Company Affiliates, as of December 31st, 2004, is attached hereto as the Aetna Affiliate Listing. Company shall provide Hospital with Notice of new Affiliates as referenced in Section 9.6.

1.3   <u>Agreement</u>. Defined in the first paragraph of this Agreement.

1.4   <u>Ancillary Personnel</u>. Defined in Section 2.3.1 of this Agreement.

1.5   <u>Appeal Arbitrator</u>. Defined in Section 8.3.2 of this Agreement.

1.6   <u>Arbitration Record</u>. Defined in Section 8.3.3 of this Agreement.

1.7    Arbitrator. Defined in Section 8.3.1 of this Agreement.

1.8    Award. Defined in Section 8.3.1 of this Agreement.

1.9    Clean Claim. A clean claim is a claim that contains the information that is required by applicable Texas law and regulations adopted by the Commissioner of Insurance, and is submitted consistent with Aetna's established processing procedures to the extent Aetna establishes the information and processing procedure requirements consistent with applicable Texas law and regulations.

1.10   Coinsurance. The percentage of the rates established under this Agreement which a Member is required to pay for Covered Services under a Plan.

1.11   Company. Defined in the first paragraph of this Agreement.

1.12   Confidential Information. Any information that identifies a Member and is related to the Member's participation in a Plan, the Member's physical or mental health or condition, the provision of health care to the Member or payment for the provision of health care to the Member. Confidential Information includes, "individually identifiable health information", as defined in 45 C.F.R. § 164.501 and "non-public personal information", as defined in laws or regulations promulgated under the Gramm-Leach-Bliley Act of 1999.

1.13   Copayment. A charge required under a Plan that must be paid by a Member at the time of the provision of Covered Services, or at such other time as determined by Hospital.

1.14   Cost Plus Services. Those healthcare services that are paid for under the Product or Plan based on a percentage markup over the Hospital's documented cost. For purposes of this Agreement, Cost Plus Services is not applicable.

1.15   Covered Services. Those health care services that are paid for under the applicable Plan that are not otherwise excluded or limited. The Parties agree that Company is obligated to pay for only those Covered Services that are determined to be medically necessary, as determined in accordance with the Member's applicable Plan or applicable Texas law and regulation.

1.16   Deductible. An amount that a Member must pay for Covered Services during a specified coverage period in accordance with the Member's Plan before benefits will be paid.

1.17   Effective Date. Defined in the first paragraph of this Agreement.

1.18   Emergency Services. Those services necessary to treat a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in: (a) placing the health of the individual (or, with respect to a pregnant woman, her pregnancy or health or the health of her fetus) in serious jeopardy; (b) serious impairment to bodily functions; or (c) serious dysfunction of any bodily organ or part; or such other definition as may be required by applicable law.

1.19   Full Risk Plan. A Plan where Company is the underwriter, in full, of the Plan (i.e. fully-insured Plans).

1.20   Government Programs. Defined in Section 2.3.2 of this Agreement.

1.21   HIPDB. Defined in Section 2.3.1 of this Agreement.

1.22   Hospital. Defined in the first paragraph of this Agreement.

1.23    Hospital-based Physicians.  Any physician or provider employed by or under contract (directly or indirectly) with hospital to provide, or who otherwise provides those services to Members as listed in the Professional Component section of the Services and Compensation Schedule attached hereto and made a part hereof.

1.24    Hospital Services.  Defined in Section 2.1 of this Agreement.

1.25    Information.  Defined in Section 5.3.2 of this Agreement.

1.26    Initial Term.  Defined in Section 6.1 of this Agreement.

1.27    JCAHO.  Defined in Section 2.3.1 of this Agreement.

1.28    License.  Defined in Section 3.2 of this Agreement.

1.29    Material Change.  Any change in Policies that could reasonably be expected to have a material adverse impact on (i) Hospital's reimbursement for Hospital Services or (ii) Hospital administration.

1.30    Member.  An individual covered by or enrolled in a Plan.

1.31    NPDB.  Defined in Section 2.3.1 of this Agreement.

1.32    Negotiation Record.  Defined in Section 8.3.3 of this Agreement.

1.33    Participating Provider.  Any physician, hospital, hospital-based physician, skilled nursing facility, or other individual or entity involved in the delivery of health care or ancillary services who or which has entered into and continues to have a current valid contract with Company to provide Covered Services to Members, and, where applicable, has been credentialed by Company or its designee consistent with Company's credentialing policies.  Certain categories of Participating Providers may be referred to herein more specifically as, e.g., "Participating Physicians" or "Participating Hospitals."

1.34    Party.  Company or Hospital, as applicable.

1.35    Plan.  A Member's health care benefits as set forth in the Member's Summary Plan Description, Certificate of Coverage or other applicable coverage document.

1.36    Plan Sponsor.  An employer, insurer, third party administrator, labor union, organization or other person or entity which has contracted with Company to offer, issue and/or administer a Plan that is not a Full Risk Plan and has agreed to be responsible for funding benefit payments for Covered Services provided to Members under the terms of a Plan.

1.37    Policies.  The policies and procedures promulgated by Company which relate to this Agreement, including, but not limited to:  (a) quality improvement/management; (b) utilization management, including, but not limited to, precertification of elective admissions and procedures, concurrent review of services and referral processes or protocols; (c) pre-admission testing guidelines; (d) claims payment review; (e) Member grievances; (f) provider credentialing; (g) electronic submission of claims; and (h) any applicable Participation Criteria for outpatient services, if attached as set forth in the Participation Criteria Schedules. Policies also include those policies and procedures set forth in the Company's Hospital procedure manual (as modified from time to time); Clinical Policy Bulletins made available via Company's internet web site; and other policies and procedures, whether made available via a password-protected web site for Participating Providers (when available), by letter, newsletter, electronic mail or other media.  "Precertification" when used in this Agreement means the utilization review process to determine whether the requested service, procedure, prescription drug or medical device meets the Company's clinical criteria for coverage. Precertification does not mean verification which is defined by Texas law, as a reliable representation of payment of care or services to fully insured HMO and PPO Members.

1.38  Primary Care Physician. A Participating Physician whose area of practice and training is family practice, general medicine, internal medicine or pediatrics, or who is otherwise designated as a Primary Care Physician by Company, and who has agreed to provide primary care services and to coordinate and manage all Covered Services for Members who have selected or been assigned to such Participating Physician, if the applicable Product or Plan provides for a Primary Care Physician. For Plans of Plan Sponsors, the term "Primary Care Physician" shall be referred to as "Physician Primary Care."

1.39  Products. Medical benefit Plans including but not limited to HMO, Point of Service, and PPO features such as utilization management, networks, Specialty Programs, and benefit differentials, subject to the requirements outlined in Sections 2.3.2 and 2.5.

1.40  Proprietary Information. Any and all information, whether prepared by a Party, its advisors or otherwise, relating to such Party or the development, execution or performance of this Agreement whether furnished prior to or after the Effective Date. Proprietary Information includes but is not limited to, with respect to Company, the development of a pricing structure, (whether written or oral) all financial information, rate schedules and financial terms which relate to Hospital and which are furnished or disclosed to Hospital by Company. Proprietary Information includes but is not limited to, with respect to Hospital, the development of a pricing structure, (whether written or oral) all financial information, rate schedules and financial terms which relate to Company and which are furnished or disclosed to Company by Hospital. Notwithstanding the foregoing, the following shall not constitute Proprietary Information:

(a)  information which was known to a receiving Party (a "Recipient") prior to receipt from the other Party (a "Disclosing Party") (as evidenced by the written records of a Recipient);

(b)  information which was previously available to the public prior to a Recipient's receipt thereof from a Disclosing Party;

(c)  information which subsequently became available to the public through no fault or omission on the part of a Recipient, including without limitation, the Recipient's officers, directors, trustees, employees, agents, contractors and other representatives;

(d)  information which is furnished to a Recipient by a third party which a Recipient confirms, after due inquiry, has no confidentiality obligation, directly or indirectly, to a Disclosing Party; or

(e)  information which is approved in writing in advance for disclosure or other use by a Disclosing Party.

1.41  Records. Defined in Section 5.3.2 of this Agreement.

1.42  Rules. Defined in Section 8.3.1 of this Agreement.

1.43  Specialty Program. A Company-established program for a targeted group of Members with certain types of illnesses, conditions or risk factors (e.g., organ transplants, women's health, other disease management programs, etc) as well as hard steerage initiatives and soft steerage initiatives as defined in Section 2.5.

1.44  Specialty Program Providers. Those hospitals, Participating Physicians and other Participating Providers that have been identified or designated by Company to provide transplant services and other Covered Services associated with a Specialty Program. Certain categories of Specialty Program Providers may be referred to herein more specifically as, e.g. "Specialty Program Physician".

1.45  THR Joint Venture. A legal entity which provides Hospital Services and in which Texas Health Resources owns some but not all of the entity's outstanding equity.

**2.0   HOSPITAL SERVICES AND OBLIGATIONS**

2.1   Provision of Services.
Hospital will make available and provide services to Members in the same manner, in accordance with the same standards, and with the same availability offered to other patients of Hospital ("Hospital Services"). Hospital Services covered under this Agreement include the services normally provided by Hospital as listed in the Services and Compensation Schedule, attached hereto and made a part hereof. Company and Hospital may mutually agree in writing at any time, and from time to time, either to increase or decrease the Hospital Services made available to Members under this Agreement.

2.2   Non-Discrimination

2.2.1   Equitable Treatment of Members. Hospital and Company agree that Members and non-Members should be treated equitably; to that end Hospital agrees not to discriminate against Members on the basis of race, gender, creed, ancestry, lawful occupation, age, religion, marital status, sexual orientation, mental or physical disability, color, national origin, place of residence, health status, source of payment for services, cost or extent of Hospital Services required, or any other grounds prohibited by law or this Agreement.

2.2.2   Affirmative Action. Company is a federal contractor and an Equal Opportunity Employer which maintains an Affirmative Action Program. To the extent applicable to Hospital, Hospital agrees to comply with the following, as amended from time to time: Executive Order 11246, the Vietnam Era Veterans Readjustment Act of 1974, the Drug Free Workplace Act of 1988, Section 503 of the Rehabilitation Act of 1973, Title VI of the Civil Rights Act of 1964, the Age Discrimination Act of 1975, the Americans with Disabilities Act of 1990, and any similar laws, regulations or other legal mandates applicable to transactions under or otherwise subject to any government contract of Company.

2.3   Hospital Representations.

2.3.1   General Representations. Hospital represents and warrants, as applicable, that: (a) it is, and will remain throughout the term of this Agreement, accredited by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO") or the Bureau of Hospitals of the American Osteopathic Association; (b) it is, and will remain throughout the term of this Agreement substantially in compliance with all applicable federal and state laws and regulations related to this Agreement and the services to be provided under this Agreement, including, without limitation, statutes and regulations related to fraud, abuse, discrimination, disabilities, confidentiality, false claims and prohibition of kickbacks; (c) it is certified to participate in the Medicare program; with such accreditation or participation applicable to all Hospital Services; (d) all Hospital-Based Physicians are properly credentialed, privileged, and re-appointed within the scope of their specialty; (e) all ancillary health care personnel employed by, associated or contracted with Hospital who treat Members ("Ancillary Personnel"): (i) are and will remain throughout the term of this Agreement appropriately licensed and/or certified (when and as required by state law) and supervised, and qualified by education, training and experience to perform their professional duties; and (ii) will act within the scope of their licensure or certification, as the case may be; and (iii) shall remain in compliance with all applicable terms of this Agreement; (f) Hospital's credentialing, privileging, and re-appointment procedures are in accordance with its medical staffs by-laws, regulations, and policies, comply with JCAHO standards, meet the querying and reporting requirements of the National Practitioner Data Bank ("NPDB") and Healthcare Integrity and Protection Data Bank ("HIPDB"), and fulfill all applicable state and Federal standards; (g) this Agreement has been executed by its duly authorized representative; and (h) executing this Agreement and performing its obligations under this Agreement shall not cause Hospital to violate any term or covenant of any other agreement or arrangement now existing or subsequently executed.

2.3.2 <u>Government Programs</u>. Company has or may seek a contract to serve Medicare, Medicaid, CHIP, and/or Tricare beneficiaries ("Government Programs"). To the extent Company participates in Government Programs, Hospital agrees, on behalf of itself and any subcontractors of Hospital acting on behalf of Hospital, to use best efforts to abide by all rules and regulations of, and all requirements applicable to, such Government Programs. With respect to Members of Government Plans, Hospital acknowledges that compensation under this Agreement for such Members constitutes receipt of Federal funds.

If Company designates Hospital to participate in a Government Program pursuant to Section 2.5 below, Hospital may opt out of participation of that Government Program. Hospital shall have thirty (30) days from receipt of Company's notice of designation, to notify Company in writing if Hospital elects not to participate in that Government Program.

2.4 <u>Hospital's Insurance</u>.



2.5 <u>Product Participation</u>.

During the term of this Agreement, Hospital agrees to participate in the Products and Plans and other health benefit products listed on the Product Participation Schedule attached hereto and made a part hereof. Company reserves the right to introduce and designate Hospital's participation in new Plans, Specialty Programs and Products during the term of this Agreement and will provide Hospital with ninety (90) days prior written notice and description of such new Plans, Specialty Programs and Products and the associated compensation. To the extent Company introduces a new Specialty Program, Plan or Product not contemplated under the Product Participation Schedule, Hospital may, within thirty (30) days receipt of such notice, provide Company with any documentation that such Specialty Program, Plan or Product will have a demonstrable, material financial or administrative impact on this Agreement. Upon receipt of such information, Company agrees to negotiate in good faith an amendment to this Agreement specific to such new Specialty Program, Plan or Product. Both Parties agree to use best efforts to reach an agreement for new Specialty Programs, Products or Plans. Should Company and Hospital not be able to reach mutually agreeable terms related to such new Specialty Program, Product or Plan within thirty (30) days of receipt of such information from Hospital, either Party shall have the option of terminating this Agreement with one hundred and eighty (180) days written Notice regardless of the requirements otherwise outlined in Section 6.2 of this Agreement. Hospital agrees that renaming a Plan, Specialty Program, or Product does not constitute the offering of a new Plan, Specialty Program, or Product provided that the change does not materially differ from the existing Plan, Product, or Specialty Program in design or administration requirements. Company will provide Hospital ninety (90) days prior written notice of Specialty Program, Product or Plan name changes.

Nothing herein shall require that Company identify, designate or include Hospital as a preferred participant in any specific Plan, Specialty Program or Product; provided, however, Hospital shall accept compensation in accordance with this Agreement for the provision of any Covered Services to Members under a Plan, Specialty Program or Product in which Hospital has agreed to participate in under this Agreement. Company agrees that it will not exclude Hospital from participation in a new Specialty Program, Product or Plan if (i) Hospital can provide services as required by such new Specialty Program, Product or Plan, (ii) Hospital meets

TX\Hosp Serv Agreement (10-04)
00144627
DHSA0050

Page 8 of 32

Printed: 09/14/05
V.3.0.11.04

any applicable criteria established by Company for such Specialty Program, Product or Plan, and (iii) Hospital agrees to accept all terms and conditions of such new Specialty Program, Product or Plan.



2.6     <u>Consents to Release Medical Information</u>.
    Hospital agrees that it will obtain from Members to whom Hospital provides Hospital Services, any necessary consents or authorizations to the release of Information and Records to Company, Plan Sponsors, their agents and representatives. In performing this agreement, Hospital shall comply with any applicable federal or state law or regulation or this Agreement.

**3.0    COMPANY OBLIGATIONS**

3.1     <u>Company's Covenants</u>.
    Effective January 1, 2006, Company or Plan Sponsor shall provide Members with a means to identify themselves to Hospital. Such means shall include (i) Company's logo and Product or Plan name; or (ii) Company's logo and Plan Sponsor's naming convention describing Company's Products or Plans; or (iii) Company's logo and the Medicare designation; or (iv) Company's logo specific to Aetna Signature Administrators (ASA). Company shall provide Hospital with a means to check Member eligibility, claim status and claim payment and shall provide electronic remittance advice (ERA) and electronic funds transfer (EFT). Company will take the following steps regarding ongoing eligibility and benefits verification:

TX\Hosp Serv Agreement (10-04)        Page 9 of 32        Printed: 09/14/05
00144627        V.3.0.11.04
DHSA0050

Company will work with Hospital to ensure that Hospital facilities have real time access to correct eligibility and benefits information for Members via the current electronic eligibility and benefits verification system utilized by Company. In the event that Company changes their current electronic system, Company and Hospital will work in good faith to expedite a transition to the new Company system. Company shall include Hospital in the Participating Provider directory or directories for the Plans, Specialty Programs and Products in which Hospital is a Participating Provider, including when Hospital is designated as preferred participant, and shall make these directories available to Members. Company reserves the right to determine the content of provider directories; however if Company wants to use Hospital information beyond Hospital's name, address, specialty type and telephone number, or other information available in the public domain, then Company shall request Hospital's written consent.

3.2 <u>Company Representations.</u>
Company represents and warrants that: (a) it, where applicable, is licensed to offer, issue and administer Products or Plans in the service areas covered by this Agreement by the applicable regulatory authority ("License"); (b) it will not lose such License involuntarily during the course of this Agreement; (c) it is, and will remain throughout the term of this Agreement, substantially in compliance with all applicable Federal and state laws and regulations related to this Agreement and the services to be provided under this Agreement; including without limitation, any applicable prompt payment statutes and regulations or capital reserve requirements; provided however, that for the purposes of (b) and (c) except as specifically provided in section 6.4, Hospital will have no basis for termination to the extent that such action does not impact the obligations of Company under this Agreement; (d) this Agreement has been executed by its duly authorized representative; and (e) executing this Agreement and performing its obligations under this Agreement shall not cause Company to violate any term or covenant of any other agreement or arrangement now existing or subsequently executed.

3.3 <u>Company's Insurance.</u>
Company at its sole cost and expense agrees to procure and maintain such policies of general and/or professional liability and other insurance (or maintain a self-insurance program) as shall be necessary to insure Company and its employees against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by Company under this Agreement and the administration of Products or Plans. Company agrees to deliver certificates of insurance to Hospital upon request as evidence of such coverage.

3.4 <u>Physician Network Adequacy</u>
If Hospital believes the physician network around Hospital is inadequate, Hospital shall provide a list of physicians with active privileges at each of its participating hospitals to Company no more than once a year. Company will review these lists from Hospital within thirty (30) days of receipt for potential physician recruitment opportunities. Company will identify all specialty types with one or fewer physicians from these lists and send a "letter of interest" application to all listed physicians within these opportunity specialty types. Upon receipt of "interest" letters from the physicians, Company will treat these requests as priority and begin the contracting/credentialing process. If a physician has declined or not responded to Aetna's "letter of interest", Aetna shall have no obligation to continue pursuing the physician and will notify Hospital.

3.5 <u>Silent PPO Activity and Plan Sponsor Access to this Agreement.</u>
Silent PPOs are managed care networks that offer their contracted rates to other Plan Sponsors and self-funded organizations without providing steerage (financial incentive, provider directories, etc.) to the contracted providers or identifying the relationship between the PPO network and the Plan Sponsor on the Member's identification card. Typically these discounts are taken after the services have been performed while neither the provider nor the Member was aware of a relationship between the Plan Sponsor and the PPO network. Company acknowledges that Hospital objects to the practice of Silent PPO networks and agrees to comply with the following conditions:

3.5.1 

TX\Hosp Serv Agreement (10-04)
00144627
DHSA0050

Page 10 of 32

Printed: 09/14/05
V.3.0.11.04

REDACTED

As outlined in Section 3.5.1, Company confirms that the Plans made available through Aetna Signature Administrators benefit product do not constitute silent PPO activity. Company acknowledges that Hospital has not agreed under the terms of this Agreement to allow leasing, selling or making available the use of the negotiated rates in this Agreement to any entity who is not a Plan Sponsor, insurer or underwriter of a health plan and a directly contracted client of Company, through the Aetna Signature Administrators benefit product. Notwithstanding the terms of this section herein, no preferred provider organization or rental network is allowed to access these rates.

3.6    Company represents that it exercises commercially reasonable due diligence prior to entering into agreements with Plan Sponsors. Company represents that its agreements with Plan Sponsors require that such Plan Sponsor make funds available to allow Company to reimburse Participating Providers for Covered Services provided to Members enrolled in the applicable self-funded Plan. In the event that a Plan Sponsor consistently fails to pay or make funds available to pay Hospital according to the terms of this Agreement, Company agrees to work with Plan Sponsor and Hospital to resolve the payment failures quickly. If Hospital identifies a potential failure of Plan Sponsor, or designee, to pay claims according to terms of this Agreement, Hospital will forward the issue to the Joint Operating Committee. The Joint Operating Committee will track and work the issue until resolved or mutually addressed. Unless prohibited from doing so by applicable law, by order of the court or by non-compliance with the terms of this Agreement, Company agrees to allow Hospital to terminate the Plan Sponsor in question within thirty (30) days of written notice according to the Notice requirements in this Agreement, unless such Plan Sponsor makes funds available in Company's determination and Hospital agrees that a good faith effort is being made to pay Hospital according to the terms of this Agreement during the thirty (30) day notice period.

## 4.0    CLAIMS SUBMISSIONS, COMPENSATION AND MEMBER BILLING

4.1    Claim Submission and Payment.

4.1.1    Hospital Obligation to Submit Claims. Hospital agrees to submit Clean Claims to Company or the applicable Plan Sponsor, for Hospital Services rendered to Members. To the extent that Hospital submits claim data related to a Member enrolled in a Government Program, Hospital certifies that any such data is accurate, complete and truthful. Hospital represents that, where necessary, it has obtained signed assignments of benefits authorizing payment for Hospital Services to be made directly to Hospital. Except as otherwise required under applicable Federal, or state law or regulation, Hospital shall use best efforts to submit claims electronically. If Hospital submits a claim, Hospital shall not submit a duplicate claim to Company or the applicable Plan Sponsor, in paper form or resubmit the claim electronically in accordance with the time frames required under this Agreement or applicable law or regulation. In the event of a systems failure, or a catastrophic event as defined by 28 Texas Administration Code Section 21.2803, that substantially interferes with the business operations of the Hospital, the Hospital may submit non-electronic claims in accordance with the requirements in 28 Texas Administration Code Section 21.3701 and for the number of calendar days during which substantial interference with business operations occurs as of the date of the catastrophic event or systems failure. Hospital shall provide written notice of the Hospital's intent to submit non-electronic

claims to the issuer of the health benefit plan within five calendar days of the catastrophic event or systems failure. A waiver of the electronic submission requirements may be requested by Hospital in any of the following circumstances: (1) No method available for the submission of claims in electronic form. This exception applies to situations in which the federal standards for electronic submissions (45 C. F.R., Parts 160 and 162) do not support all of the information necessary to process the claim. (2) The operation of small provider practices. This exception applies to those providers with fewer than ten full-time-equivalent employees, consistent with 42 C . F.R. Section 424.32(d)(1)(viii). (3) Demonstrable undue hardship, including fiscal or operational hardship. (4) Any other special circumstances that would justify a waiver. The Hospital's request for a waiver must be in writing, and must include documentation supporting the issuance of a waiver.

Hospital agrees that Company, or the applicable Plan Sponsor, will not be obligated to make payments for claims received more than one hundred eighty (180) days from (a) the date of service or, (b) when Company or a Plan Sponsor is the secondary payor, from the date of Hospital's receipt of the primary payor's explanation of benefits. This limitation will be waived in the event Hospital provides notice to Company, or the applicable Plan Sponsor, along with appropriate evidence, of extraordinary circumstances outside the control of Hospital that resulted in the delayed submission.

For a claim for which the Member did not provide correct payor information for Hospital to submit the claim, Company, or the applicable Plan Sponsor, will consider the claim for payment if Hospital submits the claim within one year of the date those services are rendered and if Hospital can provide information to support that Hospital was not aware of Member's status with Company or the applicable Plan Sponsor's Member and the claim meets Medical Necessity. If a Member does not provide correct payor information in a timely manner, Company, or the applicable Plan Sponsor, will not deny payment on the basis of failure to pre-certify with regard to those Covered Services incurred during the time period that Hospital did not have correct payor information. In the event that payment of a claim for a Covered Service is denied for lack of precertification/authorization or for untimely filing, the denial will be reversed if Hospital appeals within one year after the date of service and can show all of the following: i) that, at the time the claim was due, Hospital and/or Company, or the applicable Plan Sponsor, did not know and was unable to reasonably determine that the patient was a Member, ii) that Hospital took reasonable steps to verify that the patient was a Member, and iii) that Hospital promptly filed the claim after learning that the patient was a Member. If the claim is denied based upon lack of Medical Necessity or because the service is not a Covered Service, Hospital may bill Member as Member did not provide correct payor information in a timely manner.

Except as otherwise required under applicable Federal, or state law or regulation, unless Hospital notifies Company, or the applicable Plan Sponsor, of any payment disputes (via telephone, electronic means, or in writing) within one year of receipt of payment from Company or the applicable Plan Sponsor, such payment will be considered full and final payment for the related claims. Except as otherwise required under applicable Federal, or state law or regulation, if Hospital does not bill Company or Plan Sponsors, or does not dispute any payment, timely as provided in this section 4.1.1, Hospital will be deemed to have waived its claim for payment or additional payment (as applicable) and Hospital will not seek payment or additional payment from Plan Sponsors, Company or Members.

Company and Plan Sponsors will limit retroactivity of member eligibility for non-governmental members to a ninety (90) day period.

To the extent Hospital bills using a HCFA 1500, Company utilizes a commercial software package (as modified by Company for all participating providers in the ordinary course of Company's business), which relies upon Medicare and other industry standards in the development of its rebundling logic, to perform rebundling and make adjustments for inappropriate billing or coding. To the extent Hospital does not bill using a HCFA 1500, Company will process claims in accordance with the Services and Compensation Schedules attached hereto.

Company and/or Plan Sponsors will provide Hospital with ninety (90) days advance written notice of any change in information and processing procedure requirements related to Clean Claims.

Company Obligation to Pay Covered Services.  Company agrees to: (a) pay Hospital for Covered Services rendered to Members of Full Risk Plans or Products, and (b) notify Plan Sponsors to forward payment to Company for payment to Hospital for Covered Services rendered to a Plan Sponsor's Members. Such payment shall be (i) the rates set forth in the Services and Compensation Schedule; within thirty (30) days for an electronic claim and forty-five (45) days for a paper claim (or such shorter time as required by applicable law or regulation) of actual receipt by Company or the applicable Plan Sponsor, whichever is earlier, of a Clean Claim.

4.1.2.1 Prompt Pay Penalties related to Full Risk Plans or Products and those covered under applicable law or regulation. Except for capitated services, in the event Company fails to pay Clean Claims within thirty (30) days for an electronic claim and forty-five (45) days for a paper claim (or such shorter time as required by applicable law or regulation) of receipt, Company shall pay a penalty as required by applicable law or regulation. In relation to Full Risk Plans or Products, if applicable law or regulation does not require a penalty for Company's failure to pay a Clean Claim within the time period required by applicable law or regulation, then Hospital shall not be entitled to billed charges or any penalty. Hospital shall not be entitled to billed charges or any penalty for claims submitted in relation to Plan Sponsor Plans other than as described below (Plan Sponsor Plans are not Full Risk Plans).

The receipt date for claims will be determined in accordance with applicable law or regulation.

4.1.2.2 Prompt Pay Penalties related to Plan Sponsor Plans.  If applicable law or regulation does not require a penalty for a Plan Sponsor's failure to pay a Clean Claim within thirty (30) days (or such period required or allowed by applicable law or regulation) and after initial payment or no payments, and where Hospital has attempted to resolve or correct an incorrectly paid claim by calling Company's or Plan Sponsor's Service Center(s) Single Point of Contact (SPOC), Company shall require Plan Sponsors to pay a penalty in accordance with the following:

Upon written notice from Hospital, in a mutually acceptable electronic format to Company's designee, of a Plan Sponsor's failure to pay a Clean Claim (both underpayments and no payments) within thirty (30) days of receipt of such Clean Claim, the applicable Plan Sponsor shall have thirty (30) additional days from the receipt of such notice, to pay the claim in accordance with the terms of this Agreement and no penalty shall apply.  After calling Company or the appropriate claim resolution party's SPOC unit for resolution, Hospital can submit an electronic file at any time.  If such Clean Claim is then not paid within the thirty (30) days, then the applicable Plan Sponsor shall be obligated to pay a penalty according to the following terms:

Payment or corrected payment made thirty one to sixty (31-60) days after electronic file notice: Contracted reimbursement according to the attached Services and Compensation Schedules plus fifty percent (50%) of the difference between the contracted reimbursement and Hospital's eligible billed charges.

Payment made sixty one or more (61+) days after electronic file notice:  Contracted reimbursement according to the Services and Compensation Schedules attached plus one hundred percent (100%) of the difference between the contracted reimbursement and Hospital's eligible billed charges.

4.1.2.3 Underpayments. Except as otherwise required under applicable Federal, or state law or regulation, if Company, or the applicable Plan Sponsor, pays a claim and afterwards either –

   a.      Company, or the applicable Plan Sponsor, discovers a possible underpayment to Hospital within the time period for Hospital to dispute payments stated in Section 4.1.1, or

TX\Hosp Serv Agreement (10-04)         Page 13 of 32         Printed: 09/14/05
00144627         V.3.0.11.04
DHSA0050

b.  Hospital discovers a possible underpayment to Hospital and gives prompt notice to Company within the time period for Hospital to dispute payments stated in Section 4.1.1 above,

then Company shall review the claim within forty-five (45) days of Company's or the applicable Plan Sponsor's discovery or Hospital's notice, and shall pay any eligible unpaid portion of the claim. In relation to Full Risk Plans or Products, if applicable law or regulation does not require a penalty for Company's failure to pay a Clean Claim within the time period required by applicable law or regulation, then Hospital shall not be entitled to billed charges or any penalty for a possible underpayment. Hospital shall not be entitled to billed charges or any penalty for possible underpayment for claims submitted in relation to the applicable Plan Sponsor Plans except as outlined in the section Prompt Pay Penalties related to Plan Sponsor Plans. (Plan Sponsor Plans are not Full Risk Plans.)

4.1.2.4 Other Claim Provisions. When required, Company and the applicable Plan Sponsors shall comply with all applicable statutes and rules pertaining to prompt payment of Clean Claims, including Texas Insurance Code Chapter 1301, Sections 843.336–843.353, and 28 Texas Administrative Code Sections 21.2801-21.2826, with respect to payment to a Participating Provider for Covered Services that are rendered to Members.

In accordance with applicable law and regulation, including but not limited to Texas Insurance Code Section 1301.136 and Sec. 843.319:

(1) Hospital may request a description and copy of the coding guidelines, including any underlying bundling, recoding, or other payment process and fee schedules applicable to specific procedures that the Hospital will receive under the contract;

(2) Company or Company's agent will provide the coding guidelines and fee schedules not later than the 30th day after the date the Company receives the request;

(3) Company or Company's agent will provide notice of changes to the coding guidelines and fee schedules that will result in a change of payment to Hospital not later than the 90th day before the date the changes take effect and will not make retroactive revisions to the coding guidelines and fee schedules;

(4) The contract may be terminated by Hospital on or before the 30th day after the date Hospital receives information requested under this subsection without penalty or discrimination in participation in other health care Products or Plans;

(5) Hospital shall only use or disclose the information for the purpose of practice management, billing activities, and other business operations; and disclose the information to a governmental agency involved in the regulation of health care or insurance;

(6) Company shall, on request of Hospital, provide the name, edition, and model version of the software that Company uses to determine bundling and unbundling of claims.

While Company may pay claims on behalf of Plan Sponsors, Hospital and Company acknowledge that Company has no legal responsibility for the payment of such claims for Covered Services rendered to a Plan Sponsor's Member; provided, however, that Company agrees to reasonably assist Hospital as appropriate in collecting any such payments. Where there is a Plan Sponsor, Company shall have no obligation to pay Hospital in the event the applicable Plan Sponsor or Member fails to pay Hospital.
As long as Hospital participates in Company's networks, Company and Plan Sponsors will reimburse Hospital directly for Covered Services instead of reimbursing the Member under all Aetna Health Fund programs.

4.1.2.5 Overpayments. Except as otherwise required under applicable Federal, or state law or regulation, Company, on behalf of itself or on behalf of Plan Sponsors, may notify Hospital of overpayments made to Hospital within one year of the claim payment. Hospital shall not be responsible for any identified overpayments arising from Company or Plan Sponsor audits requested and completed more

than one year following claim payment. Any such requests from Company or Plan Sponsor will be sent to the Joint Operating Committee.

Hospital agrees to return any such overpayment or payment made in error (e.g., a duplicate payment or payment for services rendered by Hospital to a patient who was not a Member) subject to the following timeframes.

Company shall provide Hospital with a written request (including date of service, Member's name, Member's Hospital account number when available, and Member's Company identification number) of any such overpayments and any amounts determined to be due and owing as a result of such overpayments.

If Hospital agrees with the overpayment calculation as a duplicate claim from Company or the same Plan Sponsor, Hospital shall refund the monies within forty five (45) days of notification of the overpayment. For all other potential overpayments, if Hospital agrees with the overpayment calculation, Hospital shall refund the monies within sixty (60) days of notification of the overpayment. If Hospital disagrees with the overpayment calculation or needs additional time to research the claim beyond sixty (60) days, Hospital may appeal a request for refund by providing written notice of disagreement with the refund request not later than forty five (45) days after receipt of notice. Upon receipt of a written notice of disagreement, Company shall not offset such amounts and Company and/or the applicable Plan Sponsor shall begin and complete (i) Company's internal appeal process; (ii) overpayment recovery appeals not resolved in this process may be referred to Hospital and Company's Joint Operating Committee for resolution; (iii) items not resolved through the Joint Operating Committee may be referred to the Dispute Resolution and/or Mediation as outlined in Section 8.2 of this Agreement; and (iv) Company agrees not to offset disputed overpayments pending the outcome of Dispute Resolution and/or Mediation as outlined in Section 8.2 of this Agreement.

Company and Plan Sponsor shall not be entitled to collect any other penalty, charge or fee, for Hospital's failure to return overpayment of claims under any Full Risk Plans or Products and the applicable Plan Sponsor Plans or Products.

4.1.3 <u>Utilization Management</u>. Company utilizes systems of utilization review/quality improvement/peer review consistent with applicable federal and state laws to promote adherence to accepted medical treatment standards and to encourage Participating Physicians/Hospitals to minimize unnecessary medical costs consistent with sound medical judgment. To further this end, Hospital agrees:

a) To participate, as reasonably requested, and to cooperate with Company's utilization review, patient management, quality improvement programs and decisions with respect to all Members.

b) To cooperate with Company's pre-certification and utilization management requirements for all elective admissions and other Covered Services.

c) To regularly interact and cooperate with Company's nurse case managers, medical directors, and other related Company staff.

To use best efforts to utilize Participating Group and Participating Group Physicians consistent with sound medical judgment.

To cooperate with all Company's credentialing criteria and procedures, including site visits and medical chart reviews, and to submit to these processes biannually, annually, or otherwise, when applicable.

f) To verify in advance that Member's physician has completed authorization from Company prior to any non-emergency admission. In cases where a Member requires an emergency hospital admission or direct inpatient admission, Hospital shall notify Company as soon as is reasonable,

TX\Hosp Serv Agreement (10-04)      Page 15 of 32      Printed: 09/14/05
00144627      V.3.0.11.04
DHSA0050

but in no event later than the next Working Day. "Working Day" shall mean a weekday, excluding New Years Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day, day after Thanksgiving and Christmas Day. Failure to notify Company shall result in denial of payment, subject to timeframes listed in 4.1.1.

Except when a Member requires Emergency Services or direct inpatient admission, Hospital agrees to cooperate with any applicable precertification, and/or referral requirements under the Member's Plan or Product prior to the provision of Hospital/Physician Services. Hospital agrees to use best efforts to notify Company of all admissions of Members, and of all services for which Company requires notice, upon admission or prior to the provision of such services. For those Members who require services under a Specialty Program, Hospital agrees to work with Company in transferring the Member's care to a Specialty Program Provider.

Except as provided for herein or otherwise required under applicable Federal, or state law or regulation, or a Plan or Product, the Parties agree that Company, on its behalf and on behalf of Plan Sponsors, reserves the right to perform utilization management (including retrospective review) and to adjust or deny payment for the inefficient and/or inappropriate delivery of Hospital Services related to admissions, or length of stay. To facilitate timely and accurate concurrent utilization management, Hospital and Company will cooperate as necessary to facilitate on-site and/or concurrent telephonic utilization management at Hospital as further described in Section 4.1.4.

Company shall not retroactively review, deny or downgrade an inpatient day or level of service that had been previously certified for authorized services provided the information provided by Hospital and relied upon by Company to authorize services has not changed. For the purpose of this section, a certification means an approval for services given to Hospital by an appropriate Company nurse, Medical Director, or Designee for that specific day or service or in accordance with Section 4.1.4. This provision is not intended to obligate Company to reimburse Hospital for services provided to Members who are later determined to have been ineligible at the time of service subject to federal or state law, regulations and timelines outlined in Section 4.1.1.

Medical Management. .
Except as provided by applicable Federal and state law or regulation, Company and applicable Plan Sponsors will pay for medically necessary Hospital Services and/or Hospital days, as applicable, which have been pre-authorized by Company or applicable Plan Sponsor in accordance with Sections 4.1.3 and 4.1.4.
1. Company or the applicable Plan Sponsor will pre-authorize Hospital Services and/or Hospital days, as applicable, for Hospital facilities for a thirty (30) day window from the date of the authorization. In addition:
Hospital will verify eligibility as of the date of service.
Non-urgent Hospital Services or Hospital days will be pre-authorized or denied by Company or the applicable Plan Sponsor within three (3) business days of receipt of request and will make decisions based on information available, and failure by Company or applicable Plan Sponsor to pre-authorize or deny any Hospital Services or Hospital days within three (3) business days shall cause such Hospital days or Hospital Services to be automatically authorized or as required by Federal or State Law.
Urgent Hospital Services or Hospital days will be pre-authorized or denied by Company or applicable Plan Sponsor within one (1) business day of receipt of necessary clinical information, and failure by Company or applicable Plan Sponsor to pre-authorize or deny any Hospital Services or Hospital days within one (1) business day shall cause such Hospital days or Hospital Services to be automatically authorized or as required by Federal or State Law.
Company or applicable Plan Sponsor shall communicate to Hospital facilities the services authorized each day according to the following timeframes: If all necessary clinical information necessary to make a determination of medical necessity is received from Hospital by 11:30 AM, Company or applicable Plan Sponsor will provide decision to Hospital by 5:00 PM the same day. If all necessary clinical information is received from Hospital between 11:00 AM and 3:00 PM, Company or applicable Plan Sponsor will provide decision to Hospital by 10:00

AM the next business day. If all necessary clinical information is received from Hospital after 3:00 PM, Company or the applicable Plan Sponsor will provide a decision to Hospital by 2:00 PM the next business day. Necessary clinical information may include, but is not limited to, verbal, electronic or written documentation received from Hospital and/or attending physicians that provides the clinical justification for the provision of Covered Services at the appropriate intensity of inpatient care.

Any inpatient admissions though the Emergency room or direct inpatient admission will be automatically certified for one (1) day if Hospital notifies Company of the admission within twenty-four (24) hours post-stabilization or until the next Working Day, whichever is longer. Company, or the applicable Plan Sponsor, will not retroactively downgrade or deny the first day or the days prior to the next Working Day, if Hospital provides the twenty-four (24) hour notice or until the next Working Day, whichever is longer. Should Company identify a pattern of admission from the emergency room which proves to be medically unnecessary, Hospital will assist Company in the development of a corrective action plan as it affects the Emergency room, its staff, physicians and admitting physicians to eliminate this pattern.

Company shall provide to Hospital a copy of the communication educating staff regarding emergency authorization and internal policies regarding the administration and authorization of these services.

Company, or the applicable Plan Sponsor, agrees to notify by telephone the designated single point of contact for each Hospital facility of any adverse determination for a hospitalized Member within one Working Day of notification, in accordance within regulatory Texas Department of Insurance guidelines or as required by Federal or state law.

The telephonic notification shall include the following information:

The name and phone number of the Company or applicable Plan Sponsor representatives or unit with whom an appeal, if any, should be initiated;

The mechanism for an expedited appeal, and phone number for initiating the expedited appeal

Company, or the applicable Plan Sponsor, agrees to confirm notice of any adverse determination in accordance with regulatory Texas Department of Insurance guidelines.

Company, or the applicable Plan Sponsor, agrees to pay for each day of service that a Member remains hospitalized in a Hospital facility because the Member cannot be transferred to a lower level of care because the lower level of care is not available through Company's provider network. When such alternate level of care is available through Company, Hospital will use best efforts to cooperate with Company to assure a transfer occurs expeditiously, and will cooperate with Company to obtain appropriate physician orders, in keeping with Hospital's medical staff rules. Payment for each such day of service shall be at the rate specified in the Agreement for the level of care provided to the Member by the Hospital facility.

As long as Company requires concurrent review for patients at Hospital facilities, Company will perform onsite concurrent review based on Company's determination of the necessity for onsite review at Hospital facilities. Company will review hospitals designated for onsite review on a semi-annual basis or more frequently if there is an increase in volume warranting such onsite reviews as determined by Company. Hospital will provide a designated area for all on-sites with a work station and telephone. Each of Hospital facilities where Company performs onsite concurrent review shall provide onsite RNs with a daily census of patients and access to patient floors and medical records within the rules and procedures of the applicable facility, provided that adequate access to floors and medical records shall be provided for the onsite RNs to perform the onsite concurrent review. The onsite RN and Hospital facility single point of contact agree to meet in an exit conference prior to the onsite RN leaving the facility each weekday or if agreed upon between the onsite RN and Hospital facility, the onsite RN may document on a Hospital log which patients he/she has seen, what level of care is authorized with the appropriate authorization number and the number of days authorized.

If an onsite RN is not available on a weekday, notification will be made in advance by Company (as soon as practical following Company's becoming aware of such fact) to the facility if clinical information will need to be provided telephonically by facility UM staff.

TX\Hosp Serv Agreement (10-04)
00144627
DHSA0050

Page 17 of 32

Printed: 09/14/05
V.3.0.11.04

For all Hospital facilities where Company does not perform onsite concurrent reviews, Company will provide a RN to conduct telephonic reviews. To the extent it is possible, any changes to this process will require thirty (30) days advance notice to the Hospital by Company.

Company may request a daily Hospital census to determine (1) if the Member's condition has changed and (2) if Company needs additional clinical information.

Per the Agreement, Hospital will cooperate with Company in the administration of its utilization management programs.

Company shall allow Members to self refer to contracted physicians and facilities for mammography services (without any precertification requirements) in accordance with Texas law and regulations.

As of the Effective Date, Company will have provided Hospital with a current, updated Company Policy and Procedure regarding appeals and expedited appeals by providers. Company shall, in accordance with Section 5.1, provide ninety (90) days prior written notice to Hospital of any and all amendments to such Policy and Procedure. Company and Plan Sponsor, if applicable, shall continue to follow Texas laws and regulations, unless superseded by Federal law, regarding appeals and expedited appeals by providers and shall respond within the timeframes required by such laws and regulations.

Company and Plan Sponsor authorizations for Hospital services shall be honored as described in this Section 4.1.4.

4.2     Coordination of Benefits.
        Hospital shall use best efforts to retain in its records updated information for a Member concerning other health benefit Plan coverage and to provide the information to Company on the form described by applicable law or regulation, and if a form is not described by applicable law or regulation, in the manner specified by Company. Except as otherwise required under applicable Federal, or state law or regulation or a Plan or Product, (a) when Company and Hospital agree that Company or a Plan Sponsor, as the case may be, is the primary payor under applicable coordination of benefit principles, Company or the Plan Sponsor agrees to pay in accordance with this Agreement, and (b) when Company or a Plan Sponsor is secondary under these principles, and payment from the primary payor is less than the compensation payable under this Agreement without coordination of benefits, then Company or Plan Sponsor will pay Hospital as specified in the applicable Plan or Product. In the event Explanation of Payments for a Plan indicates limits which are less than the reimbursement amounts in this Agreement, Hospital may bill or charge Member for the applicable Copayments, Coinsurance, and/or Deductibles up to the reimbursement rates outlined in this Agreement.

4.3     Member Billing.

4.3.1   Permitted Billing of Members.   Under certain Plans, Members may be required to pay Copayments, Coinsurance or Deductibles for certain Covered Services. Hospital may collect any applicable Copayments, Coinsurance, and Deductibles from Members at the time of service and agrees not to waive any such Member's financial responsibilities, applicable law or regulation. Such amounts collected must be based only on the compensation herein. Additionally, Hospital agrees to refund any overpayment amounts from the collection of such Copayments, Coinsurance or Deductibles to Members within thirty (30) days after receipt of correct documentation from Company.

        Except for applicable Copayments, Coinsurance and Deductibles, Hospital may bill Members only in the circumstances described below:

If the Member is not a Member of a Full Risk HMO based-Plan, Hospital may bill the Member for Hospital Services provided to the Member in the event that the Plan Sponsor becomes insolvent or otherwise breaches the terms and conditions of its agreement to pay Hospital, provided that, Hospital shall have first exhausted all reasonable efforts to obtain payment from the Plan Sponsor.

Subject to Company's rules, policies and procedures, relevant sections of this Agreement, services that are not Covered Services may be billed to Members by Hospital only if: (a) the Member's Plan provides and/or Company, or the applicable Plan Sponsor, confirms that the services are not covered; (b) the Member was advised in writing prior to the services being rendered that the specific services are not Covered Services; and (c) the Member agreed in writing to pay for such services.

Nothing in this section is intended to prohibit or restrict Hospital from billing individuals who were not Members at the time that services were rendered.

4.3.2    Holding Members Harmless.  As it relates to Full Risk HMO based Plans or Products, Hospital hereby agrees that in no event, including but not limited to, non-payment by the Company, insolvency of Company HMO Plans and Products or breach of this Agreement, shall Hospital bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against Members or persons acting on their behalf (other than Company HMO Plans and Products). This provision shall not prohibit collection of Copayments, Coinsurance, Deductibles or other supplemental charges made in accordance with the terms of the applicable Plan or Product. This provision shall apply only to Members enrolled in a Full Risk HMO Product or Plan and shall not apply to any self-funded or self-administered Products or Plans.

Hospital further agrees that: (a) this provision shall survive the termination of this Agreement regardless of the cause giving rise to termination and shall be construed for the benefit of Members; and (b) this provision supersedes any oral or written contrary agreement now existing or hereafter entered into between Hospital and Members or persons acting on their behalf.

Any modifications, additions, deletions to the provisions of this clause shall become effective on a date no earlier than fifteen (15) days after the Commissioner of Insurance has received written notice of such proposed changes.

Claims Administration.  Hospital will designate points of contact for each Hospital Business Office, and Company will designate a specific Claims Department point of contact for each Business Office to coordinate the resolution of billing, claims payment and other Customer Service questions/issues (to be known as single point of contact, "SPOC").

Joint Operating Committee (JOC).  Company and Hospital will establish a small group meeting (3 representatives each) with individuals representing key functional areas to review contract performance and to identify goals and steps to address each goal.  This group will be empowered to make decisions and set direction in the management of the Company/Hospital relationship.

## 5.0    COMPLIANCE WITH POLICIES

5.1    Policies.
Hospital agrees to use best efforts to accept and comply with Policies (e.g., Coverage Policy Bulletins or other Policies made available to Participating Providers generally, including, but not limited to those set forth in Section 4.1.3).  Except when a Member requires Emergency Services, Hospital agrees to use best efforts to comply with any applicable precertification, and/or referral requirements under the Member's Plan or Product prior to the provision of Hospital Services.  Hospital agrees to notify Company as soon as is reasonable, but in no event later than the next Working Day of all emergency admissions or direct inpatient admissions of Members, to verify that Member's physician has obtained advance authorization from Company prior to any non-emergency admission, and to use best efforts to comply with Section 4.1.3 for all emergency admissions.  Hospital agrees to notify Company of all services for which Company requires notice, upon admission or prior to the provision of such services.  For the purpose of pre-admission testing, Hospital agrees to directly provide testing or accept test results and examinations performed outside Hospital provided such tests and examinations are: (a) performed by a state licensed laboratory for laboratory tests, and a licensed physician

for such other tests and examinations; and (b) performed within a time reasonably proximate to the admission. Company may at any time modify Policies. For those Members who require services under a Specialty Program, Hospital agrees to work with Company in transferring the Member's care to a Specialty Program Provider, as the case may be. Company will provide ninety (90) days prior notice by U.S. certified letter of Material Changes to Company's Policies.

Unless otherwise specified in this Agreement. Hospital agrees that noncompliance with any requirements of this Section 5.1 or any Policies may relieve Company or Plan Sponsors and Members from any financial liability for the applicable portion of the Hospital Services. In extraordinary circumstances, Hospital may appeal any denied claim related to this Section by referring to the Joint Operating Committee. The Joint Operating Committee may provide an administrative waiver related to the noncompliance of this section, provided that the services are medically necessary Covered Services, and not owe prompt pay penalties by granting an exception. If needed, the Joint Operating Committee may refer to Dispute Resolution and/or Mediation as outlined in Section 8.2 of this Agreement.

5.2     Notices and Reporting.
        To the extent neither prohibited by law nor violative of applicable privilege, Hospital agrees to provide notice to Company, and shall provide all information reasonably requested by Company regarding the nature, circumstances, and disposition, of: (a) any action taken by Hospital adversely affecting medical staff membership of Participating Physicians and other Participating Providers, whether or not such actions are reportable to the National Practitioner Data Base ("NPDB") or the Healthcare Integrity and Protection Data Bank ("HIPDB"); (b) any litigation brought against Hospital or any of its employees, medical staff members or affiliated providers which is related to the provision of health care services and could have a material impact on the Hospital Services provided to Members; (c) any investigation initiated by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO") or any government agency or program against or involving Hospital or any of its employees, medical staff members or affiliated providers that does or could adversely affect Hospital's JCAHO accreditation status, licensure, or certification to participate in the Medicare or Medicaid programs; (d) any change in the ownership or management of Hospital; and (e) any material change in services provided by Hospital or licensure status related to these services, including without limitation a significant decrease in medical staff or the closure of a service unit or material decrease in beds or emergency services departments, Hospital agrees to use best efforts to provide Company with prior notice of, and in any event will provide notice as soon as reasonably practicable notice of, any actions taken by Hospital described in this Section 5.2.

5.3     Information and Records.

        5.3.1   A. Maintenance of Information and Records. Hospital agrees (a) to maintain Information and Records (as such terms are defined in Section 5.3.2) in a current, detailed, organized and comprehensive manner and in accordance with customary medical practice, applicable Federal and state laws, and accreditation standards; (b) that all Member medical records and Confidential Information shall be treated as confidential and in accordance with applicable laws; (c) to maintain such Information and Records for the longer of six (6) years after the last date Hospital Services were provided to Member, or the period required by applicable law. This Section 5.3.1 shall survive the termination of this Agreement, regardless of the cause of the termination.

                B. Hospital Comparison Information

                    This Section 5.3.1.B applies and binds the parties only if Company, or Plan Sponsor or its designee, includes Hospital-identifiable quality and cost data on Company's website, which includes Company's Aetna Navigator™ website, or Plan Sponsor's or it's designee' website.

                    Company will provide additional information to Hospital regarding the types and methods of the data provided in the marketing/selling of the Company products in Texas as information

becomes available to Company. The information will be available on Company's Aetna Navigator™ website.

**Quality Data**

<u>i. Data Source</u>

The quality information that Company will display on the Aetna Navigator website will be obtained from the public domain. The specific sources of the quality data are: Leapfrog information, Medicare and state sources. The Texas data is derived from the data provided by Texas hospitals to these three entities via Texas Health Care Information Council (THCIC). Company will indicate the source of the data on the Aetna Navigator website. If insufficient information is provided to these sources, Company will indicate accordingly (e.g., Not Available).

<u>ii. Specific Data Elements</u>

The quality information will consist of the top procedures in the marketplace. Each of these procedures will have four outcome components (i.e., patient volume, average length of stay, mortality, and unfavorable events). While there will be general statements regarding the components, there will not be specific recommendations regarding any specific hospital. For example, "hospitals with higher patient volume would be expected to have higher quality outcomes".

Example - When a Member accesses the Aetna Navigator™ website, the Member will select a procedure or diagnosis as well as a geographic area for the search. The Member will also select the importance of the four components (outlined above in Specific Data Elements). Based on the Member's preferences, the hospital comparison report is produced. If a Member runs the same report, but changes the importance level on the components, the Member would receive a different report.

The Texas hospital comparison information is quality driven and based on public hospital data from THCIC. Additionally, the information is presented based on the outcome components that are important to the individual Member.

<u>iii. Cost Data</u>

Additionally, Company's Aetna Navigator™ website does not contain hospital cost information or cost comparisons as of the Effective Date of this Agreement.

<u>iv. Plan Sponsor or their designee</u>

As of the Effective Date of this Agreement, Plan Sponsor or their designee websites do not contain hospital quality data, hospital cost information or cost comparisons.

<u>v. Changes</u>

Company and Plan Sponsors or their designee agree to provide thirty (30) days prior written notice of changes to the process or website outlined in this Section or to any additional elements, including cost, shown on Company's Aetna Navigator website or Plan Sponsor or their designee. Company, Plan Sponsor or their designee, and Hospital agree to work in good faith to address the changes. If Company, Plan Sponsor or their designee, and Hospital agree on the process change, website or additional elements, Company, Plan Sponsor or their designee and Hospital shall mutually agree in writing. If Company, Plan Sponsor or their designee, and Hospital do not agree on the process change, website or additional elements, Company and Plan Sponsor or their designee agree to accept Hospital's written request to

leave Hospital's information blank on Company's Aetna Navigator website and Plan Sponsor or designee, unless such changes are required by law or regulations.

5.3.2 <u>Access to Information and Records</u>. Hospital agrees that (a) Company and Plan Sponsors shall have access to all medical and billing records obtained, created or collected by Hospital related to Members and necessary for the evaluation of and payment of claims ("Information"); (b) in accordance with applicable federal and state laws, Company, Plan Sponsors and federal, state, and local governmental authorities having jurisdiction, upon request, shall have access to medical and billing records relating to this Agreement and to those services rendered by Hospital to Members ("Records"); (c) consistent with the consents and authorizations required by Section 2.6 hereof, Company or its agents or designees shall have access to medical records for the purpose of assessing quality of care, conducting medical evaluations and audits, and performing utilization management functions; As required by Texas law, Company and Plan Sponsors conducts quality assessment through a panel of at least three (3) Participating Physicians; (d) applicable federal and state authorities and their agents shall have access to medical records for assessing the quality of care or investigating Member grievances or complaints; and (e) Members shall have access to their health information as required by 45 C.F.R. § 164.524 and applicable state law, be provided with an accounting of disclosures of information when and as required by 45 C.F.R. § 164.528 and applicable state law, and have the opportunity to amend or correct the information as required by 45 C.F.R. § 164.526 and applicable state law. Hospital agrees to supply copies of Information and Records within fourteen (14) days of the receipt of a request, where practicable, and in no event later than the date required by any applicable law or regulatory authority. Company and Plan Sponsor agree to reimburse Hospital for all reasonable copy and shipping charges, including labor costs, that Hospital incurs to furnish the information that Company and Plan Sponsor request. The copying cost for such requested information shall be at the current fees authorized by and promulgated under Section 241.154 (b-e) or its successor of the Texas Health and Safety Code by the Texas Department of Health. This Section 5.3.2 shall survive the termination of this Agreement, regardless of the cause of termination.

5.3.3 <u>Government Access to Records</u>. Until the expiration of four (4) years after the furnishing of services under this Agreement, Hospital agrees to make available upon request by the Secretary of the U.S. Department of Health and Human Services, the U.S. Comptroller General, and their duly authorized representatives, this Agreement and all other books, documents and records that are necessary to certify the nature and extent of costs incurred by Hospital in furnishing services under this Agreement for a government program. If Hospital carries out any of its duties through a subcontract with a value or cost of ten thousand dollars ($10,000) or more over a twelve (12) month period, with a related organization, this subcontract shall contain a clause permitting access to the subcontractor's contract, books, documents and records to the parties listed above until the expiration of four (4) years after the furnishing of services pursuant to the subcontract.

5.4 <u>Accreditation and Review Activities</u>.
Hospital agrees to cooperate with any review of Company or a Plan or Product conducted by the National Committee for Quality Assurance ("NCQA") or a state or federal agency with authority over Company and/or the Plan, as applicable.

5.5 <u>Proprietary Information</u>.

5.5.1 <u>Rights and Responsibilities</u>. Each Party agrees that the Proprietary Information of the other Party is the exclusive property of such Party and that each Party has no right, title or interest in the Proprietary Information. Each Party agrees to keep the Proprietary Information and this Agreement strictly confidential and agrees not to disclose any Proprietary Information or the contents of this Agreement to any third party, except to governmental authorities having jurisdiction and, in the case of Company's disclosure, to Members, Plan Sponsors, consultants and vendors under contract with Company, or as otherwise directed by the other Party. Except as otherwise required under applicable federal or state law, each Party agrees to not use any Proprietary Information of the other Party, and at the request of the other Party to this Agreement, return any Proprietary Information upon termination

of this Agreement for whatever reason. This Section 5.5.1 shall survive the termination of this Agreement for one (1) year, regardless of the cause of termination.

5.5.2 Certain Exceptions. Notwithstanding Section 5.5.1 Hospital through its staff, shall have the right and is encouraged to discuss with its patients pertinent details regarding the diagnosis of the patient's condition, the nature and purpose of any recommended procedure, the potential risks and benefits of any recommended treatment, and any reasonable alternatives to this treatment. In addition, Hospital is encouraged to discuss Company's provider reimbursement methodology with Hospital's patients, including descriptions of the methodology under which Hospital is reimbursed (but expressly excluding the specific rates paid hereunder, due to their competitively sensitive nature). Hospital's obligations under this Agreement not to disclose Proprietary Information does not apply to any disclosures to a patient determined by Hospital to be necessary or appropriate for the diagnosis and care of a patient, except to the extent such disclosure would otherwise violate Hospital's legal or ethical obligations.


## 6.0    TERM AND TERMINATION

Prior to termination initiated by Company and in accordance with applicable State law, Company shall provide a written explanation of the reason(s) for termination, and upon request before the effective date, Hospital shall be entitled to a review by an advisory panel.

6.1    Term.
This Agreement shall be effective for a term ("Term") of three (_3_) years and four (4) months from the Effective Date, and thereafter shall automatically terminate on December 31, 2008, unless previously terminated in accordance with this Article 6.0.

6.2    Termination for Special Cause.
Pursuant to this Section 6.2, either Party may terminate this Agreement for special cause during the Term of this Agreement only as outlined below:

6.2.1  Company and Hospital have mutually addressed the introduction of new Affiliates in Section 9.6, and new Products, Plans and Specialty Programs in Section 2.5. Company or Hospital may terminate this Agreement for special cause only under the circumstances outlined in Sections 2.5 and 9.6.

6.2.2  If Company introduces a new Company Policy or similar new Company network initiative not contemplated in Sections 9.6 or 2.5, Hospital may provide Company within thirty (30) days of the later of Company's introduction or of Hospital's learning of the introduction of the new Policy or network initiative, any documentation that the Policy or network initiative will have a demonstrable, adverse, material financial or administrative impact on Hospital. Upon receipt of such information, Company agrees to negotiate in good faith an amendment to this Agreement specific to the new Policy or network initiative. Should Company and Hospital not be able to reach mutually agreeable terms related to the new Policy or network initiative within twenty five (25) days of Company's receipt of the information from Hospital, either Party shall have the option of terminating this Agreement with one hundred and eighty (180) days of written notice. Either Party shall have no more than thirty (30) days following Company's receipt of the information and subsequent negotiations to send the one hundred and eighty (180) days termination notice.

6.3    Termination for Breach.
This Agreement may be terminated at any time by either Party upon at least sixty (60) days prior written notice of such termination to the other Party upon material default or substantial breach by the other Party of one or more of its obligations under this Agreement, unless such material default or substantial breach is

cured within sixty (60) days of the notice of termination. Notwithstanding the foregoing, the effective date of termination may be extended pursuant to Section 6.6 of this Agreement.

6.4  Immediate Termination or Suspension.
Any of the following events shall result in the immediate termination or suspension of this Agreement by Company, upon notice to Hospital, at Company's discretion at any time: (a) the withdrawal, expiration or non-renewal of any federal, state or local license, certificate, approval or authorization of Hospital; (b) the bankruptcy or receivership of Hospital, or an assignment by Hospital for the benefit of creditors; (c) the loss or material limitation of Hospital's insurance under Section 2.4 of this Agreement; (d) a determination by Company that Hospital's continued participation in provider networks could result in harm to Members; (e) the debarment or suspension of Hospital from participation in any government sponsored program, including, but not limited to, Medicare or Medicaid; (f) the indictment or conviction of Hospital for any crime; (g) the revocation or suspension of Hospital's accreditation by JCAHO or the Bureau of Hospitals of the American Osteopathic Association; (h) the listing of Hospital in the HIPDB; or (i) notwithstanding Section 9.15, 9.16, 9.17, and 9.18, change of control of Hospital to an entity not acceptable to Company. To protect the interests of patients, including Members, Hospital will provide immediate notice to Company of any of the events described in this Section 6.4, including notification of impending bankruptcy.

Any of the following events shall result in the immediate termination or suspension of this Agreement by Hospital, upon notice to Company, at Hospital's discretion at any time: (a) the withdrawal, expiration or non-renewal of any federal, state or local license of Company which is required for Company to perform its obligations hereunder; however where such voluntary withdrawal, voluntary expiration or voluntary non-renewal is limited to specific products, in lieu of termination of this Agreement, Hospital may only amend the Product Participation Schedule attached hereto to remove the affected products; (b) the bankruptcy or receivership of Company, or an assignment by Company for the benefit of creditors; (c) the conviction of Company for any felony if such conviction directly impairs Company's ability to perform its obligations hereunder. Company shall provide immediate notice to Hospital of any of the aforementioned events.

6.5  Obligations Following Termination.
Following the effective date of any expiration or termination of this Agreement or any Plan or Product, Hospital and Company will cooperate as provided in this Section 6.5. This Section 6.5 shall survive the termination of this Agreement, regardless of the cause of termination.

6.5.1  Upon Termination. Upon expiration or termination of this Agreement for any reason, other than termination by Company in accordance with Section 6.4 above, Hospital agrees to provide Hospital Services at Company's discretion to: (a) any Member who is an inpatient at Hospital as of the effective date of termination until such Member's discharge or Company's orderly transition of such Member's care to another provider; and (b) any Member, upon request of such Member or the applicable Plan Sponsor, until the anniversary date of such Member's respective Plan or (c) for ninety (90) days, whichever is less.

Company, or the applicable Plan Sponsor, shall reimburse Hospital for Covered Services to any Member of special circumstance, such as a person who has a disability, acute condition, or life-threatening illness or is past the twenty-fourth week of pregnancy. "Special circumstances" means a condition such that Hospital reasonably believes that discontinuing care by the Hospital could cause harm to the patient. The special circumstance shall be identified by the Hospital, who must request that the Member be permitted to continue treatment under the Hospital's care and agree not to seek payment from the patient of any amounts for which the Member would not be responsible if the Hospital were still a Participating Hospital. This subsection does not extend the obligation of Company or applicable Plan Sponsor to reimburse the terminated Hospital for ongoing treatment of a Member beyond the 90th day after the effective date of termination, or beyond nine months in the case of an Member who at the time of the termination has been diagnosed with a terminal illness, except that the obligation to reimburse a Member who at the time of the termination is past the 24th week of pregnancy, extends through delivery of the child, immediate postpartum care, and the follow-up checkup within the first six weeks of delivery.

The terms of this Agreement, including the Services and Compensation Schedule, shall apply to all services under this Section 6.5.1.

6.5.2 <u>Upon Insolvency or Cessation of Operations</u>. If this Agreement terminates as a result of insolvency or cessation of operations of Company, and as to Members of HMOs that become insolvent or cease operations, then in addition to other obligations set forth in this Section 6.5, Hospital shall continue to provide Hospital Services to: (a) all Members for the period for which premium has been paid; and (b) Members confined as inpatients in Hospital on the date of insolvency or other cessation of operations until medically appropriate discharge. This provision shall be construed to be for the benefit of Members. No modification of this provision shall be effective without the prior written approval of the applicable regulatory agencies..

6.5.3 <u>Obligation to Cooperate</u>. Upon notice of expiration or termination of this Agreement or of a Plan or Product, Hospital shall cooperate with Company and comply with Policies, if any, in the transfer of Members to other providers. Upon notice of termination of this Agreement or of a Plan or Product, Hospital, upon the direction of Company and in accordance with applicable state law, shall provide reasonable advance notice of the impending termination to Members currently under the treatment of Hospital.

6.6 <u>Obligations During Dispute Resolution Proceedings</u>.
In the event of any dispute between the Parties in which a Party has provided notice of termination under Section 6.3 and the dispute is required to be resolved or is submitted for resolution under Article 8.0 below, the termination of this Agreement shall be stayed and the Parties shall continue to perform under the terms of this Agreement until the final resolution of the dispute.

## 7.0   RELATIONSHIP OF THE PARTIES

7.1 <u>Independent Contractor Status</u>.
The relationship between Company and Hospital, as well as their respective employees and other agents, is that of independent contractors, and neither shall be considered an agent or representative of the other Party for any purpose, nor shall either hold itself out to be an agent or representative of the other for any purpose. Company and Hospital will each be solely liable for its own activities and those of its employees and other agents, and neither Company nor Hospital will be liable in any way for the activities of the other Party or the other Party's employees or other agents arising out of or in connection with: (a) any failure to perform any of the agreements, terms, covenants or conditions of this Agreement; (b) any negligent act or omission or other misconduct; (c) the failure to comply with any applicable laws, rules or regulations; or (d) any accident, injury or damage. Hospital acknowledges that all Member care and related decisions are the responsibility of Hospital and its medical staff, and that Policies do not dictate or control Hospital's clinical decisions with respect to the care of Members. In particular, medical necessity decisions are for compensation purposes only, and do not direct or limit the advice or care which Hospital can or should provide in Hospital's sole medical judgment. Hospital agrees to indemnify and hold harmless the Company from any and all claims, liabilities and third party causes of action arising out of the Hospital's provision of care to Members. Notwithstanding anything else in this section or this Agreement to the contrary, nothing shall require Hospital to indemnify and hold harmless Company (including for costs and counsel fees) from any and all claims, liabilities and third party causes of action arising out of the Company's administration of Plans or Products. This provision shall survive the expiration or termination of this Agreement, regardless of the cause giving rise to termination.

7.2 <u>Use of Name</u>.
Hospital consents to the use of Hospital's name, address, telephone number and services offered in provider directories and in other materials and marketing literature of Company in all formats, including, but not limited to, electronic media. All other Hospital identifying and description material shall require Hospital's

prior written consent. Hospital may use Company's names, logos, trademarks or service marks in marketing materials or otherwise, upon receipt of Company's prior written consent, which Company shall not unreasonably withhold.

7.3    Interference with Contractual Relations.
Hospital shall not engage in activities that will cause Company to lose existing or potential Members, including but not limited to: (a) advising Company customers, Plan Sponsors or other entities currently under contract with Company to cancel, or not renew said contracts; (b) impeding or otherwise interfering with negotiations which Company is conducting for the provision of health benefits or Plans or Products; or (c) using or disclosing to any third party membership lists acquired during the term of this Agreement for the purpose of soliciting individuals who were or are Members or otherwise to compete with Company. Nothing in this Section 7.3 is intended or shall be deemed to restrict (i) any communication between Hospital and a Member, or a party designated by a Member, determined by Hospital to be necessary or appropriate for the diagnosis and care of the Member and otherwise in accordance with Section 5.5.2; or (ii) notification of participation status with other HMOs or insurers.  This Section shall continue to be in effect for a period of one (1) year after the expiration or termination of this Agreement. In the event of notice of termination, both Parties agree that any public advertising, provider communications, employer communications, other than those which simply state the facts of termination and provide other health Plan or Product options will require prior written consent from the other Party for the period beginning on the date of the termination notice and for a period of twelve (12) months following the termination effective date.

## 8.0    DISPUTE RESOLUTION

8.1    Member Grievance Dispute Resolution.
Hospital agrees to (a) cooperate with and participate in Company's applicable appeal, grievance and external review procedures (including, but not limited to, medical necessity appeals and expedited appeals procedures) for Members,  (b) provide Company with the information necessary to resolve same, and  (c) abide by decisions of the applicable appeals, grievance and review committees. As required by State law, Hospital shall post a notice to Members on the process for resolving complaints with Company including the Department of Insurance toll-free telephone number for filing complaints.  Company shall not terminate or refuse to renew this Agreement or otherwise retaliate against Hospital because Hospital reasonably filed a complaint or an appeal on behalf of a Member.

8.2    Provider Grievance Dispute Resolution.
Company shall provide an internal mechanism under which Hospital may raise issues, concerns, controversies or claims regarding the obligations of the Parties under this Agreement. Hospital shall exhaust this internal mechanism for any contractual disputes prior to instituting any other permitted legal proceeding. Discussions and negotiations held pursuant to this Section 8.2 shall be treated as inadmissible compromise and settlement negotiations for purposes of applicable rules of evidence.

If any dispute or claim arising out of or relating to this Agreement, a breach of this Agreement or the services provided under this Agreement cannot be settled through negotiation, the Parties may at their option agree first to try in good faith to settle the matter by mediation before resorting to remedies available under law. Cost of mediation will be borne equally by both Parties.

8.3    The arbitration provision and definitions as referenced in Section 1.0 do not apply in this Agreement

8.4    Dispute Resolution Solely Between Parties;  No Consolidation or Class Action.
Any proceeding related to a dispute arising under this Agreement shall be conducted solely between them. Neither Party shall request, nor consent to any request, that the dispute be joined or consolidated for any

purpose, including without limitation any class action or similar procedural device, with any other proceeding between such Party and any third party.

## 9.0 MISCELLANEOUS

9.1 Amendments.
This Agreement constitutes the entire understanding of the Parties and no changes, amendments or alterations shall be effective unless signed and agreed to by duly authorized representatives of both Parties. Notwithstanding the foregoing, at Company's discretion, Company may amend this Agreement upon written notice, by U.S. certified letter to Hospital to comply with applicable law or regulation, or any order or directive of any governmental agency.

9.2 Waiver.
The waiver by either Party of a breach or violation of any provision of this Agreement shall not operate as or be construed to be a waiver of any subsequent breach of this Agreement. To be effective, all of these waivers must be in writing and signed by an authorized officer of the Party to be charged. Hospital waives any claims or cause of action for fraud in the inducement or execution related to these waivers.

9.3 Governing Law.
Unless otherwise provided for, this Agreement shall be governed in all respects by the laws of the State of Texas which exist not only at the time of this Agreement, but also includes any recodification and amendments to existing law as well as the future enactment of any new statutes and regulations by the State of Texas. The effective date of any recodification, and amendments to existing law as well as the future enactment of any new statutes and regulations by the State of Texas is the date stated by the Legislature, unless the Legislature specifies that the effective date of any such change in law or regulation to be the renewal date of this Agreement.

9.4 Liability.
Notwithstanding Section 9.3, either Party's liability, if any, for damages to the other Party for any cause whatsoever arising out of or related to this Agreement, and regardless of the form of the action, shall be limited to the damaged Party's actual damages. Neither Party shall be liable for any indirect, incidental, punitive, exemplary, special or consequential damages of any kind whatsoever sustained as a result of a breach of this Agreement or any action, inaction, alleged tortious conduct, or delay by the other Party.

9.5 Severability.
Any determination that any provision of this Agreement or any application thereof is invalid, illegal or unenforceable in any respect in any instance shall not affect the validity, legality and enforceability of such provision in any other instance, or the validity, legality or enforceability of any other provision of this Agreement. Neither Party shall assert or claim that this Agreement or any provision hereof is void or voidable if such Party performs under this Agreement without prompt and timely written objection.

9.6 Successors; Assignment.
Except as outlined in Section 9.15 through 9.19, this Agreement relates solely to the provision of Hospital Services by Hospital and does not apply to any other organization which succeeds to Hospital assets, by merger, acquisition or otherwise, or is an affiliate of Hospital. Neither Party may assign its rights or delegate its duties and obligations under this Agreement without the prior written consent of the other Party, which consent may not be unreasonably withheld. Company will provide Hospital with written notice of Company's intent to assign this Agreement as listed in the Aetna Affiliate Listing to an Affiliate of Company that was not an Affiliate as of the Effective Date of this Agreement or a successor in interest thereto. In the event Hospital can substantiate that Company's assignment will result in a material, adverse financial impact to Hospital, Hospital shall have thirty (30) days from the receipt of such notice to provide written documentation to that effective. Upon receipt of such notice, Company agrees to negotiate rates and terms specific to such New Affiliate or New Affiliate product prior to the assignment date.

TX\Hosp Serv Agreement (10-04)         Page 27 of 32         Printed: 09/14/05
00144627         V.3.0.11.04
DHSA0050

Should Company and Hospital not be able to reach mutually agreeable terms related to such New Affiliate within thirty (30) days of receipt of such information from Hospital, either Party may terminate this Agreement with one hundred eighty (180) days written notice regardless of anything contrary provided for under Section 6 of this Agreement.

9.7     Headings.
The headings contained in this Agreement are included for purposes of convenience only, and shall not affect in any way the meaning or interpretation of any of the terms or provisions of this Agreement.

9.8     Notices.
All notices given shall be effective only if given in writing and sent by overnight delivery service with proof of receipt, or by United States certified mail return receipt requested, to the addresses listed below.

To Hospital at:

Senior Vice President, Managed Care
Texas Health Resources
611 Ryan Plaza Drive, Suite 1100
Arlington, TX 76011


And to Company at:

Aetna Health Inc.                                   Aetna Health Inc.
Provider Contract Management                        Provider Contract Management
Network Operations – S.W. Region                    Network Operations – S.W. Region
Post Office Box 569440                              2777 Stemmons Freeway, #300
Dallas, TX 75356-9440                               Dallas, TX 75207

A Party may add, change or delete its addresses for notice by U.S. certified letter, and may change its address for notice by delivery and United States mail, by notice in conformity with this section 9.8.

9.9     Remedies.
Notwithstanding Sections 8.3 and 9.3, the Parties agree that each has the right to seek any and all remedies at law or equity in the event of breach or threatened breach of Section(s) 5.5, 6.6 and 7.3.

9.10    Non-Exclusivity.
This Agreement is not exclusive, and nothing herein shall preclude either Party from contracting with any other person or entity for any purpose. Company makes no representation or guarantee as to the number of Members who may select or be assigned to Hospital.

9.11    Force Majeure.
If either Party shall be delayed or interrupted in the performance or completion of its obligations hereunder by any act, neglect or default of the other Party, or by an embargo, war, act of terror, riot, incendiary, fire, flood, earthquake, epidemic or other calamity, or other act of God or of the public enemy, governmental act (including, but not restricted to, any government priority, preference, requisition, allocation, interference, restraint or seizure, or the necessity of complying with any governmental order, directive, ruling or request) then the time of completion specified herein shall be extended for a period equivalent to the time lost as a result thereof. This Section 9.10 shall not apply to either Party's obligations to pay any amounts owing to the other Party, nor to any strike or labor dispute involving such Party or the other Party.

9.12  Survival.
In addition to those provisions which by their terms survive expiration or termination of this Agreement (e.g. 4.3.2 and 5.3.1), Sections 1.0, 5.3.2, 5.5, 6.5, 7.1, 7.3, 8.0 and 9.0 shall survive expiration or termination of this Agreement, regardless of the cause giving rise to expiration or termination of this Agreement.

9.13  Entire Agreement.
This Agreement, including the Product Participation Schedule, Participation Criteria Schedules, Services and Compensation Schedule, if applicable and any additional attached schedules, constitute the complete and sole contract between the Parties regarding the subject matter described above and supersedes any and all prior or contemporaneous oral or written representations, communications, proposals or agreements not expressly included in this Agreement and may not be contradicted or varied by evidence of prior, contemporaneous or subsequent oral representations, communications, proposals, agreements, prior course of dealings or discussions of the Parties.  There are no oral agreements between the Parties.  Hospital represents that Hospital has not relied on any data, financial analysis, reports, notes, proposals, conclusions or projections, whether made orally or in writing, made by Company or any of its representatives, agents, employees or advisors, in connection with negotiation, acceptance, execution or delivery of the Agreement by Hospital.
The hierarchy of which document shall supercede any conflicts shall be:
Product Participation Schedule
Services and Compensation Schedule
Agreement
Company Policies and Programs

9.14  Delegation.
To the extent Company delegates certain functions to Hospital, such delegation shall be governed by a separate delegation agreement which shall be subject to the applicable requirements of Texas Insurance Code, Article 20A.18C.

Company agrees that it will not delegate any of its claim payment responsibilities, except Aetna Signature Administrators, under this Agreement to any physician organization or any third party administrator utilized by any such physician organization without the prior written approval of Hospital.  Related to any physician organization or any third party administrator utilized by any such physician organization, Company agrees that Hospital shall have access to or provide notification of any such utilization management, precertification, and pre-authorization information solely through Company and its utilization management and/or review numbers and contacts and, as such, Company agrees that Hospital shall never be required to adhere to any utilization management policies and procedures other than Company's. Company further agrees that concurrent review will be provided by Company or Company's designated representative and not by a physician organization or any third party administrator utilized by any such physician organization.

9.15  THR Joint Ventures and Management Agreements –



REDACTED

9.1'

9.16    THR Joint Ventures With Buy-Down Provisions.

REDACTED

9.17    Presbyterian Hospital of Denton.

9.18    Messenger Model. Company understands that Hospital may from time to time act as a "Messenger" for other facilities pursuant to formal contracting relationships. Company has the ability to accept or decline the addition of these facilities to this Agreement. Company and Plan Sponsors will reimburse new facilities covered by this Section 9.18 for Hospital Services at seventy percent (70%) of the THR hospital rates on the Services and Compensation Schedule, so long as THR is acting as a "Messenger" for the facility.

9.19 <u>New Facilities</u>. Any entity which is wholly owned by Hospital in the future, shall be added to this Agreement thirty (30) days following written notification by the Hospital to Company. Such entity must meet Company's credentialing requirements.

**IN WITNESS WHEREOF**, the undersigned parties have executed this Agreement by their duly authorized officers, intending to be legally bound hereby.

**HOSPITAL**
**Texas Health Resources**

By:_____

Printed Name:_Douglas D. Hawthorne, FACHE

Title: President and CEO

Date:_____

**COMPANY**

By:_____

Printed Name:_____

Title:_____

Date:_____

**HOSPITAL**
**Texas Health Resources**

By:_____

Printed Name:_Stanley G. Dennis

Title: Senior Vice President, Managed Care

Date:_____

REIMBURSEMENT ADDRESS:

_____

_____

_____

MAIN TELEPHONE NUMBER:_____

CHIEF EXECUTIVE OFFICER:_____

CHIEF FINANCIAL OFFICER:_____

BUSINESS OFFICE MANAGER:_____

FEDERAL TAX I.D. NUMBER:_____

TX\Hosp Serv Agreement (10-04)
00144627
DHSA0050

Page 31 of 32

Printed: 09/14/05
V.3.0.11.04

TX\Hosp Serv Agreement (10-04)
00144627
DHSA0050

Page 32 of 32

Printed: 09/14/05
V.3.0.11.04

## AMENDMENT

This Amendment (the "Amendment") is made as of October 15, 2011 (the "Effective Date"), between Aetna Health Inc., a Texas corporation, on behalf of itself and its Affiliates (hereinafter referred to as "Company") and Texas Health Resources THR (hereinafter referred to as "Provider").

**WHEREAS,** Company and Provider have entered into a Hospital Services Agreement ("Agreement") to provide health care services to members enrolled in Plans issued or administered by Company; and

**WHEREAS,** Company and Hospital have successfully re-negotiated the compensation terms payable under the Agreement; and

**WHEREAS,** the Parties wish to provide for continuity of participation by revising the Term of the Agreement; and

**WHEREAS,** the Parties wish to amend the Agreement to include provisions for Aetna Steerage Programs, Present on Admission (POA), Experimental Denials and Credit Card Payments; and

**WHEREAS,** Company and Hospital agree to work in good faith to establish a Pay for Performance (P4P) program; and

**WHEREAS,** Company and Hospital have successfully re-negotiated terms in the Hospital Services Agreement; and

**WHEREAS,** the Parties to the Agreement wish to amend the Agreement as of the Effective Date as provided herein.

**NOW, THEREFORE,** in consideration of the mutual promises and undertakings contained herein, the parties agree to be legally bound as follows:

1.  The Services and Compensation Schedules of the Agreement are hereby deleted and replaced by the Services and Compensation Schedules attached hereto and made a part hereof.
    - Diagnostic Radiology and Imaging Services Compensation Schedule - Southwest Diagnostic Center for Molecular Imaging
    - Diagnostic Radiology and Imaging Services Compensation Schedule - Southwest Diagnostic Imaging Center and Health Imaging Partners
    - Long Term Acute Care Hospital Services Compensation Schedule – Texas Health Specialty Hospital
    - Home Health Care Service Compensation Schedule - Texas Health Presbyterian Home Care
    - THR Hospital(s) Services and Compensation Schedule (Wholly Owned-Behavioral Health Facilities)
    - THR Hospital(s) Services and Compensation Schedule (Wholly Owned-Non Behavioral Health Facilities)
    - THR Hospital(s) Services and Compensation Schedule (Joint Venture Facilities)

2.  The Service and Billing Location form attached to the Agreement shall be deleted and replaced in its entirety effective October 15, 2011 by the Service and Billing Location Form attached hereto to include the following addition: add Texas Institute for Surgery to the THR Hospital(s) Service and Compensation Schedule (Joint Venture Facilities).

3.  Section 2.5 is herby deleted and replaced with the following:
    2.5.1 Product Participation and Steerage

    During the term of this Agreement, Hospital agrees to participate in the Products and Plans and other health benefit products listed on the Product Participation Schedule attached hereto and made a part hereof. Company

reserves the right to introduce and designate Hospital's participation in new Plans, Specialty Programs and Products during the term of this Agreement and will provide Hospital with ninety (90) days prior written notice and description of such new Plans, Specialty Programs and Products and the associated compensation. To the extent Company introduces a new Specialty Program, Product or Plan not included under the Product Participation Schedule, including government sponsored healthcare exchange products or other products resulting from the passage of the PPACA legislation in 2010, Hospital must be given the option to participate in such Specialty Program, Product, Benefit Plan or Plan and Company shall provide Hospital with ninety (90) days advance written notice of such Specialty Program, Product or plan and the associated compensation. Hospital may, within thirty (30) days receipt of such notice, provide Company with any documentation that such Specialty Program, Plan or Product will have a demonstrable, material financial or administrative impact on this Agreement. Upon receipt of such information, Company agrees to negotiate in good faith an amendment to this Agreement specific to such new Specialty Program, Product or plan. Both Parties agree to use best efforts to reach an agreement for new Specialty Programs, Products or plans. Should Company and Hospital not be able to reach mutually agreeable terms related to such new Specialty Program, Product or plan within thirty (30) days of receipt of such information from Hospital and Company continues development or implementation of such Specialty Program, Product or plan, then Hospital may terminate this Agreement by providing Company with one hundred and eighty (180) days prior written notice. Hospital agrees that renaming a Plan, Specialty Program, or Product does not constitute the offering of a new Plan, Specialty Program, or Product provided that the change does not materially differ from the existing Plan, Product, or Specialty Program in design or administration requirements. Company will provide Hospital ninety (90) days prior written notice of Specialty Program, Product or Plan name changes. Hospital shall accept compensation in accordance with this Agreement for the provision of any Covered Services to Members under a Plan, Specialty Program or Product in which Hospital has agreed to participate in under this Agreement. Company agrees that it will not exclude Hospital from participation in a new Specialty Program, Product or Plan if (i) Hospital can provide services as required by such new Specialty Program, Product or Plan, (ii) Hospital meets any applicable criteria established by Company for such Specialty Program, Product or Plan, and (iii) Hospital agrees to accept all terms and conditions of such new Specialty Program, Product or Plan.

In addition, Company agrees that it shall not develop or implement a "Narrow Network" defined as any product, program or plan that excludes one or more of Hospital's facilities from the highest benefit coverage level under a Company Covered Member's benefit plan, If Company develops or implements a Narrow Hospital Network that excludes Hospital or places Hospital in a benefit level that is not the highest / most beneficial to the Covered Member, then Hospital may terminate this Agreement by providing Company with one hundred and eighty (180) days prior written notice and this Section is not subject to the dispute resolution provision.

2.5.2 Narrow Physician Network or Accountable Care Organization Model



**REDACTED**

2.5.3 Service Line Steerage

**REDACTED**

4.  Section 6.1 Term is hereby deleted and replaced with the following:

    6.1    <u>Term</u>. This Agreement shall be effective for an additional term ("Renewal Term") of sixty seven (67) months beginning on December 1, 2008 ("Renewal Date") and thereafter shall automatically terminate on June 30, 2014, unless previously terminated in accordance with this Article 6.0.

5.  The following section is added as Section 4.1.5 of the Agreement

    4.1.5    <u>Credit Card.</u>  Company shall not utilize a credit card intermediary (such as Visa, MasterCard or American Express) for payment to Hospital for Covered Services. In the event that Company attempts to pay Hospital using a credit card, Hospital shall not incur any type fee or administrative charge to receive payment from Company for Covered Services. If Hospital is charged a fee for any payment to Hospital by Electronic Funds Transfer (EFT) as a result of a credit card payment by Company, then Hospital shall deduct that fee from the amount paid to Hospital by Company which will result in an underpayment to

Hospital and such underpayment shall be subject to any prompt payment penalties as outlined in this Agreement.

6.    Section 4.3.1 is hereby deleted and replaced with the following:

4.3.1    **Permitted Billing of Members**.  Under certain Plans, Members may be required to pay Copayments, Coinsurance or Deductibles for certain Covered Services.  Hospital may collect any applicable Copayments, Coinsurance, and Deductibles from Members at the time of service and agrees not to waive any such Member's financial responsibilities, applicable law or regulation. Such amounts collected must be based only on the compensation herein.  Additionally, Hospital agrees to refund any overpayment amounts from the collection of such Copayments, Coinsurance or Deductibles to Members within thirty (30) days after receipt of correct documentation from Company.

Except for applicable Copayments, Coinsurance and Deductibles, Hospital may bill Members only in the circumstances described below:

1) If the Member is not a Member of a Full Risk HMO based-Plan, Hospital may bill the Member for Hospital Services provided to the Member in the event that the Plan Sponsor becomes insolvent or otherwise breaches the terms and conditions of its agreement to pay Hospital, provided that, Hospital shall have first exhausted all reasonable efforts to obtain payment from the Plan Sponsor.

2) Subject to Company's rules, policies and procedures, relevant sections of this Agreement, services that are not Covered Services may be billed to Members by Hospital only if: (a) the Member's Plan provides and/or Company, or the applicable Plan Sponsor, confirms that the services are not covered; and (b) the Member agreed in writing to pay for such services.

Nothing in this section is intended to prohibit or restrict Hospital from billing individuals who were not Members at the time that services were rendered.

7.    Pay for Performance Program:

**REDACTED**

8.    The following has been agreed to by the parties:

# REDACTED

9. All other terms and provisions of the Agreement not amended hereby shall remain in full force and effect. In the event of any inconsistency between the terms of this Amendment and the Agreement, the terms of this Amendment shall govern and control.

10. This Amendment may be signed in several counterparts, each of which will be deemed an original; however, all shall constitute one and the same Amendment.

**IN WITNESS WHEREOF**, this Amendment has been duly executed by the authorized representatives of Company and Provider as of the Effective Date.

Accepted By:

**PROVIDER**

By: _____
(Signature)

Printed Name:  Stanley G. Dennis

Title:  Chief Revenue Officer/SVP

Date:  9/30/11

By: _____
(Signature)

Printed Name:  Ron Long

Title:  EVP, Resource Development and Deployment/CFO

Date:  9/30/11

**COMPANY**     Aetna Health Inc., a Texas corporation

By: _____
(Signature)

Printed Name: ALLAN GREENBERG

Title: REGION HEAD OF NETWORK

Date: 10/6/11