

**EXHIBIT**

**D**

## INDEPENDENT PRACTICE ASSOCIATION AGREEMENT

This Independent Practice Association Agreement ("Agreement") is made and entered into by and between Aetna Health Plans of Texas, Inc, d/b/a Aetna U.S. Healthcare, on behalf of itself and its Affiliates (as defined below) (hereinafter "Company"), and St. Luke's Episcopal Hospital Independent Practice Association, Inc. _____ (hereinafter "IPA"), to become effective on February 1, ___, 1998 ("Effective Date").

WHEREAS, Company contracts with health care providers to render services to individuals entitled to receive health care services from or through a Plan (as defined below); and

WHEREAS, IPA wishes to contract with Company to arrange for the provision of health care services to such individuals through health care providers who are under contract with IPA on the following terms and conditions;

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants, promises and undertakings herein and intending to be legally bound hereby, the parties agree as follows:

### 1.0 PROVISION OF SERVICES

1.1 **Provision of Covered Services.** Participating IPA Providers shall provide to Members those Covered Services which are within the scope of the respective Participating IPA Provider's license and certification to practice. A Services Schedule shall be attached hereto and made a part hereof to the extent IPA contains any Participating IPA Providers who are not physicians. Company and IPA may mutually agree in writing at any time, and from time to time, either to increase or decrease the services described in the Services Schedule. An IPA Provider may not provide any Covered Services to Members unless and until said IPA Provider has been fully credentialed and approved by the applicable peer review committee. It is understood and agreed that Company, or, when applicable, the Payor shall have final authority to determine whether any services provided by Participating IPA Providers were Covered Services and to adjust or deny payment for services rendered by Participating IPA Providers to Members in accordance with the results of such determinations.

1.2 **Non-Discrimination.** Participating IPA Providers shall accept and treat as patients all Members without regard to the health status or health care needs of such Members, and shall protect the rights of such Members as patients. Participating IPA Providers shall not differentiate or discriminate in the treatment, or in the access to treatment, of Members on the basis of race, gender, creed, ancestry, lawful occupation, age, religion, marital status, sexual orientation, mental or physical disability, color, national origin, place of residence, health status, source of payment for services, cost or extent of Covered Services required, status as Members, or any other grounds prohibited by law or this Agreement. Each Participating IPA Provider shall provide or arrange for the provision of Covered Services to Members: (a) in no less than the same manner and in accordance with at least the same standards as offered to said Participating IPA Provider's other patients; and (b) in accordance with at least the same standard of practice, care, skill, and diligence customarily used by similarly situated providers at the time at which such services are rendered. Participating IPA Providers shall not provide or threaten to provide inferior care or imply to Members that their care or access to care will be inferior due to the source of payment.

1.3 **IPA Providers.** Notwithstanding any contrary interpretation of this Agreement or of any contracts between IPA and Participating IPA Providers, IPA acknowledges and agrees that all provisions of this Agreement applicable to IPA shall apply with equal force to Participating IPA Providers, unless clearly applicable only to IPA. IPA agrees that it is IPA's responsibility to assure that the obligations of Participating IPA Providers under this Agreement are fully satisfied, that IPA will take all steps necessary to cause Participating IPA Providers to comply with and perform the terms and conditions of this Agreement, and that IPA's failure to do so shall constitute a material breach of this Agreement by IPA. IPA agrees, and shall require Participating

TX\IPA 1.0 (10/96)

-11-

IPA Providers to agree, that in the event of any inconsistency between this Agreement and the contracts entered into between IPA and Participating IPA Providers, the terms of this Agreement shall control. Upon request by Company, IPA shall provide copies of its contracts with Participating IPA Providers to Company. IPA agrees that each Participating IPA Provider shall execute ~~an individual participation agreement~~ Physician Participation Memorandum ~~with Company~~ as seen in Attachment I of this Agreement.

1.4    IPA Capacity. IPA shall provide, at the earliest possible time, notice to Company of any significant changes in the capacity of IPA to provide or arrange for the provision of Covered Services to Members as contemplated by this Agreement, including, but not limited to, any reduction in the number of Participating IPA Providers. If Company determines at any time in its sole discretion that Members' access to Participating IPA Providers is unacceptable due to any reduction in the number of Participating IPA Providers, or any change in the types or geographic mix of Participating IPA Providers, Company may request that IPA take corrective action acceptable to Company within thirty (30) days. If IPA fails to take such corrective action within such thirty (30) day period, Company may terminate this Agreement as provided in Section 7.3.

1.5    ~~1.6~~    IPA Providers' Information. IPA shall provide to Company a complete list of IPA Providers, including names, office addresses, office hours, telephone and facsimile numbers, and area of practice or specialty. IPA shall notify Company in writing ~~within ten (10) business days of its acquiring knowledge~~ of any changes in this information on a monthly basis. IPA shall provide to Company at least one hundred twenty (120) days prior notice (or, if IPA does not receive at least one hundred twenty (120) days notice, then such notice as IPA actually receives) of the termination of IPA's relationship with a Participating IPA Provider. IPA shall obtain a completed credentialing application to become a Participating Provider from each IPA Provider, ~~and shall, at Company's request, make available to Company any credentialing material held by or accessible to IPA. IPA shall obtain all necessary releases from IPA Providers to permit IPA to release said credentialing files to Company, and Company shall be entitled to presume that such releases have been obtained.~~

1.6    Primary Care Physicians. Each Participating IPA Provider who is a Primary Care Physician shall comply with the following:

   1.6.1    Coordination of Care. A Primary Care Physician shall arrange and coordinate the overall provision of Covered Services to each Member who has selected or been assigned to said Primary Care Physician, in accordance with the terms and conditions of the Member's Plan. A Primary Care Physician shall provide or arrange for the provision of Covered Services, including, without limitation, urgently needed services or Emergency Services, regardless of whether the Primary Care Physician has previously seen or treated the Member.

   1.6.2    Referrals. Unless the requirement does not apply to Members' applicable Plans, a Primary Care Physician shall refer or admit Members only to Participating Providers for Covered Services as is Medically Necessary, and shall furnish such physicians and providers with complete information on treatment procedures and diagnostic tests performed prior to such referral or admission.

   1.6.3    New Members. With good cause acceptable to Company, a Primary Care Physician may decline to accept new Members as patients (excluding persons already in his or her practice who become Members) by providing at least ninety (90) days prior written notice to Company, provided, however, that each office where a Primary Care Physician practices shall accept a minimum of two hundred fifty (250) Members to the extent that two hundred fifty (250) Members select or are assigned to said office. Nothing in this Agreement is intended to or shall be deemed to guarantee the selection or assignment of two hundred fifty (250) Members to any such office. After a Primary Care Physician office has notified Company that said office will accept no additional Members, said office shall not accept as patients additional members from other managed care organizations. Any request for a re-opening of said office for the enrollment of additional Members must have the prior approval of the applicable peer review committee.

TX\IPA 1.0 (10/96)

-2-

1.7 <u>IPA Providers Other than Primary Care Physicians.</u> A Participating IPA Provider who is not a Primary Care Physician shall: (a) provide Emergency Services to Members, as necessary; (b) provide all other Covered Services to Members only upon prior referral of such patients by a Primary Care Physician to said Participating IPA Provider on prescribed forms or by electronic means as instructed by Company, if such a referral is required by the applicable Plan; (c) render services to Members only at those inpatient, extended care, and ancillary service facilities which have been approved in advance by Company; and (d) promptly submit a report on the treatment of each Member to the referring Primary Care Physician, if applicable. Except in the case of the provision of Emergency Services, payment for retroactive referrals shall be subject to adjustment or denial by Company.

## 2.0 REPRESENTATIONS

2.1 <u>IPA Representation.</u> IPA represents and warrants that: (a) it and Participating IPA Providers have and shall maintain throughout the term of this Agreement all appropriate license(s) and certification(s) mandated by governmental regulatory agencies, which for Participating IPA Providers shall include, without limitation, DEA certification (unless such certification is not a criterion for participation for a given Participating IPA Provider under the applicable **Participation Criteria Schedule**), and an unrestricted license to practice medicine (or, for any Participating IPA Provider who is not a physician, an unrestricted license, certification or other authorization to practice his or her other professional discipline) in the state(s) in which the respective Participating IPA Provider maintains offices and provides Covered Services to Members; (b) it and Participating IPA Providers shall comply with all applicable federal and state laws and regulations related to this Agreement and the services to be provided hereunder, including, but not limited to, laws and regulations related to fraud, abuse, discrimination, disabilities, confidentiality, self-referral, false claims and prohibition of kickbacks; (c) each Participating IPA Provider has and shall maintain throughout the term of this Agreement unrestricted hospital privileges at a Participating Hospital (unless the maintenance of such privileges is not a criterion for participation for a given Participating IPA Provider under the applicable **Participation Criteria Schedule**); (d) it has not discriminated and will not discriminate in the selection or retention of IPA Providers on the basis of gender, race, age, religion, national origin or any other grounds prohibited by law; (e) it is legally authorized to negotiate on behalf of IPA Providers and to bind those IPA Providers who are Participating IPA Providers to abide by the terms of this Agreement, as amended from time to time; (f) it has executed this Agreement through its duly authorized representative; and (g) executing and performing its obligations under this Agreement shall not cause IPA or any IPA Provider to violate any term or covenant of any other arrangement now existing or hereafter executed.

2.2 <u>Qualified Personnel.</u> ~~IPA also represents that IPA has established an ongoing quality assurance/assessment program which includes, but is not limited to, credentialing of employees. IPA shall supply to Company the relevant documentation, including, but not limited to, internal quality assurance/assessment protocols, state licenses and certifications and/or federal agency certifications and/or registrations upon request.~~ IPA shall make best efforts to ensure that~~and~~ Participating IPA Providers shall ensure that all personnel employed by, associated or contracted with IPA or Participating IPA Providers who treat Members: (a) are and shall remain throughout the term of this Agreement appropriately licensed and/or certified and supervised (when and as required by state law), and qualified by education, training and experience to perform their professional duties; and (b) shall act within the scope of their licensure or certification, as the case may be. Company may audit compliance with this section upon prior notice. IPA must obtain the approval of Company prior to utilizing any subcontractors to provide Covered Services to Members.

## 3.0 COMPENSATION

3.1 <u>Payment.</u> Company shall, or when it is not the applicable Payor shall notify each Payor to, pay Participating IPA Providers for Covered Services rendered to Members in accordance with the **Compensation Schedule** attached hereto and made a part hereof, or, if such Compensation Schedule is not applicable to the individual Participating IPA Provider, in accordance with the compensation arrangement then in effect as applicable to such Members' Plans; either of which may be modified from time to time by Company. Participating IPA

TX\IPA 1.0 (10/96)

-~~3~~-

Provider's compensation for non-capitated Covered Services rendered to Members shall be: (A) the lower of (i) the rates in the **Compensation Schedule**, or (ii) the Participating IPA Provider's reasonable and customary billed charge, and (B) minus any applicable Copayments, Coinsurance or Deductibles. Participating IPA Provider shall notify Company of any overpayments or payments made in error within ten (10) business days of becoming aware of such overpayments or erroneous payments, and shall return or arrange for the return of any such overpayment or payment made in error to Company, or to the Payor or Member, as applicable. Company reserves the right to rebundle to the primary procedure those services determined by Company to be part of, incidental to, or inclusive of the primary procedure. IPA and Participating IPA Providers shall hold Company, its Affiliates, Sponsors, Members and Payor harmless against any and all claims by covering providers related to or arising out of payment for Covered Services for which Participating IPA Providers are compensated on a capitated basis hereunder. This section does not allow any amendment to be made to this Agreement or to Compensation Schedules without the consent of both parties.

3.2 Billing of Members. Under certain Plans, Members may be required to pay Copayments, Coinsurance or Deductibles for certain Covered Services. Participating IPA Providers shall collect any applicable Copayments, Coinsurance and Deductibles from Members. Copayments shall be collected at the time that Covered Services are rendered. Except for applicable Copayments, Coinsurance and Deductibles, Participating IPA Providers may bill Members only in the circumstances described below.

3.2.1 If the applicable Payor is not a health maintenance organization ("HMO"), Participating IPA Providers may bill a Member for Covered Services provided to the Member in the event that the Payor becomes insolvent or otherwise breaches the terms and conditions of its agreement to pay, provided that: (a) Participating IPA Provider shall have first exhausted all reasonable efforts to obtain payment from the Payor; and (b) Participating IPA Provider shall not institute or maintain any collection activities or proceed with any action at law or in equity against a Member to collect any sums that are owed by a Payor to Participating IPA Provider unless Participating IPA Provider provides at least thirty (30) days prior notice to Company of Participating IPA Provider's intent to institute such an action.

3.2.2 Services that are not Covered Services may be billed to Members by Participating IPA Providers only if: (a) the Member's Plan provides and/or Company confirms that the services are not covered; (b) the Member was advised in writing prior to the services being rendered that the specific services are not Covered Services; and (c) the Member agreed in writing to pay for such services.

Nothing in this section is intended to prohibit or restrict Participating IPA Providers from billing individuals who were not Members at the time that services were rendered.

3.3 Coordination of Benefits. When a Payor is the primary payor under applicable coordination of benefit principles, the Payor shall pay in accordance with this Agreement, and when a Payor is secondary under said principles, Payor's payment shall be limited as specified in the applicable Plan. If the Plan fails to specify coordination of benefits requirements, and unless prohibited by applicable law, Payor's payment shall be limited to the amount which, together with the amount paid by the primary payor following all reasonable efforts by Participating IPA Provider to collect same, equals the compensation due to Participating IPA Provider under this Agreement, or if the primary payor fails to pay, Payor's payment shall be in accordance with this Agreement. In no event shall amounts billed and retained under coordination of benefits for Covered Services exceed the Participating IPA Provider's usual and customary billed charges for such services.

3.4 Company's Obligation to Pay. Company shall have no obligation to pay Participating IPA Provider for Covered Services in the event that a Payor or Member fails to pay IPA, except where Company is the underwriter of the applicable Plan.

3.5 Claims Submission. Participating IPA Provider shall submit claims to Company or the applicable Payor for non-capitated Covered Services rendered to Members by Participating IPA Providers. Claims shall be submitted within ninety (90) days of the Member's receipt of such Covered Services or Participating IPA

TX\IPA 1.0 (10/96)

-4-

Provider's receipt of an explanation of benefits from a primary payor. Billings shall include detailed and descriptive medical and Member data and identifying information on HCFA 1500 forms or any subsequent form adopted for that purpose. Participating IPA Provider shall use best efforts to submit bills electronically as required requested by Company or the applicable Payor. Company utilizes CPT-4 for the coding, description of services, and rules for the services provided. If a Participating IPA Provider has not billed Company or the applicable Payor for Covered Services within the stated time frame, said Participating IPA Provider's claim for compensation with respect to such Covered Services shall be deemed waived, and Participating IPA Provider shall not bill any other person or entity, including, but not limited to, Company, the applicable Payor, Sponsor, or Member, for such Covered Services. Statements made in any claim or related documentation submitted by or on behalf of a Participating IPA Provider shall be considered statements made by said Participating IPA Provider, regardless of whether such statements are prepared by Participating IPA Provider's employees, agents, or representatives. Any adjustments to claims submitted by Participating IPA Providers must be filed with Company or the applicable Payor within thirty (30) ninety (90) days of the submission of the original claim, or the original claim will be deemed final.

3.6    Hold Harmless.

3.6.1    Holding Members Harmless. If the applicable Payor is an HMO, IPA and Participating IPA Providers agree that in no event, including, but not limited to, non-payment by the HMO, insolvency of the HMO or breach of this Agreement, shall IPA or any Participating IPA Provider bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against a Member or persons (other than the HMO) acting on a Member's behalf for Covered Services. This provision shall not prohibit collection of Deductibles, Coinsurance, or Copayments from Members in accordance with the terms of the Member's Plan.

IPA and Participating IPA Providers further agree that: (a) this provision shall survive termination of this Agreement regardless of the cause giving rise to termination and shall be construed for the benefit of Members; and (b) this provision supersedes any oral or written agreement to the contrary now existing or hereafter entered into between IPA or any Participating IPA Provider and a Member or persons acting on a Member's behalf.

Any modifications, additions, deletions to the provisions of this clause shall become effective on a date no earlier than 15 days after the Commissioner of Insurance has received written notice of such proposed changes.

3.6.2    Hold Harmless and Indemnify. IPA and Participating IPA Provider shall hold Company, its Affiliates, Sponsors, Members and Payors harmless and indemnify them against any and all claims related to or arising out of payment for Covered Services rendered to Members for which IPA or Participating IPA Provider is financially responsible, when a Payor has remitted payment to Participating IPA Provider as set forth in this Agreement and said claim alleges that IPA or Participating IPA Provider has failed to remit payment to providers as required by this Agreement.
IPA and Participating IPA Providers agree to indemnify Company from any and all liability, loss, damage, claim or expense of any kind whatsoever, including costs and attorneys' fees which result from negligent or reckless acts or omissions by the IPA and Participating IPA Providers, their agents or employees, directors or officers regarding the duties and obligations of the IPA and Participating IPA Providers under this Agreement. Company agrees to indemnify the IPA and Participating IPA Providers from any and all liability, loss, damage, claim or expense of any kind whatsoever, including costs and attorneys' fees which result from negligent or reckless acts or omissions by the Company, its agents or employees, directors or officers regarding duties and obligations of the Company under this Agreement.

TX\IPA 1.0 (10/96)

### 4.0 COMPLIANCE WITH COMPANY RULES, POLICIES AND PROCEDURES

4.1 **Compliance and Participation.** IPA and Participating IPA Providers shall comply fully with and abide by the rules, policies and procedures that Company has established or will establish, including, but not limited to, those regarding: (a) quality improvement/management; (b) utilization management, including, but not limited to, precertification of elective admissions and procedures (when applicable), referral process or protocols, and reporting of clinical encounter data; (c) claims payment review; (d) Member grievances; (e) provider credentialing; and (f) electronic submission of referrals, encounter data, claims and other data required by Company. Participating IPA Providers shall comply with and be bound by applicable Participation Criteria, , as set forth in the **Participation Criteria** Schedules attached hereto and made a part hereof. IPA acknowledges and agrees that the failure of IPA or Participating IPA Providers to comply with any applicable Participation Criteria and Company's other rules, policies and procedures may adversely affect any compensation due hereunder and could lead to sanctions including, without limitation, termination of this Agreement or the participation of noncompliant Participating IPA Providers. Company may at any time modify any Participation Criteria, and any Company rules, policies and procedures.

4.2 **Utilization Review.** Company utilizes systems of utilization review/quality improvement/peer review consistent with applicable federal and state laws to promote adherence to accepted medical treatment standards and to encourage Participating Providers to control medical costs consistent with sound medical treatment. To this end, Participating IPA Providers shall:

    a.    Participate, as requested, and abide by Company's utilization review, patient management, quality improvement programs, and all other related programs (as modified from time to time) and decisions with respect to all Members.

    b.    Comply with Company's precertification (when applicable) and utilization management requirements for all elective admissions and other Covered Services.

    c.    Regularly interact and cooperate with Company's Nurse Case Managers.

    d.    Utilize Participating Providers to the fullest extent possible, consistent with sound medical judgment.

    e.    ~~e.~~    Abide by all Company's credentialing criteria and procedures, including site visits and medical chart reviews, and submit to these processes biannually, annually, or otherwise, when applicable. <u>Company shall provide Participating IPA Provider not less than five (5) business days advance notice of such visits and reviews.</u>

    f.    Obtain advance authorization from Company prior to any non-emergency admission, and notify Company in cases where a Member requires an emergency hospital admission, both in accordance with Company's rules, policies and procedures then in effect.

    g.    Cooperate with the Member's Primary Care Physician, if applicable, including timely scheduling of appointments and appropriate communication after patient evaluation and treatment.

4.3 **Grievances.** IPA and Participating IPA Providers shall cooperate with and participate in Company's applicable grievance procedures, provide Company with the information necessary to resolve grievances, and abide by decisions of the applicable grievance committees.

4.4 **Notices and Reporting.** IPA and Participating IPA Providers shall: (a) notify Company of any litigation brought against IPA or any Participating IPA Provider related to the provision of health care services; (b) notify Company of any actions taken or investigations initiated by any government agency involving IPA or any Participating IPA Provider, or any health care entity in which IPA or any Participating IPA Provider holds more than a five percent (5%) interest; (c) notify Company of any ownership interest or position with

TX\IPA 1.0 (10/96)

another health maintenance organization or other managed care organization or health plan; and (d) comply with any Company requirements regarding reporting of self-referrals, loss of licensure or accreditation, and claims by governmental agencies or individuals regarding fraud, abuse, self-referral, false claims, or kickbacks. All notices required by this section shall be provided to Company within ten (10) business days of the date that IPA or a Participating IPA Provider acquired knowledge of the occurrence of an event requiring notice, or earlier if otherwise required by this Agreement. Upon Company's request, IPA and Participating IPA Providers shall provide all known details of the nature, circumstances and disposition of any suits, claims, actions or investigations to Company.

4.5     Assignments of Benefits and Consents to Release of Medical Information. Participating IPA Providers shall obtain from all non-HMO Members to whom Covered Services are provided: (a) assignments of benefits authorizing payment for Covered Services to be made directly to Participating IPA Provider or the Participating IPA Provider's designee; and (b) consents to release medical information to Company and Payors or their authorized representatives.

4.6     Accreditation and Review Activities. IPA and Participating IPA Providers shall implement all activities reasonably necessary to assist Company to obtain external accreditation by the National Committee for Quality Assurance or any other similar organization selected by Company including, but not limited to, cooperating in the auditing of Members' medical records. Similarly, IPA and Participating IPA Providers shall cooperate fully with any review of Company or a Plan conducted by a state or federal agency with authority over Company and/or a Plan, as applicable. IPA acknowledges Company's obligation and right to report to and access the National Practitioner Data Bank ("Data Bank") as it relates to IPA Providers. IPA Providers shall assist Company in accessing and reporting to the Data Bank, including submitting inquiries to the Data Bank on behalf of Company if requested to do so.

4.7     Proprietary and Confidential Information. All parties agree that ~~IPA agrees, on its behalf and on behalf of Participating IPA Providers, that the~~ Proprietary Information is the exclusive property of the originator ~~Company or a Payor and that IPA and Participating IPA Providers~~ and that all parties have no right, title or interest in the same. ~~IPA and Participating IPA Providers~~ All parties shall keep the Proprietary Information and this Agreement strictly confidential and shall not disclose any Proprietary Information or the contents of this Agreement to any third party, except to federal, state and local governmental authorities having jurisdiction. ~~IPA and Participating IPA Providers~~ Each party shall ~~not use any Proprietary Information, and shall, at the request of Company,~~ return any Proprietary Information and any copies or abstracts thereof, upon termination of this Agreement ~~for whatever reason~~. In the event of a breach or a threatened breach of this section by ~~IPA or a Participating IPA Provider~~ either party, ~~Company~~ the non-breaching party shall have the right of specific performance and injunctive relief in addition to any and all other remedies and rights at law or in equity, and such rights and remedies shall be cumulative. This section shall survive the termination of this Agreement, regardless of the cause of termination.

4.8     Encounter Data. For those services for which IPA is compensated on a capitated basis, if any, IPA shall provide Company with encounter data by type of Covered Service rendered to Members in the form and manner as specified by Company. Such encounter data shall be the property of Company.

TX\IPA 1.0 (10/96)

-7-

**5.0 INSURANCE**

5.1 ~~5.1~~ ~~IPA's Insurance.~~

## REDACTED

5.2 <u>IPA Providers' Insurance.</u> Each Participating IPA Provider shall maintain throughout the term of this Agreement professional liability insurance and comprehensive general liability insurance in at least the minimum amounts specified in the applicable Participation Criteria Schedule.

**6.0 INSPECTION OF RECORDS AND DATA ACCESS**

6.1 <u>Access to Information.</u> IPA and Participating IPA Providers shall grant to Company, on behalf of itself and its Affiliates, access to all data and information obtained, created or collected by IPA or Participating IPA Providers related to Members ("Information"). Such Information shall be jointly owned by IPA (or Participating IPA Providers) and Company, and neither IPA nor any Participating IPA Provider shall enter into any contract or arrangement whereby Company or its Affiliates do not have unlimited free and equal access to the Information in electronic or other form or would be required to pay any access, transaction or other fee to obtain such Information in electronic, written or other form. Information shall not be directly or indirectly provided by IPA or Participating IPA Providers to any competitor of Company or Company's Affiliates. Any and all information and data provided to IPA or Participating IPA Providers by Company or at Company's direction shall remain the sole and exclusive property of Company and shall not be disclosed by IPA or Participating IPA Providers to any third party.

6.2 <u>Confidentiality of Medical Records.</u> IPA, Participating IPA Providers and Company shall ensure that all Member medical records are treated as confidential so as to comply with all state and federal laws regarding, among other things, the confidentiality of patient records. According to the terms of Company's HMO enrollment forms, agreements with Members and applicable law, Company is authorized to obtain information from IPA and Participating IPA Providers without additional written release by the Member. Company shall have the right, upon request, to inspect at all reasonable times any accounting, administrative, and medical records maintained by IPA or Participating IPA Providers pertaining to Company, Members, or IPA's or Participating IPA Providers' participation hereunder.

6.3 <u>Provision of Records.</u> IPA and Participating IPA Providers shall provide Company and federal, state and local governmental authorities having jurisdiction, upon request, access to all books, records and other papers (including, but not limited to, medical and financial records) and information relating to this Agreement and to those Covered Services rendered by Participating IPA Providers to Members, and shall maintain such books, records and papers and Information for the longer of five (5) years after termination of this Agreement or the period required by state law. All requested Information shall be supplied within fourteen (14) days of the receipt of the request, where practicable. This audit right may be extended to Company's customers upon request of Company.

6.4 <u>Medical Records.</u> ~~IPA and~~ Participating IPA Providers shall maintain Information in a current, detailed, organized and comprehensive manner and in accordance with customary medical practice, applicable state and federal laws, and accreditation standards. Medical records of Members shall include reports from

TX\IPA 1.0 (10/96)

-81-

referred and/or referring providers, discharge summaries, records of emergency care received by the Member and such other signed progress notes which, at a minimum, shall contain the principal complaint or purpose of the visit, diagnosis or findings and therapeutic procedure. ~~IPA and~~ Participating IPA Providers shall make these records available to: (a) Company for the purpose of assessing quality of care, conducting medical evaluations and audits and determining, on a concurrent or retrospective basis, the medical necessity and appropriateness of care provided to Members; and (b) applicable state and federal authorities and their agents involved in assessing the quality of care or investigating Member grievances or complaints.

6.5 <u>Survival</u>. These data access and records provisions shall survive the termination of this Agreement, regardless of the cause giving rise to the termination.

## 7.0 TERM AND TERMINATION

7.1 <u>Term and Renewal</u>. This Agreement shall commence on the Effective Date and, subject to the termination provisions contained herein, shall continue for an initial term of one (1) year and shall thereafter automatically renew for successive one (1) year periods. Prior to termination under 7.2 or 7.3, Company shall provide a written explanation of the reasons for termination, and upon request before the effective date, IPA shall be entitled to a review by an advisory panel and a copy of the advisory panel's recommendation and the Company's determination.

7.2 <u>Termination without Cause</u>. This Agreement may be terminated by either party at any time without cause upon at least ~~one hundred eighty (180)~~ ninety (90) days prior written notice to the other party, and in accordance with such procedures as are applicable at the time of such termination.

7.3 <u>Termination for Breach</u>. This Agreement may be terminated at any time by either party upon at least thirty (30) days prior written notice of such termination to the other party upon default or breach by such party of one or more of its obligations hereunder, unless such default or breach is cured within thirty (30) days of the notice of termination.

7.4 <u>Termination or Suspension</u>.

7.4.1 <u>Termination or Suspension of IPA</u>. This Agreement may be immediately terminated, or IPA's participation in any or all Plans may be immediately suspended, by Company at its sole discretion at any time due to: (a) the suspension, withdrawal, expiration, non-renewal or revocation of any state or local license, certificate, approval or authorization of IPA; (b) IPA's indictment, arrest, charge or conviction of any felony or criminal charge related to moral turpitude or the practice of medicine or other professional discipline; (c) the cancellation, reduction, limitation or termination of any insurance required by Section 5.1; (d) the suspension or debarment of IPA from participation in any governmental sponsored program, including, without limitation, the Medicare or Medicaid programs; (e) a filing in bankruptcy, the appointment of a receiver, the marshaling of debts or assets, or the proposed settlement of outstanding debts under applicable reorganization or insolvency laws filed by or against IPA; or (f) Company's determination, in its sole discretion, that continuation of this Agreement could negatively affect patient care. IPA shall provide immediate notice to Company of any of the aforesaid events.

7.4.2 <u>Termination or Suspension of Participating IPA Providers</u>. Company may terminate the status of any Participating IPA Provider as a Participating Provider for default or breach of said Participating IPA Provider's obligations hereunder upon at least thirty (30) days notice to said Participating IPA Provider, unless such default or breach is cured within the notice period. In addition, Company may immediately terminate or suspend the status of any Participating IPA Provider as a Participating Provider, at Company's sole discretion at any time, due to: (a) a suspension, withdrawal, expiration, non-renewal or revocation of any state or local license, certificate or other legal credential authorizing said Participating IPA Provider to practice medicine (or his or her other professional discipline); (b) a suspension or revocation of said Participating IPA Provider's DEA certification (unless such

TX\IPA 1.0 (10/96)

-9-

certification is not a criterion for participation for said Participating IPA Provider under the applicable **Participation Criteria Schedule**) or any other right to prescribe controlled substances; (c) said Participating IPA Provider's indictment, arrest, charge or conviction of any felony or criminal charge related to moral turpitude or the practice of medicine (or Participating IPA Provider's other professional discipline); (d) the cancellation, reduction, limitation or termination of said Participating IPA Provider's insurance required by this Agreement; (e) said Participating IPA Provider's suspension or debarment from participation in any governmental sponsored program, including, without limitation, the Medicare or Medicaid programs; (f) a filing in bankruptcy, the appointment of a receiver, the marshaling of debts or assets, or the proposed settlement of outstanding debts under applicable reorganization or insolvency laws filed by or against said Participating IPA Provider; (g) any false statement or material omission in said Participating IPA Provider's participation application and/or confidential information forms and all other requested information, as determined by Company in its sole discretion; (h) any adverse action with respect to said Participating IPA Provider's hospital staff privileges, if Participating IPA Provider is required to maintain such privileges under the applicable Participation Criteria Schedule; or (i) Company's determination, in its sole discretion, that continuation of said Participating IPA Provider's participation hereunder could negatively affect patient care. IPA and Participating IPA Providers shall provide immediate notice to Company of any of the aforesaid events.

7.5 <u>Obligations Following Termination</u>. Following the effective date of any termination of this Agreement, or any Plan, IPA and Participating IPA Providers shall comply with the following obligations. This section shall supersede any contrary arrangements now existing or hereinafter made and shall survive the termination of this Agreement, regardless of the cause of termination.

7.5.1 <u>Upon Termination</u>. Upon termination of this Agreement for any reason, other than termination by Company in accordance with Section 7.4 above, each Participating IPA Provider shall remain obligated at Company's sole discretion to provide Covered Services to: (a) any Member under said Participating IPA Provider's care who, at the time of the termination, is a registered bed patient at a Participating Facility until such Member's discharge therefrom or Company's orderly transition of such Member's care to another provider, whichever is less; (b) any Member, upon request of such Member or the applicable Payor, until the anniversary date of such Member's respective Plan or for one (1) calendar year, whichever is less; and (c) any Member under Participating IPA Provider's care who, as of the effective date of termination, is under treatment by Participating IPA Provider for a disability, acute condition or life-threatening illness, or is past the 24th week of pregnancy, where discontinuing care by Participating IPA Provider reasonably could cause harm to the patient. The terms of this Agreement shall apply to such services.

7.5.2 <u>Upon Insolvency or Cessation of Operations</u>. If this Agreement terminates as a result of insolvency or cessation of operations of a Company Affiliate that is an HMO, and as to Members of HMOs that become insolvent or cease operations, then, in addition to the other obligations set forth in this section, Participating IPA Providers shall continue to provide Covered Services to: (a) all Members for the period for which premium has been paid; and (b) Members confined in an inpatient facility on the date of insolvency or other cessation of operations until medically appropriate discharge. This section shall be construed to be for the benefit of Members. No modification to this section shall be effective without the prior written approval of the applicable regulatory agencies.

7.5.3 <u>Obligation to Cooperate</u>. Upon notice of termination of this Agreement or of a Plan, IPA and Participating IPA Providers shall cooperate fully with Company and comply with Company procedures, if any, in the transfer of Members to other providers. In addition, upon notice of termination, at Company's option, Members shall not be permitted to select Participating IPA Providers as their Primary Care Physicians. Upon notice of termination of this Agreement or of a Plan, IPA and Participating IPA Providers, upon the direction of Company, shall provide reasonable advance notice to enrollees currently under treatment by Participating IPA Providers of the impending termination.

TX\IPA 1.0 (10/96)

-10-

## 8.0 MODIFICATIONS

8.1 <u>Amendments</u>. This Agreement constitutes the entire understanding of the parties hereto and no changes, amendments, or alterations shall be effective unless signed by both parties, except as expressly provided herein. Notwithstanding the foregoing, at Company's discretion, Company may amend this Agreement upon written notice to IPA to comply with any applicable law or regulation, or any order or directive of any governmental agency.

8.2 <u>Plan Participation</u>. Company has and retains the right to designate IPA and Participating IPA Providers, considered one entity, as Participating Providers or non-participating providers in any specific Plan. Company shall designate IPA and Participating IPA Providers as Participating Providers in all current Plans unless exclusion is specifically requested by a Plan Sponsor. Company reserves the right to introduce new Plans during the course of this Agreement. IPA agrees that Participating IPA Providers will provide Covered Services to Members of such Plans under applicable compensation arrangements determined by Company. Participating IPA Providers shall accept compensation in accordance with this Agreement for the provision of any Covered Services by a Participating IPA Provider to Members under a Plan, regardless of whether IPA or said Participating IPA Provider is a Participating Provider in said Plan, except when such Member is a resident within the Aetna Health Plans of Texas, Inc. (Houston) service area and IPA is not designated as a Participating Provider in such Member's Plan. Company has or intends to seek a contract to serve Medicare and/or Medicaid beneficiaries. Such beneficiaries shall be considered as Members. IPA and Participating IPA Providers shall be bound by all requirements applicable to such contract and all rules and regulations of the Medicare and Medicaid programs. This section does not allow any amendment to be made to this Agreement or Compensation Schedules without consent of both parties.

## 9.0 RELATIONSHIP OF THE PARTIES

9.1 <u>Independent Contractor Status</u>. IPA and Participating IPA Providers are independent contractors of Company. IPA, Participating IPA Providers, and their respective employees and agents shall in no way be considered agents or representatives of Company for any purpose, nor shall IPA, Participating IPA Providers, or their respective employees and agents hold themselves out to be agents or representatives of Company for any purpose. Company and its employees and agents shall in no way be considered agents or representatives of IPA or Participating IPA Providers for any purpose, nor shall Company or its agents and employees hold themselves out to be agents or representatives of IPA or Participating IPA Providers for any purpose. Company shall in no event be liable for the activities of IPA, Participating IPA Providers, or their respective agents and employees, including, without limitation, any liabilities, losses, damages, injunctions, suits, actions, fines, penalties, claims or demands of any kind or nature by or on behalf of any person, party or governmental authority arising out of or in connection with: (a) any failure to perform any of the agreements, terms, covenants or conditions of this Agreement; (b) any negligent act or omission or other misconduct; (c) the failure to comply with any applicable laws, rules or regulations; or (d) any accident, injury or damage. IPA and Participating IPA Providers shall in no event be liable for the activities of Company or its agents and employees, including, without limitation, any liabilities, losses, damages, injunctions, suits, actions, fines, penalties, claims or demands of any kind or nature by or on behalf of any person, party or governmental authority arising out of or in connection with: (i) any failure to perform any of the agreements, terms, covenants or conditions of this Agreement; (ii) any negligent act or omission or other misconduct; (iii) the failure to comply with any applicable laws, rules or regulations; or (iv) any accident, injury or damage. ~~IPA acknowledges that all patient care and related decisions are the sole responsibility of Participating IPA Providers and that Company's medical management procedures, protocols and policies do not dictate or control Participating IPA Providers' clinical decisions with respect to the medical care or treatment of Members. IPA agrees to indemnify and hold harmless Company from all claims, liabilities or other causes of action (including costs and counsel fees) related to Participating IPA Providers' delivery of care or treatment to Members. This provision shall survive the termination of this Agreement, regardless of the cause giving rise to termination.~~ Except to the extent prohibited by applicable law, Provider acknowledges that all patient care and related decisions are the sole responsibility of Provider and that Company's medical management

procedures, protocol and policies do not dictate or control Provider's clinical decisions with respect to the medical care or treatment of Members. IPA shall indemnify and hold harmless Company (which for purposes of this section, shall include all agents, officers, employees, and contractors of Company) from and against any and all claims, losses, damages, causes of action, liabilities, and expenses, including, without limitation, attorney's fees, relating to or arising from, directly or indirectly, any injury, death, other actual or alleged damage that results from or arises out of or in connection with, in whole or part, directly or indirectly, (1) any breach by IPA or Participating IPA Providers of any provision of this Agreement, (2) any strict liability, act, omission, or negligence by Participating IPA Providers, including, without limitation, Participating IPA Provider's agents, employees, contractors, invitees, and guests. IPA assumes no liability for the sole negligence of Company. Company understands and agrees that this indemnity provision in no way whatsoever is intended to reduce or eliminate any insurance coverage maintained by IPA or Participating IPA Providers. This provision shall survive the termination of this Agreement, regardless of the cause giving rise to termination.

9.2 Use of Name. IPA consents, on its behalf and on behalf of Participating IPA Providers, to the use of its and Participating IPA Providers' names and other identifying and descriptive material in provider directories and in other materials and marketing literature of Company in all formats, including, but not limited to, electronic media. Neither IPA nor any Participating IPA Provider shall use Company's names, logos, trademarks or service marks in marketing materials or otherwise, except as provided in this Agreement, without Company's prior written consent. Except that IPA and Participating IPA Providers may list Company's name as one of its contracted payors.

9.3 Interference with Contractual Relations. IPA and Participating IPA Providers shall not, (a) counsel or advise, directly or indirectly, Payors, Sponsors or other entities who are currently under contract with Company or any Affiliate to cancel, modify, or not renew said contracts; (b) impede or otherwise interfere with negotiations which Company or an Affiliate is conducting for the provision of Plans; or (c) use or disclose to any third party membership lists acquired during the term of this Agreement for the purpose of directly or indirectly soliciting individuals who were or are Members or otherwise to compete with Company or any Affiliate. Nothing in this section is intended or shall be deemed to restrict any communication between a Participating IPA Provider and a Member determined by the Participating IPA Provider to be necessary or appropriate for the diagnosis and care of the Member. This section shall survive the termination of this Agreement. In the event of a breach or a threatened breach of this section by IPA or a Participating IPA Provider, Company shall have the right of specific performance and injunctive relief in addition to any and all other remedies and rights at law or in equity, and such rights and remedies shall be cumulative.

9.4 Liaison. IPA shall appoint and retain at all times an administrator and a medical director to serve as liaisons to Company in connection with this Agreement. The medical director (or the administrator, if a physician) shall have authority to bind IPA with respect to clinical matters and the administrator shall have authority to bind IPA with respect to all other matters.

10.0 COMPANY OBLIGATIONS

10.1 Company Obligations. Company or Payors shall provide Participating IPA Providers with a means to identify Members (e.g., identification cards). Company shall further provide Participating IPA Providers with an explanation of benefits available to Members, utilization standards, administrative requirements, a listing of physicians, hospitals and ancillary providers in Company's network, and timely notification of significant changes in this information. Company will enable IPA or Participating IPA Providers to check eligibility. Company will include Participating IPA Providers in the applicable Participating Provider directory or directories and will make such directories available to Members. Company shall provide a dispute resolution mechanism whereby IPA or Participating IPA Providers may raise issues regarding the obligations of Company, IPA or Participating IPA Providers under this Agreement. IPA and Participating IPA Providers shall utilize this dispute resolution procedure prior to submitting a complaint to any regulatory agency or instituting any legal action. Company shall not terminate or refuse to renew this Agreement or

TX\IPA 1.0 (10/96)

-12-

otherwise retaliate against a Participating IPA Provider because such Provider reasonably filed a complaint or an appeal on behalf of a Member.

**11.0 MISCELLANEOUS**

11.1 Waiver. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as or be construed to be a waiver of any subsequent breach thereof. To be effective, all waivers must be in writing and signed by the party to be charged.

11.2 Governing Law. This Agreement shall be governed in all respects by the laws of the State of Texas.

11.3 Liability. Notwithstanding Section 11.2, Company's liability, if any, for damages to IPA or any Participating IPA Provider for any cause whatsoever arising out of or related to this Agreement, and regardless of the form of the action, shall be limited to IPA's or the Participating IPA Provider's actual damages, which shall not exceed, as to IPA and Participating IPA Providers in total, the amounts actually paid for services rendered by all Participating IPA Providers under this Agreement during the twelve (12) month period immediately prior to the date the cause of action arose, or as to any given Participating IPA Provider, the amounts actually paid for services rendered by said Participating IPA Provider under this Agreement during the twelve (12) month period immediately prior to the date the cause of action arose. Company Neither party shall not be liable for any indirect, incidental, punitive, exemplary, special or consequential damages of any kind whatsoever sustained as a result of a breach of this Agreement or any action, inaction, alleged tortious conduct, or delay by Company either party.

11.4 Statute of Limitations. Notwithstanding Section 11.2, no action, regardless of form, arising out of or related to this Agreement may be brought by any party more than twelve (12) twenty-four (24) months after such cause of action has arisen.

11.5 Severability. Any determination that any provision of this Agreement or any application thereof is invalid, illegal or unenforceable in any respect in any instance shall not affect the validity, legality and enforceability of such provision in any other instance, or the validity, legality, or enforceability of any other provision of this Agreement.

11.6 Inconsistencies. If any term or provision of this Agreement is inconsistent with a term or provision of a non-insured Plan, then as to individuals entitled to receive Covered Services through said Plan, the term or provision of the Plan shall prevail.

11.7 Assignment. This Agreement, being intended to secure the services of IPA and Participating IPA Providers, shall not be assigned, subcontracted, delegated or transferred by IPA in any manner. Company may assign, delegate or transfer this Agreement in whole or in part to any Affiliate, existing now or in the future, or to any entity which succeeds to the applicable portion of its business through a sale, merger or other transaction, provided that such other entity assumes the obligations of Company hereunder.

11.8 Affirmative Action. Company is an Equal Opportunity Employer which maintains an Affirmative Action Program. To the extent applicable to IPA or Participating IPA Providers, IPA and Participating IPA Providers shall comply with the following, as amended from time to time: Executive Order 11246, the Vietnam Era Veterans Readjustment Act of 1974, the Drug Free Workplace Act of 1988, Section 503 of the Rehabilitation Act of 1973, any similar legislation regarding transactions relating to any government contract of Company or an Affiliate, and any rules and regulations promulgated under such laws.

11.9 Headings. The headings contained in this Agreement are included for purposes of convenience only, and shall not affect in any way the meaning or interpretation of any of the terms or provisions of this Agreement.

11.10 Notices. Any notice required to be given pursuant to the terms and provisions hereof shall be effective only if given in writing and sent by overnight delivery service with proof of receipt, or by certified mail return

TX\IPA 1.0 (10/96)

-13-

receipt requested. Notices shall be sent to the following addresses (which may be changed by giving notice in conformity with this section):

To IPA at:

St. Luke's Independent Practice Association
Texas Medical Center
P. O. Box 20269 MC2-169
Houston, Texas 77225-0269

and to Company at:

Contract Management Department
Aetna U.S. Healthcare
2777 Stemmons Freeway #300
Dallas, Texas 75207

11.11 Non-Exclusivity. This Agreement is not exclusive, and nothing herein shall preclude either party from contracting with any other person or entity for any purpose.

11.12 Entire Agreement. This Agreement (including any attached schedules) constitutes the complete and sole contract between the parties regarding the subject hereof and supersedes any and all prior or contemporaneous oral or written communications or proposals not expressly included herein.

11.13 Restrictive Covenant. IPA agrees that during the term of this Agreement, IPA and its owned and contracted entities, including but not limited to any owned, non-profit, for profit, taxable or tax exempt entities, shall not directly or indirectly, enter into or engage in the ownership, management, operation or control of, or act as a consultant or advisor to any existing or proposed entity operating or planning to operate an HMO, risk-based preferred provider organization, managed care organization, point-of-service plan, or third party administration company for self-insured employers. IPA and IPA Participating Providers shall not (i) disparage Company to any Member; (ii) advise, solicit, influence or induce or attempt to advise, solicit, influence or induce any Member to disenroll from any Company health care plan or enroll in any other health care plan that would require such Member to disenroll from a Company Plan. Furthermore IPA and IPA Participating Providers shall not take any action or make any statements that could tend to influence or induce employers or other entities with which Company has entered into group membership agreements to cease doing business with Company or diminish or otherwise adversely affect their business relationship with Company. This provision continues in effect for one (1) year after termination of this Agreement.

## 12.0 DEFINITIONS

When used in this Agreement, all capitalized terms shall have the following meanings:

12.1 Affiliate. An Affiliate, with respect to Company, means any corporation, partnership or other legal entity (including any Plan) directly or indirectly owned or controlled by, or which owns or controls, or which is under common ownership or control with, Company.

12.2 Coinsurance. The percentage of the lesser of: (a) the rates established under this Agreement; or (b) the Participating IPA Provider's reasonable and customary billed charges, which a Member is required to pay for Covered Services under a Plan.

TX\IPA 1.0 (10/96)
-14-

12.3 **Copayment.** A charge required under a Plan that must be paid by a Member at the time of the provision of Covered Services.

12.4 **Covered Services.** Those Medically Necessary Services which a Member is entitled to receive under the terms and conditions of a Plan.

12.5 **Deductible.** An amount that a Member must pay for Covered Services per specified period in accordance with the Member's Plan before benefits will be paid.

12.6 **Emergency Services.** Emergency Services shall mean, unless otherwise defined in the applicable Plan, Medically Necessary Services to preserve life or stabilize health, available on an inpatient or outpatient basis, twenty-four (24) hours per day, seven (7) days per week.

12.7 **IPA Provider.** A duly licensed and qualified health care provider who is under contract, or on whose behalf a contract has been entered, with IPA.

12.8 **Medically Necessary Services.** Medically Necessary Services shall mean, unless otherwise defined in the applicable Plan, health care services that are appropriate and consistent with the diagnosis in accordance with accepted medical standards and which are likely to result in demonstrable medical benefit, and which are the least costly of alternative supplies or levels of service which can be safely and effectively provided to the patient. Medically Necessary Services do not include custodial or supportive care or rest cures, or services or supplies provided for the convenience of the patient, the patient's family, or the provider. When used in relation to hospital inpatient care, Medically Necessary Services include only those services and supplies that cannot be safely and satisfactorily provided at home, in a physician's office, as an outpatient service, or in any lesser facility. Medically Necessary Services must be related to diagnosis or treatment of an existing illness or injury, except for preventive and well baby care. Health services are not Medically Necessary Services if they are experimental services. Medical necessity, when used in relation to services, shall have the same meaning as Medically Necessary Services.

12.9 **Member.** An individual covered by or enrolled in a Plan.

12.10 **Participating IPA Provider.** An IPA Provider who has been accepted as a Participating Provider by Company.

12.11 **Participating Provider.** Any physician, hospital, skilled nursing facility, or other individual or entity involved in the delivery of health care or ancillary services who or which has entered into and continues to have a current valid contract with Company to provide Covered Services to Members, and has been credentialed by Company or its designee consistent with Company's credentialing policies. Certain categories of Participating Providers may be referred to herein more specifically as, e.g., "Participating Physicians" or "Participating Hospitals."

12.12 **Payor.** An employer, insurer, health maintenance organization, labor union, organization or other person or entity which has agreed to be responsible for funding benefit payments for Covered Services provided to Members under the terms of a Plan.

12.13 **Plan.** Any health benefit product or plan issued, administered, or serviced by Company or one of its Affiliates, including, but not limited to, HMO, preferred provider organization, indemnity, Medicaid, Medicare and Workers' Compensation.

12.14 **Primary Care Physician.** A Participating Physician whose area of practice and training is family practice, general medicine, internal medicine or pediatrics, or who is otherwise designated as a Primary Care Physician by Company, and who has agreed to provide primary care services and to coordinate and manage all Covered

TX\IPA 1.0 (10/96)

-15-

Services for Members who have selected or been assigned to such Participating Physician, if the applicable Plan provides for a Primary Care Physician.

12.15 Proprietary Information. The Information developed by or belonging to Company or any third party Payor including, but not limited to, this Agreement, mailing lists, patient lists, employer lists, Company rates and procedures, product related information and structure, utilization review procedures, formats and structure and related information and documents concerning Company's systems and operations of its Plans

12.16 Specialist Physician. A Participating Physician who is not a Primary Care Physician.

12.17 Sponsor. An entity that has contracted with Company to issue, administer, or service a Plan. Sponsors shall include, without limitation, employer groups sponsoring or offering a self-insured Plan to their employees.

**IN WITNESS WHEREOF**, the undersigned parties have executed this Agreement, intending to be bound hereby.

| IPA | COMPANY |
|---|---|
| By: _James E. Key, m_ | By: _____ |
| Printed Name: _James O Key, II, MD_ | Printed Name: _____ |
| Title: _President_ | Title: _____ |
| Date: _Feb. 3, 1998_ | Date: _____ |

TX\IPA 1.0 (10/96)

-16-

TX\Independent Practice Association Agreement (02/08)
05001163

Page 16 of 34

Printed: 10/10/13
V.6.0.12.09

Pages 17-18

Redacted-
Confidential

ATTACHMENT I

ST. LUKE'S EPISCOPAL HOSPITAL
INDEPENDENT PRACTICE ASSOCIATION , INC.

PHYSICIAN PARTICIPATION MEMORANDUM

I understand that the St. Luke's Episcopal Hospital Independent Practice Association
("IPA") has entered into a Payor Agreement ("Payor") as defined in the Physician
Membership Agreement between Physician and IPA) with Aetna Health Plans of Texas,
Inc. d/b/a Aetna U.S. Healthcare ("Company") and that I must acknowledge and agree to
the following:

Please indicate "NO" or "YES"

_____ No, I do not wish to participate

_____ Yes, I wish to participate, and:

1. I acknowledge Company as Payor under the Payor Agreement with the IPA. If
requested, I shall specifically acknowledge individual insurance products of Payor as
being covered by this acknowledgment.

2. I agree to abide by

(A) all applicable terms of the Payor Agreement between IPA and Company;

(B) all applicable IPA and Payor standards, policies, procedures, programs, rules,
and regulations (including, but not limited to, any utilization management and
quality assurance programs), as amended from time to time; and

( C) all applicable laws and regulations including, but not limited to, the Health
Maintenance Organization Act of 1973 (42 U.S.C. Sec. 300e, et. seq.) and all
applicable regulations thereunder, the Employment Retirement Income Security
Act (29 U.S.C. Sec. 1001, et. seq.) and applicable regulations thereunder, the
Texas Health Maintenance Organization Act (Tex. Ins. Code, Chapter 20A) and
applicable regulations thereunder Titles XVIII and XIX of the Social Security
Act and applicable regulations thereunder, as amended from time to time.

_____
Signature

_____
Print Name

_____
Date

## PRIMARY CARE PHYSICIAN
## PARTICIPATION CRITERIA SCHEDULE

I. **BUSINESS CRITERIA**

  A. **Applicability**

  1. These criteria shall apply to each applicant for participation and each Primary Care Physician participating in Company* Plans and shall be enforced at the sole discretion of Company.

  2. Each applicant for participation as a Primary Care Physician must satisfactorily document evidence meeting the criteria stated in item 4 for at least six (6) months prior to application, unless applicant has entered clinical practice or completed a residency or a fellowship program within the past six (6) months.

  3. Each participating Primary Care Physician must continue to meet the following criteria for the duration of participation in the Company Plans.

  4. A Primary Care Physician must be an internist, pediatrician, family and/or a general practitioner who for the two (2) years prior to applying for participation, unless Primary Care Physician has been in practice less than two (2) years or has had a hiatus in practice, and during his or her participation with Company performs the functions of a Primary Care Physician at least fifty percent (50%) of the time in which he/she engages in the practice of medicine. These functions shall include the supervision, coordination and provision of initial and basic care to patients, as well as referring patients for specialist care and maintaining the continuity of their care. The applicable network medical director will determine whether a physician satisfies the requirements of this section I.A.(4).

  5. The applicant must be certified by a Board recognized by the American Board of Medical Specialties or the American Osteopathic Association unless the applicant meets an exception under the Company Board Certification Exceptions Policy (Credentialing Policy 97-08). All exceptions must be approved by the Aetna U.S. Healthcare Network Medical Director following the Company Board Certification Exceptions Approval Process.

  6. If Primary Care Physician is part of a group practice, all Primary Care Physicians in the group must meet these Participation Criteria and must agree to participate in all Company Plans. If all physicians in the group do not meet these criteria, the group cannot participate.

  7. Each Primary Care Physician must execute a Provider Agreement (with a footer dated 8/96 or later) or an alternative acceptable to Company under which the Primary Care Physician agrees to provide services to Members of all health products, plans or programs issued, administered, or serviced by Company or one of its affiliates, including but not limited to health maintenance organization, preferred provider organization, indemnity, Medicaid (where applicable), and Medicare.

---

*Company is defined in Agreement.

7/97

1

# PRIMARY CARE PHYSICIAN
# PARTICIPATION CRITERIA SCHEDULE

8. Each applicant must fully complete the participation application form, and each applicant and participating Primary Care Physician shall periodically supply to Company all requested information, including the confidential information forms.

B. **Office Standards**

Each Primary Care Physician's medical office must:

1. Have a sign containing the names of all physicians practicing at the office. The office sign must be visible when the office is open.

2. Have a mechanism for notifying members if an Allied Health Professional (i.e., physician assistant, advanced practice nurse, nurse practitioner, nurse midwife) may provide care.

3. Be readily accessible to all patients, including but not limited to its entrance, parking and bathroom facilities.

4. Be clean, presentable, and have a professional appearance.

5. Provide clean, properly equipped patient toilet and handwashing facilities.

6. Have a waiting room able to accommodate at least five (5) patients.

7. Have at least two (2) examining rooms which are clean, properly equipped, and provide privacy for the patient.

8. Have a gynecology table and equipment for pelvic exams for acute conditions (except for pediatric age limit - newborn through 17)

9. Have a no-smoking policy.

10. Have an assistant in office during scheduled hours.

11. Require a medical assistant to attend specialized (e.g., gynecological) examinations, unless the patient declines to allow such assistant to be present.

12. Provide evidence that physician has a copy of current licenses for all Allied Health Professionals practicing in the office, including: state professional license, Federal Drug Enforcement Agency and State Controlled Drug Substance (where applicable).

13. Keep on file and make available to Aetna U.S. Healthcare any state required practice protocols or supervising agreements for Allied Health Professionals practicing in office.

14. Complete a Location Form, attached hereto, identifying the address(es) and physical location(s) of office(s).

C. **Coverage**

1. Twenty-four (24) hours-a-day coverage for Members must be arranged with another Company Participating Primary Care Physician except as provided in Section C.4 below.

2. Covering physician office must be located within 25 minutes of the Primary Care Physician office.

7/97                                                        2

## PRIMARY CARE PHYSICIAN
## PARTICIPATION CRITERIA SCHEDULE

3.  Inpatient coverage must be arranged with a Participating Physician who has privileges at the same hospital as the covered physician

4.  A Primary Care Physician must submit for prior approval by Company any coverage arrangements made with a nonparticipating Primary Care Physician. Approval of coverage by a nonparticipating Primary Care Physician is subject to Company's sole discretion, and such approval must be in writing. If Primary Care Physician receives approval from Company for coverage by a nonparticipating Primary Care Physician, Primary Care Physician shall require such nonparticipating Primary Care Physician to comply with applicable terms of this Agreement. Primary Care Physician shall make suitable arrangements regarding the amount and manner in which such covering nonparticipating Primary Care Physician shall be compensated, provided, however, that Primary Care Physician shall ensure that the covering physician will not under any circumstances bill Members (except for applicable Copayments, Coinsurance and Deductibles) for any Covered Services.

### D.  Access

1.  Each Primary Care Physician's medical office must throughout the term of participation with Company, have at least one (1) Primary Care Physician for every three thousand (3,000) active patients, defined as those patients seen within the past two (2) years.

2.  Each Primary Care Physician's medical office must have, at a minimum, twenty (20) hours of regularly scheduled office hours for the treatment of patients (whether Members or other patients) over at least four (4) days per week.

3.  If a Primary Care Physician has more than one office location participating with Company, then the Primary Care Physician must have, at a minimum, twenty (20) hours over at least four (4) days per week of regularly scheduled office hours for the treatment of patients in each location.

4.  Each Primary Care Physician or his or her covering Primary Care Physician must respond to a Member within thirty (30) minutes after notification of an urgent call.

5.  Each Primary Care Physician must schedule appointments with Members within the following time frames:

| | |
|---|---|
| • Emergency care: | must be seen immediately (or referred to ER, as appropriate) |
| • Urgent complaint: | same day or within twenty-four (24) hours |
| • Symptomatic/non-urgent acute complaint (e.g., sore throat: | within three days |
| • Routine care: | within seven days |
| • Preventive routine care: | within four weeks |
| • Follow-up visit: | within two weeks |

6.  Each Primary Care Physician shall have no more than an average of five (5) intermediate level patient visits (or no more than six (6) pediatric intermediate level visits), whether a Member or otherwise, per hour as documented from a fixed appointment schedule.

7.  Each Primary Care Physician office must have adequate plans for managing an increase in patient load.

7/97                                    3

# PRIMARY CARE PHYSICIAN
## PARTICIPATION CRITERIA SCHEDULE

8. Each Primary Care Physician must have a reliable twenty-four (24) hours-a-day, seven (7) days-a-week answering service or machine with a beeper or paging system. A recorded message or answering service which refers Members to emergency rooms is not acceptable.

E. Hospital Care

1. At the time of application, a Primary Care Physician must show that during the six (6) months immediately prior to application, he/she had hospital privileges to admit his/her patients on his/her own service, unless such applicant has more recently entered clinical practice or completed his/her residency or fellowship training program. This showing may be in the form of:

   (a) A letter from the Chief of Staff of the admitting hospital; or

   (b) A letter from the Chief of Service of the admitting hospital.

   (c) A letter from the admitting hospital verifying privileges.

2. Throughout the term of the Agreement and participation with Company, a Primary Care Physician must have admitting privileges in good standing at a Participating Hospital.

3. A Primary Care Physician must admit Members whose conditions require hospitalization to said physician's own service or to the service of a plan participating physician if Member's condition is within said physician's range of expertise and scope of privileges.

4. Any exceptions to the above must be approved in advance by the applicable network medical director in accordance with relevant Company policies and procedures.

F. Office Procedures

Company representative must confirm during office site visits that:

1. Primary Care Physician does EKGs (except for pediatric age limit - newborn through age 17)

2. Primary Care Physician does pelvic exams for acute conditions in all offices caring for female Members over the age of seventeen (17).

3. Age appropriate immunizations are provided.

4. Primary Care Physician or staff draws blood in his/her office, uses "finger sticks" for hematocrits and hemaglobin (peds only), or uses a Company designated laboratory drawing station.

5. Primary Care Physician performs blood glucose monitoring on site.

G. Patient Load

1. Each Primary Care Physician practice must agree to and be able to demonstrate the capability to accept a minimum of two hundred and fifty (250) Members.

2. Each Primary Care Physician must designate by age, according to Company guidelines, those Members for whom the physician will provide care.

7/97                                          4

# PRIMARY CARE PHYSICIAN
# PARTICIPATION CRITERIA SCHEDULE

3. Any use of an allied health professional (Advanced Practice Nurse or Physicians Assistant) by a Primary Care Physician must comply with Company's then current policies and all applicable legal requirements regarding practice of allied health professionals.

### H. Office Records

1. A Primary Care Physician must demonstrate, at the time of application and thereafter, that his/her medical records are legible, reproducible and otherwise meet Company's standards for confidentiality, medical record keeping practices, and that clinical documentation demonstrates comprehensive care. Members' medical records shall include reports from referred and/or referring providers, discharge summaries, records of emergency care received and such other information as Company may require from time to time.

2. Each Member encounter must be documented in writing and signed or initialed by the Primary Care Physician or as required by state law.

### I. Professional Liability Insurance

1. During the entire term of this Agreement, Primary Care Physician shall maintain insurance at minimum levels required from time to time by Company, but in no event less than: (a) professional liability insurance at a minimum level of _____ dollars ($ _____) per claim and _____ dollars ($_____) in the annual aggregate, except in cases where this level of insurance exceeds that required by applicable state law, in which instance Primary Care Physician shall maintain the maximum level of professional liability insurance required by law; and (b) comprehensive general liability insurance at a minimum level of $1 million dollars ($1,000,000) per claim and $3 million dollars ($3,000,000) in the annual aggregate. Primary Care Physician's insurance shall cover the acts and omissions of Primary Care Physicians, as well as Primary Care Physician's agents and employees. Memorandum copies of such policies shall be delivered to Company upon request. Primary Care Physician must notify Company at least thirty (30) days in advance of the cancellation, limitation or material change of said policies.

### J. Philosophy

1. A Primary Care Physician must be supportive of the philosophy and concept of managed care and Company. A Primary Care Physician shall not differentiate or discriminate in the treatment of, or in the access to treatment of, patients on the basis of their status as Members, or other grounds identified in the Agreement.

2. Each Primary Care Physician shall have the right and is encouraged to discuss with his or her patients pertinent details regarding the diagnosis of the patient's condition, the nature and purpose of any recommended procedure, the potential risks and benefits of any recommended treatment, and any reasonable alternatives to such recommended treatment.

3. Primary Care Physician's obligations under the Agreement not to disclose Proprietary Information do not apply to any disclosures to a patient determined by Primary Care Physician to be necessary or appropriate for the diagnosis and care of a patient, except to the extent such disclosure would otherwise violate Primary Care Physician's legal or ethical obligations.

4. Primary Care Physician is encouraged to discuss Company's provider reimbursement methodology with Primary Care Physician's patients who are Members, subject only to Primary Care Physician's general contractual and ethical obligations not to make false or misleading statements. Accordingly, Proprietary Information does not include descriptions of the Quality Care Compensation System

# PRIMARY CARE PHYSICIAN
## PARTICIPATION CRITERIA SCHEDULE

methodology under which Primary Care Physician is reimbursed, although such Proprietary Information does include the specific rates paid by Company due to their competitively sensitive nature.

## II. PROFESSIONAL CRITERIA

### A. Licensure

1. A Primary Care Physician must have a valid, unencumbered license to practice medicine or osteopathy in his/her state of practice, or in the case of a Primary Care Physician with an encumbered license, the applicant demonstrates to the applicable peer review committee's satisfaction that encumbered license does not raise concern about possible future substandard professional performance, competence, or conduct.

2. A Primary Care Physician must have an unrestricted DEA certification, and, where applicable, a state-mandated controlled drug certification.

### B. Education

1. A Primary Care Physician must be a graduate of a school of medicine or osteopathy which is accredited by the Liaison Committee on Medical Education and is listed by the Association of American Medical Colleges or the American Osteopathic Association, or in the World Health Organization's directory *World Wide Medical Schools*.

### C. Continuing Education

1. A Primary Care Physician shall meet the continuing medical education requirements of the American Medical Association (AMA), American Osteopathic Association (AOA), American Academy of Pediatrics (AAP), or American Academy of Family Physicians (AAFP), or as required by state law, if greater. Applicants for participation in Company must demonstrate that they have met such continuing education requirements for the three (3) years immediately prior to submitting his/her application for participation. If an applicant has been in practice less than three (3) years, or has had a hiatus in practice, the applicant need only demonstrate that he/she has met such continuing education requirements during the period of his/her practice.

## III. PROFESSIONAL COMPETENCE AND CONDUCT CRITERIA

### A. General

1. Primary Care Physician must be of sound moral character and must not have been indicted, arrested for or charged with, or convicted (i.e., finding of guilt by a judge or jury, a plea of guilty or nolo contendere, participation in a first offender program or any other such program which may be available as an alternative to proceeding with prosecution, whether or not the record has been closed or expunged) of any felony or criminal charge related to moral turpitude or the practice of medicine.

2. Primary Care Physician must not have engaged in any unprofessional conduct, unacceptable business practices or any other act or omission which in the view of the applicable peer review committee may raise concerns about possible future substandard professional performance, competence or conduct.

7/97

6

# PRIMARY CARE PHYSICIAN
## PARTICIPATION CRITERIA SCHEDULE

**B. Professional Liability Claims History**

1. Primary Care Physician must not have a history of professional liability claims, including, but not limited to, lawsuits, arbitration, mediation, settlements or judgments, which in the view of the applicable peer review committee may raise concerns about possible future substandard professional performance, competence or conduct.

**C. History of Involuntary Termination or Restriction**

1. Primary Care Physician must not have a history of involuntary termination (or voluntary termination during or in anticipation of an investigation or dismissal) of employment or any other sort of engagement as a health care professional, or reduction or restriction of duties or privileges, or of a contract to provide health care services, which in the view of the applicable peer review committee may raise concerns about possible future substandard professional performance, competence or conduct.

**D. Notification of Adverse Actions or Limitations**

1. Primary Care Physician shall provide immediate notice to Company of any adverse action relating to said physician's (i) hospital staff privileges; (ii) DEA or state narcotics numbers; (iii) participation in the Medicare, Medicaid, or other governmental programs, or (iv) state licensure including censure. Each applicant and Primary Care Physician shall inform the Company in writing of any previous adverse actions with respect to any of the above. For the purpose of this section, "adverse action" includes, but is not limited to, any of the following or their substantial equivalents (regardless of any subsequent action or expungement of the record): denial; exclusions; fine; monitoring; probation; suspension; letter of concern, guidance, censure, or reprimand; debarment; expiration without renewal; subjection to disciplinary action or other similar action or limitation, restriction; counseling; medical or psychological evaluation; loss, in whole or in part; staff privileges reduced, withheld, suspended, voluntarily surrendered, resigned, revoked or subject to any special provision; termination or refused participation; revocation, administrative letter; non-renewal; voluntary or involuntary surrender of licensure or status to avoid, or in anticipation of, any of the adverse actions listed regardless of whether said action is or may be reportable to the National Practitioner Data Bank or any other officially sanctioned or required registry; and initiation of investigations, inquiries or other proceedings that could lead to any of the actions listed, regardless of whether said action is or may be reportable to the National Practitioner Data Bank or any other officially sanctioned or required registry. Any such adverse actions may be grounds for action, including without limitation denial, termination or other sanctions imposed pursuant to Company's credentialing/quality improvement programs.

2. Primary Care Physician shall provide immediate notice to Company of any condition or circumstance that impairs or limits his/her ability to perform the essential functions of a Participating Primary Care Physician.

3. Primary Care Physician shall provide immediate notice to Company of any condition or circumstance of which he/she is aware that may pose a direct threat to the safety of himself/herself, coworkers or patients.

4. Primary Care Physician shall provide immediate notice to Company and to Members of any condition or circumstance of which he/she is aware which law or regulation requires Primary Care Physician to report.

## PRIMARY CARE PHYSICIAN
## PARTICIPATION CRITERIA SCHEDULE

**E. References**

1. Each applicant for participation must supply references as requested by the applicable Company peer review committee.

2. The applicable Company peer review committee shall have the right to act on any reference or information received from a Primary Care Physician's colleagues. Primary Care Physician waives any and all rights to bring any legal action relating to such information or the collection or use thereof against Company, any Affiliates or related companies or any director, officer, employee or agent thereof, or any person or entity providing a reference or information at the request of the applicable Company peer review committee.

These criteria may be modified at the sole discretion of Company.

7/97

8

## SPECIALIST PHYSICIAN
## PARTICIPATION CRITERIA

### I. BUSINESS CRITERIA

#### A. Applicability

1. These criteria shall apply to each applicant for participation and each Specialist Physician participating in Company[*] Plans and shall be enforced at the sole discretion of Company.

2. Each applicant for participation as a Specialist Physician must satisfactorily document evidence meeting the criteria stated in Item I.A.4 for at least six (6) months prior to application, unless applicant has entered clinical practice or completed a residency or a fellowship program within the past six (6) months.

3. Each participating Specialist Physician must continue to meet the following criteria for the duration of participation in the Company Plans.

4. A Specialist Physician must be an M.D. or D.O. who dedicates a significant portion (usually greater than 50%) of his or her professional services to non-primary care delivery. These services include providing consultation and treatment to members upon referral from primary care physicians in products which require referrals or to members who self-refer in PPO or POS products.

5. The applicant must be certified by a Board recognized by the American Board of Medical Specialties or the American Osteopathic Association. Unless the applicant meets an exception under the Company Board Certification Exceptions Process Policy (Credentialing Policy 97-08). All exceptions must be approved by the Aetna U.S. Healthcare Network Medical Director following the Company Board Certification Exceptions Approval Process.

6. If Specialist Physician provides Specialist Services at a Participating Facility, Specialist Physician must also meet, for the time periods set forth in Sections I.A.2 and I.A.3 above, any additional criteria applicable to Specialist Physician which are set forth in the Participation Criteria for the Participating Facility.

7. If Specialist Physician is part of a group practice, all specialist physicians in the group must meet these Participation Criteria and must agree to participate in all Company Plans.

8. Each Specialist Physician must execute a Provider Agreement (with a footer dated 8/96 or later) or an alternative acceptable to Company under which the Specialist Physician agrees to provide services to Members of all health products, plans or programs issued, administered, or serviced by Company or one of its affiliates, including but not limited to health maintenance organization, preferred provider organization, indemnity, Medicaid (where applicable), and Medicare.

---

[*] Company is defined in Agreement.

7/97

1

## SPECIALIST PHYSICIAN
## PARTICIPATION CRITERIA

9.  Each applicant must fully complete the participation application form, and each applicant and participating Specialist Physician shall periodically supply to Company all requested information, including the confidential information forms.

**B.  Office Standards**

Each Specialist Physician's medical office must:

1.  Have a sign containing the names of all physicians practicing at the office. The office sign must be visible when the office is open.

2.  Have a mechanism for notifying members if an Allied Health Professional (i.e., physicians assistant, advanced practice nurse, nurse practitioner, nurse midwife) may provide care.

3.  Be clean, presentable, and have a professional appearance.

4.  Be readily accessible to all patients according including but not limited to its entrance, parking and bathroom facilities.

5.  Provide clean, properly equipped patient toilet and handwashing facilities.

6.  Have a waiting room able to accommodate at least five (5) patients.

7.  Have at least two (2) exam rooms which are clean, properly equipped, and provide privacy for the patient.

8.  Have a no-smoking policy.

9.  Have an assistant in office during scheduled hours.

10. Require a medical assistant to attend specialized (e.g., gynecological) examinations unless the patient declines to allow such assistant to be present.

11. Provide evidence that physician has a copy of current licenses for all Allied Health Professionals practicing in the office, including: state professional license, Federal Drug Enforcement Agency and State Controlled Drug Substance (where applicable).

12. Keep on file and make available to Aetna U.S. Healthcare any state required practice protocols or supervising agreements for Allied Health Professionals practicing in office.

13. Complete a **Location Form**, attached hereto, identifying the address and physical location(s) of the Provider's office(s).

**C.  Coverage**

1.  When applicable to the relevant Specialty, as determined by Company in its sole discretion, Specialist Physician shall ensure that twenty-four (24) hours-a-day coverage for Members is arranged with another Company Participating Specialist Physician, except as otherwise provided in subsection 3 of this section.

2.  For outpatient services, the covering physician's office must be within sixty (60) minutes non--rush hour travel time from the office of the covered physician.

7/97

2

## SPECIALIST PHYSICIAN
## PARTICIPATION CRITERIA

3.  A Specialist Physician must submit for prior approval by Company any coverage arrangements made with a nonparticipating specialist physician. Approval of coverage by a nonparticipating specialist physician is subject to Company's sole discretion, and such approval must be in writing. If Specialist Physician receives approval from Company for coverage by a nonparticipating specialist physician, Specialist Physician shall require such nonparticipating specialist physician to comply with applicable terms of this Agreement. Specialist Physician shall make suitable arrangements regarding the amount and manner in which such covering nonparticipating specialist physician shall be compensated, provided, however, that Specialist Physician shall ensure that the covering physician will not under any circumstances bill Members (except for applicable Copayments, Coinsurance and Deductibles) for any Covered Services.

### D.  Access

1.  Specialist Physician shall have a reliable twenty-four (24) hours, seven (7) days-a-week answering service or machine with a beeper or paging system. A recorded message or answering service which refers Members to the emergency room is not acceptable.

2.  Specialist Physician shall make available at least an average of eight (8) hours a week for scheduling office appointments.

### E.  Hospital Care

1.  When applicable to the relevant Specialty, as determined by Company in its sole discretion, at the time of application, a Specialist Physician must show that during the six months immediately prior to application, he/she had hospital privileges to admit his/her patients on his/her own service, unless such applicant has more recently entered clinical practice or completed his/her residency or fellowship training program. This showing may be in the form of:

    (a)  A letter from the Chief of Staff of the admitting hospital; or

    (b)  A letter from the Chief of Service of the admitting hospital.

    (c)  A letter from the admitting hospital verifying privileges.

2.  Throughout the term of the Agreement and participation with Company, a Specialist Physician must have admitting privileges in good standing at a Participating Hospital.

3.  Any exceptions to the above must be approved in advance by the applicable network medical director in accordance with relevant Company policies and procedures.

### F.  Office Records

1.  A Specialist Physician must demonstrate that his/her medical records are legible, reproducible and otherwise meet Company's standards for confidentiality and medical record keeping practices, and that clinical documentation demonstrates comprehensive care. Members' medical records shall include reports from referred and/or referring providers, discharge summaries, records of emergency care received and such other information as Company may require from time to time.

2.  Each Member encounter must be documented in writing and signed or initialed by the Specialist Physician or as required by state law.

7/97                                          3

## SPECIALIST PHYSICIAN
## PARTICIPATION CRITERIA

### G. Professional Liability Insurance

1. During the entire term of this Agreement, Specialist Physician shall maintain insurance at minimum levels required from time to time by Company, but in no event less than: (a) professional liability insurance at a minimum level of _____ dollars ($ _____) per claim and _____ dollars ($_____) in the annual aggregate, except in cases where this level of insurance exceeds that required by applicable state law, in which instance Specialist Physician shall maintain the maximum level of professional liability insurance required by law; and (b) comprehensive general liability insurance at a minimum level of $1 million dollars ($1,000,000) per claim and $3 million dollars ($3,000,000) in the annual aggregate. Specialist Physician's insurance shall cover the acts and omissions of Specialist Physicians, as well as Specialist Physician's agents and employees. Memorandum copies of such policies shall be delivered to Company upon request. Specialist Physician must notify Company at least thirty (30) days in advance of the cancellation, limitation or material change of said policies.

### H. Philosophy

1. A Specialist Physician must be supportive of the philosophy and concept of managed care and Company. A Specialist Physician shall not differentiate or discriminate in the treatment of, or in the access to treatment of, patients on the basis of their status as Members, or other grounds identified in the Agreement.

2. Each Specialist Physician shall have the right and is encouraged to discuss with his or her patients pertinent details regarding the diagnosis of the patient's condition, the nature and purpose of any recommended procedure, the potential risks and benefits of any recommended treatment, and any reasonable alternatives to such recommended treatment.

3. Specialist Physician's obligations under the Agreement not to disclose Proprietary Information do not apply to any disclosures to a patient determined by Specialist Physician to be necessary or appropriate for the diagnosis and care of a patient, except to the extent such disclosure would otherwise violate Specialist Physician's legal or ethical obligations.

4. Specialist Physician is encouraged to discuss Company's provider reimbursement methodology with Specialist Physician's patients who are Members, subject only to Specialist Physician's general contractual and ethical obligations not to make false or misleading statements. Accordingly, Proprietary Information does not include descriptions of the methodology under which Specialist Physician is reimbursed, although such Proprietary Information does include the specific rates paid by Company due to their competitively sensitive nature.

## II. PROFESSIONAL CRITERIA

### A. Licensure

1. A Specialist Physician must have a valid, unencumbered license to practice medicine or osteopathy in his/her state of practice, or in the case of a Specialist Physician with an encumbered license, the applicant demonstrates to the applicable peer review committee's satisfaction that the encumbered license does not raise concern about possible future substandard professional performance, competence or conduct.

7/97

4

## SPECIALIST PHYSICIAN
## PARTICIPATION CRITERIA

    2. When applicable to the relevant Specialty, as determined by Company in its sole discretion, a Specialist Physician must have an unrestricted DEA certification, and, where applicable, a state-mandated controlled drug certification.

### B. Training

    1. A Specialist Physician must be a graduate of a school of medicine or osteopathy which is accredited by the Liaison Committee on Medical Education and is listed by the Association of American Medical Colleges or the American Osteopathic Association, or in the World Health Organization's directory *World Wide Medical Schools*

## III. PROFESSIONAL COMPETENCE AND CONDUCT CRITERIA

### A. General

    1. A Specialist Physician must be of sound moral character and must not have been indicted, arrested for or charged with, or convicted (i.e., finding of guilt by a judge or jury, a plea of nolo contendere, participation in a first offender program or any other such program which may be available as an alternative to proceeding with prosecution, whether or not the record has been closed or expunged) of any felony or criminal charge related to moral turpitude or the practice of medicine.

    2. Specialist Physician must not have engaged in any unprofessional conduct, unacceptable business practices or any other act or omission which in the view of the applicable peer review committee may raise concerns about possible future substandard professional performance, competence or conduct.

### B. Professional Liability Claims History

    1. Specialist Physician must not have a history of professional liability claims, including but not limited to lawsuits, arbitration, mediation, settlements or judgments, which in the view of the applicable peer review committee may raise concerns about possible future substandard professional performance, competence or conduct.

### C. History of Involuntary Termination or Restriction

    1. Specialist Physician must not have a history of involuntary termination (or voluntary termination during or in anticipation of an investigation or dismissal) of employment or any other sort of engagement as a health care professional, or reduction or restriction of duties or privileges, or of a contract to provide health care services, which in the view of the applicable peer review committee may raise concerns about possible future substandard professional performance, competence or conduct.

### D. Notification of Adverse Actions or Limitations

    1. A Specialist Physician shall provide immediate notice to Company of any adverse action relating to said physician's (i) hospital staff privileges; or (ii) DEA or state narcotics numbers,; (iii) participation in Medicare, Medicaid, or other governmental programs; or (iv) state licensure, including censure. Each applicant and Specialist Physician shall inform Company in writing of any previous adverse actions with respect to any of the above. For the purpose of this section, "adverse action" includes, but is not limited to, any of the following or their substantial equivalents (regardless of any subsequent action or expungement of the record): denial; exclusions; fine; monitoring; probation; suspension; letter of concern, guidance, censure, or reprimand; debarment; expiration without renewal; subjected to disciplinary action or other similar action or limitation; restriction; counseling; medical or

7/97                                      5

# SPECIALIST PHYSICIAN
## PARTICIPATION CRITERIA

psychological evaluation; loss, in whole or in part; staff privileges reduced, withheld, suspended, voluntarily surrendered, resigned, revoked or subject to any special provision; termination or refused participation; revocation; administrative letter; non-renewal; voluntary or involuntary surrender of licensure or status to avoid, or in anticipation of, any of the adverse actions listed regardless of whether said action is or may be reportable to the National Practitioner Data Bank or any other officially sanctioned or required registry; and initiation of investigations, inquiries or other proceedings that could lead to any of the actions listed, regardless of whether said action is or may be reportable to the National Practitioner Data Bank or any other officially sanctioned or required registry. Any such adverse actions may be grounds for action, including without limitation denial, termination or other sanctions imposed pursuant to Company's credentialing/quality improvement programs.

2. A Specialist Physician shall provide immediate notice to Company of any condition or circumstance that impairs or limits his/her ability to perform the essential functions of a Participating Specialist Physician.

3. A Specialist Physician shall provide immediate notice to Company of any condition or circumstance of which he/she is aware that may pose a direct threat to the safety of himself/herself, coworkers or patients.

4. A Specialist Physician shall provide immediate notice to Company and to Members of any condition or circumstance of which he/she is aware which law or regulation requires Specialist Physician to report.

E. References

1. The applicable Company peer review committee shall have the right to act on any reference or information received from a Specialist Physician's colleagues. Specialist Physician waives any and all rights to bring any legal action relating to such information or the collection or use thereof against Company, any Affiliates or related companies or any director, officer, employee or agent thereof, or any person or entity providing a reference or information at the request of the applicable Company peer review committee.

These criteria may be modified at the sole discretion of Company.

## LOCATION FORM

**PROVIDER:**

Listed below is the physical location, mailing address and telephone number for the Office or Facility:

| | |
|---|---|
| **Office/Facility:** | |
| **Street Address:** | |
| **Mailing Address:** | |
| **City, State, Zip Code:** | |
| **Telephone Number:** | |

### Amendment to the IPA Agreement between
### St. Luke's Episcopal Hospital Independent Practice Association, Inc. and
### Aetna U.S. Healthcare Inc.

This amendment is made as of April 1 ____, 200__ between Aetna U.S. Healthcare Inc., on behalf of itself and its Affiliates (hereinafter referred to as "Company") and St. Luke's Episcopal Hospital Independent Practice Association.

**WHEREAS**, the parties have entered into an Independent Practice Association Agreement, effective February 1st, 1998 ("Agreement") to permit participating Independent Practice Association physicians to provide health care services to Members;

**WHEREAS**, the parties wish to amend the Agreement to revise the compensation schedule as provided herein;

**NOW, THEREFORE**, in consideration of the mutual promises and undertakings contained herein, the parties agree as follows:

1. The Compensation Schedule of the Agreement is hereby replaced by the attached Compensation Schedules. All other terms of the Agreement not amended herein remain in full force and effect. If any term of this Amendment conflicts with the terms of the Agreement, the terms of this Amendment shall prevail.

**IN WITNESS WHEREOF**, the parties have caused this Amendment to be executed below.

| ACCEPTED BY | COMPANY |
|---|---|
| By: _____ | By: _____ |
| Signature | Signature |
| Printed Name: _F. Lyone Hochman, MD_ | Printed Name: ___Kenneth W. Janda___ |
| | Regional Network Operations Manager |
| Title: _Pres. dent_ | Title: |
| Date: _February 14, 2001_ | Date: MAR 06 2001 |
| Tax ID Number: _76-0377930_ | |

St. Luke's Episcopal Hospital Independent Practice Associati

## LOCATION SCHEDULE

**PROVIDER:**

Listed below is the physical location, mailing address and telephone number for the Office or Facility:

| | |
|---|---|
| **Office/Facility:** | St. Luke's Episcopal Hospital Independent Practice Association |
| **Street Address:** | 6900 Fannin, Suite 870, Houston, Texas 77030 |
| **Mailing Address:** | P.O. Box 20269, MC2-169 |
| **City, State, Zip Code:** | Houston, Texas 77225-0269 |
| **Billing Address:** | N/A |
| **Comments:** | The physicians in St. Luke's Episcopal Hospital Independent Practice Association (IPA) operate out of their own offices. The address listed above is for the administrative offices of St. Luke's Hospital IPA. |
| **Telephone Number:** | 713/794-6948 |
| **Tax Identification Number** | TIN 76-0377930, the physicians attached to this agreement bill under their own TIN. |

| For Internal Use Only | |
|---|---|
| **PIN Number:** | |
| **PVN Number:** | |

**PHYSICIAN**
**SERVICES AND COMPENSATION SCHEDULE***

### SERVICES AND COMPENSATION:

# REDACTED

Company utilizes the nationally recognized coding structure known as the AMA Current Procedural Terminology (CPT-4) for the basic coding, description of services and rules for the services provided. As annual changes are made to the CPT-4 codes, Company will update the coding structure, but the procedure remains materially the same.

This Compensation Schedule includes reimbursement for the Primary Care Physicians, Specialists and Medical Center Emergency Physicians, P.A.

CPT-4 codes included in the Professional Component of this Agreement apply to the services rendered and are not limited to the specialty of the performing provider.

Rates are inclusive of any applicable member copayment, coinsurance or deductible.
Provider must designate the above codes when billing.

* For HMO-based Plans, this Compensation Schedule will be effective as of the commencement date of the Agreement under Section 7.1 hereof. For PPO-based Plans, this Compensation Schedule will be effective as of the date on which the rates set forth herein are fully loaded into and implemented under the Company's claims systems.

Specialist Physician. Exception to REF (7/97)
05001163

Page 3 of 5

Printed: 2/14/01
V.1.1 4.99

**SPECIALIST PHYSICIAN**
**SERVICES AND COMPENSATION SCHEDULE\***
**GULF COAST PATHOLOGY**

<u>SERVICES and COMPENSATION:</u>

Company utilizes the nationally recognized coding structure known as the AMA Current Procedural Terminology (CPT-4) for the basic coding, description of services and rules for the services provided. As annual changes are made to the CPT-4 codes, Company will update the coding structure, but the procedure remains materially the same.

CPT-4 codes included in the Professional Component of this Agreement apply to the services rendered and are not limited to the specialty of the performing provider.

Rates are inclusive of any applicable member copayment, coinsurance or deductible.
Provider must designate the above codes when billing.

\* For HMO-based Plans, this Compensation Schedule will be effective as of the commencement date of the Agreement under Section 7.1 hereof. For non-HMO-based Plans, this Compensation Schedule will be effective as of the date on which the rates set forth herein are fully loaded into and implemented under the Company's claims systems.

Specialist Physician. Exception to REF (7/97)
05001163

Page 4 of 5

Printed: 2/14/01
V.1.1.4.99

**SPECIALIST PHYSICIAN
SERVICES AND COMPENSATION SCHEDULE\***
**SINGLETON AND ASSOCIATES**

<u>SERVICES and COMPENSATION:</u>

# REDACTED

Company utilizes the nationally recognized coding structure known as the AMA Current Procedural Terminology (CPT-4) for the basic coding, description of services and rules for the services provided. As annual changes are made to the CPT-4 codes, Company will update the coding structure, but the procedure remains materially the same.

CPT-4 codes included in the Professional Component of this Agreement apply to the services rendered and are not limited to the specialty of the performing provider.

Rates are inclusive of any applicable member copayment, coinsurance or deductible.
Provider must designate the above codes when billing.

\* For HMO-based Plans, this Compensation Schedule will be effective as of the commencement date of the Agreement under Section 7.1 hereof. For non-HMO-based Plans, this Compensation Schedule will be effective as of the date on which the rates set forth herein are fully loaded into and implemented under the Company's claims systems.

Specialist Physician. Exception to REF (7/97)
05001163

Page 5 of 5

Printed: 2/14/01
V.1.1.4.99

# LOCATION FORM

**PROVIDER:**    St. Luke's IPA

Listed below is the physical location, mailing address and telephone number for the Office or Facility:

| | |
|---|---|
| Office/Facility: | St. Luke's Episcopal Hospital Independent Physicians Association |
| Street Address: | 6900 Fannin, Suite 870 |
| Mailing Address: | P.O. Box 20269, MC2-169 |
| City, State, Zip Code: | Houston, Texas 77225-0269 |
| Telephone Number: | 713/794-6948 |

The physicians in St. Luke's IPA operate out of their own offices. The address above is for the administrative offices of St. Luke's IPA.