IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Aetna Life Insurance Company | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| V. | * | No. 4:13-cv-3412 |
| | * | |
| Methodist Hospitals of Dallas, *et al.* | * | |
| | * | |
| Defendants | * | |

_____

## DEFENDANTS' RESPONSE TO
## MOTION FOR SUMMARY JUDGMENT

_____

OF COUNSEL:

LAW OFFICE OF
JOSEPH V. GIBSON, PC
Texas Bar No. 24007236
Fed. ID No. 29963
Joseph V. Gibson, IV
10330 Lake Road, Building X
Houston, Texas 77070
(281) 370-1810
(281) 370-1811 (fax)


FRANCIS, ORR & TOTUSEK, LLP
James M. Orr
Texas Bar No. 15313600
Joe Don Ridgell
Texas Bar No. 24046716
Bobby D. Amick
Texas Bar No. 24059377
500 N. Akard, Suite 1830
Dallas, Texas 75201
(214) 740-4250
(214) 740-4266 (fax)

Mikal C. Watts
Texas Bar No. 18215300
Fed. ID No. 12419
mcwatts@wattsguerra.com
WATTS GUERRA LLP
Four Dominion Drive,
Bldg. Three, Suite 100
San Antonio, Texas 78257
(210) 447-0500
(210) 447-0501 (fax)


ATTORNEY-IN-CHARGE FOR
DEFENDANTS METHODIST-DALLAS,
MEDICAL CENTER ENT &
TEXAS HEALTH RESOURCES

**TABLE OF CONTENTS**

I.    NATURE AND STAGE OF PROCEEDING ................................................. 1

II.    STATEMENT OF ISSUES TO BE RULED UPON ................................... 1

III.    SUMMARY OF THE ARGUMENT ............................................................ 1

IV.    ARGUMENT ................................................................................................ 2

    A.    THE TPPA REGULATES AETNA'S LATE-PAYMENT OF ALL
        CLAIMS MADE BY PROVIDERS WITH WHOM AETNA
        HAS CONTRACTED ......................................................................... 2

        1.    Aetna Misapplies Section 1301.0041 ...................................... 3

        2.    Aetna's Arguments for Deference to the TDI Fail ............... 12

            a.    Because TDI's Position Did Not Result from Formal
               Agency Proceedings, it is Entitled to No Deference .................. 12

            b.    TDI Has Adopted No Formal Rule Excepting Self-Funded
               Plans from the TPPA ........................................................ 13

            c.    The Case law Cited by Aetna Does Not Support Its
               Request that TDI's Position Be Given Deference ....................... 13

        3.    Aetna's Reliance on This Court's Summary Judgment
            In *St. Luke's Hosp. v. Principal Life Ins. Co.* is Misplaced
            Since There The Application of the TPPA Was Never Briefed ....... 14

    B.    ERISA DOES NOT PREEMPT THE TPPA CLAIMS
        BROUGHT BY DEFENDANTS ...................................................... 15

        1.    There is No *Complete* Preemption  by ERISA of the
            TPPA Claims Brought by Defendants ................................ 15

            a.    Federal Courts Consistently Have Held ERISA Does Not
                Completely Preempt Late-Pay Claims under the TPPA
                Brought by Providers Against Payors With Whom
                They Have Contracted ..................................................... 15

            b.    Aetna's Authorities Are Inapposite to the Facts Here ............... 15

        2.    There is No *Conflict* Preemption  by ERISA of the
            TPPA Claims Brought by Defendants ................................ 21

            a.    Neither Prong of the Fifth Circuit's Two-Pronged Conflict
                Preemption  Test is Met Here ........................................... 21

b.   The Cases, Code and Regulation Cited by Aetna Do Not
Support Conflict Preemption Here................................................. 23

c.   This Court's Prior Complete Preemption Rulings Arose
From Facts Not Involved Here....................................................... 24

**V.    CONCLUSION**........................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.,* 662 F.3d 376 (5th Cir. 2011) ............... 22

*Aetna Health, Inc. v. Davila,* 542 U.S. 200, 124 S. Ct. 2488, 159 L. Ed. 2d 312 (2004) ........... 16

*Alessi v. Raybestos-Manhatan, Inc.,* 451 U.S. 504, 101 S. Ct. 1895, 68 L. E. 2d 402 (1981) .... 20

*America's Health Ins. Plans v. Hudgens,* 915 F. Supp. 2d 1340 (N.D. Ga. 2012) ............. 19, 20

*Baylor Univ. Med. Ctr. v. Arkansas Blue Cross Blue Shield,* 331 F. Supp. 2d 502
   (N.D. Tex. 2004) ........................................................................................................... 15, 21

*Baylor Univ. Med. Ctr. v. Epoch Group, L.C.,* 340 F. Supp. 2d 749, 758 (N.D. Tex. 2004) .... 22

*Boggs v. Boggs,* 520 U.S. 833, 117 S. Ct. 1754, 138 L. Ed. 2d 45 (1997) ................................. 23

*Calvert v. Kadane,* 427 S.W.2d 605 (Tex. 1968) ......................................................................... 8

*Cameron v. Terrell Garrett, Inc.,* 618 S.W.2d 535 (Tex. 1981) ................................................... 6

*Christensen v. Harris Cnty.,* 529 U.S. 576, 120 S. Ct. 1655, 146 L. Ed. 2d 621 (2000) ........... 13

*Christus Health Gulf Coast v. Aetna, Inc.,* 397 S.W.3d 651 (Tex. 2013) ................................... 17

*Cicio v. Does 1-8,* 321 F.3d 83 (2d Cir. 2003) ............................................................................ 18

*Egelhoff v. Egelhoff,* 532 U.S. 141, 121 S. Ct. 1322 149 L. Ed. 2d 264 (2001) ............. 16, 17, 23

*Ellis v. Liberty Life Assur. Co.,* 394 F.3d 262 (5th Cir. 2004) ................................................... 17

*Entergy Gulf States, Inc. v. Summers,* 282 S.W.3d 433 (Tex. 2009) ........................................... 1

*Fiess v. State Farm Lloyds,* 202 S.W.3d 744 (Tex. 2006) .......................................................... 13

*Fischer v. United States,* 529 U.S. 667, 120 S. Ct. 1780, 146 L. E. 2d 707 (2000) ..................... 7

*Foley v. Southwest Texas HMO, Inc.,* 226 F. Supp. 2d 886 (E.D. Tex. 2002) .......................... 15

*Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 107 S. Ct. 2211, 96 L. Ed. 2d 1 (1987) .......... 20

*Fresh Coat, Inc. v. K-2, Inc.,* 318 S.W.3d 893 (Tex. 2010) .........................................................7

*Halliburton Co. Benefits Comm. v. Mem'l Hermann Hosp. Sys.,* CIV.A. H-04-1848,
   2005 WL 2138137 (S.D. Tex. Sept. 1, 2005) ......................................................................... 15

iv

*Helena Chemical Co. v. Wilkins*, 47 S.W.3d 486 (Tex. 2001) ..................................................... 8

*Hines v. Davidowitz*, 312 U.S. 52, 61 S. Ct. 399, 85 L. Ed. 581 (1941)..................................... 23

*In re Allen*, 366 S.W.3d 696 (Tex. 2012) ................................................................................... 8

*In re Bell*, 91 S.W.3d 784 (Tex. 2002) ........................................................................................8

*In re Lee*, 411 S.W.3d 445 (Tex. 2013) ....................................................................................... 3

*Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 111 S. Ct. 478, 112 L. E. 2d 474 (1990) ...... 20

*Jackson v. State Office of Administrative Hearings*, 351 S.W.3d 290 (2011).............................. 3

*Kentucky Ass'n of Health Plans v. Miller*, 538 U.S. 329, 123 S. Ct. 1471,
    155 L. Ed. 2d 468 (2003) ...................................................................................................... 7

*King v. Blue Cross Blue Shield of Ala.*, 439 F. App'x 386 (5th Cir. 2011) ............................... 16

*Lone Star OB/GYN Assoc. v. Aetna Health, Inc.*, 557 F. Supp. 2d 789 (W.D. Tex. 2008) ...... 15

*Lone Star OB/GYN Assoc. v. Aetna Health, Inc.*, 579 F.3d 525 (5th Cir. 2009)................... 1, 15

*Magnolia Petroleum Co. v. Walker*, 125 Tex. 430, 83 S.W.2d 929 (1935)................................. 8

*Martinez-Partido v. Methodist Specialty & Transplant Hosp.*, 327 S.W.3d 274 (Tex.
    App.—San Antonio 2010, no pet)........................................................................................ 6

*Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 105 S. Ct. 3085, 87 L. Ed. 2d. 96 (1985) ... 23

*Medvigy v. Metropolitan Life Ins. Co.*, CIV.A. H-08-2623, 2010 WL 518774
    (S.D. Tex. Feb. 2, 2010)..................................................................................................... 25

*Mem'l Hermann Hosp. Sys. v. Aetna Health*, CIV.A. H-06-00828, 2007 WL 1701901
    (S.D. Tex. June 11, 2007) ................................................................................................... 15

*Mem'l Hermann Hosp. Sys. v. Great-W. Life & Annuity Ins. Co.*, CIV.A. H-05-1234,
    2005 WL 1562417 (S.D. Tex. June 30, 2005)..................................................................... 15

*N. Cypress Med. Ctr. Operating Co. v. CIGNA*, 782 F. Supp. 2d 294 (S.D. Tex. 2011) ......... 17

*Northeast Hosp. Authority v. Aetna Health, Inc.*, CIV.A. H-07-2511,
    2007 WL 3036835 (S.D. Tex. Oct. 17, 2007)..................................................................... 15

*Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S. Ct. 1549, 95 L. Ed. 2d 39 (1987) .............. 23

*Quality Infusion Care, Inc. v. Unicare*, CIV.A. H-06-1689, 2007 WL 760368
    (S.D. Tex. Mar. 8, 2007)............................................................................................... 24, 25

*Quintana v. Lightner*, 818 F. Supp. 2d 964 (N.D. Tex. 2011) ................................................... 21

*R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*,
   336 S.W.3d 619 (Tex. 2011) ................................................................................... 12, 13

*S & P Consulting Eng'rs, PLLC v. Baker*, 334 S.W.3d 390
   (Tex. App.—Austin 2011, no pet.) ............................................................................ 7

*S. Texas Spinal Clinic, P.A. v. Aetna Healthcare, Inc.*, CIV.A. SA-03-CA0089FB,
   2004 WL 1118712 (W.D. Tex. Mar. 22, 2004) ......................................................... 15

*Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889 (6th Cir. 1996) ..................... 18, 19

*Schoedinger v. United Healthcare of the Midwest, Inc.*, 557 F.3d 872 (9th Cir. 2009) ....... 17, 18

*St. Luke's Episcopal Hosp. v. Principal Life Ins. Co.*, CIV.A. H-05-3825,
   2007 WL 189375 (S.D. Tex. Jan. 22, 2007) ..................................................... 14, 24

*SWEPI LP v. R.R. Comm'n of Texas*, 314 S.W.3d 253
   (Tex. App.—Austin 2010, pet. denied) ..................................................................... 6

*Texas Dept. of Ins. v. Am. Nat'l Ins. Co.*, 410 S.W.3d 843 (Tex. 2012) ...................................... 7

*Uniguard Sec. Ins. Co. v. Schaefer*, 572 S.W.2d 303 (Tex. 1978) .............................................. 6

### Statutes

28 TEX. ADMIN. CODE § 21.2826 ............................................................................................ 13

29 U.S.C. § 1133 ...................................................................................................................... 24

29 U.S.C. § 1144 ........................................................................................................................ 7

38 U.S.C. § 4303(2) .................................................................................................................... 7

TEX. GOV'T CODE ANN. § 311.026 ............................................................................................ 4

TEX. GOV'T CODE ANN. § 311.011 ............................................................................................ 7

TEX. INS. CODE § 1301.001 ................................................................................................... 3, 6

TEX. INS. CODE § 1301.002 ....................................................................................................... 6

TEX. INS. CODE § 1301.0041 ........................................................................................ 1, 3, 4, 15

TEX. INS. CODE § 1301.103 ................................................................................................... 3, 4

TEX. INS. CODE § 1301.108 ................................................................................................ 1, 3, 4

TEX. INS. CODE § 1301.137 ...................................................................................................... 22

TEX. INS. CODE § 843.345 ........................................................................................................ 6

## DEFENDANTS' RESPONSE TO
## MOTION FOR SUMMARY JUDGMENT

COME NOW Methodist Hospitals of Dallas ("Methodist-Dallas"), Medical Center Ear Nose & Throat Associates, N.A. ("Medical Center ENT") and Texas Health Resources ("THR"), and file their Response to Aetna's Motion for Summary Judgment.[1]

## I.    NATURE AND STAGE OF PROCEEDING

Defendants each entered into contracts with Aetna Health, Inc.  On November 19, 2013, Aetna Life Insurance Company filed a Declaratory Judgment action against Methodist-Dallas.   A day later, Plaintiff added THR and Medical Center ENT as defendants.  Defendants filed various motions to dismiss, and to transfer venue, which await ruling from this Court.  The Court ordered an initial status conference.  Later, Plaintiff filed its Motion for Summary Judgment, to which Defendants respond herein.

## II.    STATEMENT OF ISSUES TO BE RULED UPON

1.    Does the express language of the Texas Prompt Pay Act ("TPPA") exclude late-pay violations by an insurer administering claims involving treatment to beneficiaries of employer self-funded plans?

      *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 472 n. 57 (Tex. 2009)[2] ("If the Legislature's words are not ambiguous, they are not only the best evidence of legislative intent but the exclusive evidence."). TEX. INS. CODE §§ 1301.103, 1301.137, 1301.108 & 1301.0041.

2.    Does ERISA completely preempt or conflict-preempt TPPA claims brought by a provider contracting with an insurer, who brings suit pursuant to such contract for the late-payment of claims submitted for the treatment of beneficiaries of employer self-funded plans?

      Whether ERISA preempts a state law is reviewed *de novo. Lone Star OB/GYN Assoc. v. Aetna Health, Inc.*, 579 F.3d 525, 529 (5th Cir. 2009).

## III.    SUMMARY OF THE ARGUMENT

When a health care provider extends goods and services to patients pursuant to

---

[1] Hereinafter referred to as "Motion."
[2] Ex. 1.

its preferred provider contract with Aetna, the express language of the TPPA regulates Aetna's late-payment of the claims submitted for such goods and services provided to beneficiaries of both fully-funded plans and Aetna-administered self-funded plans. Aetna misapplies Section 1301.0041 of the Texas Insurance Code, a general provision, which does not trump specific provisions applicable here.  Section 1301.0041(a) is a non-substantive addition to the TPPA, expressly not meant to trump other specific provisions, as evidenced by its beginning language - "[e]xcept as otherwise specifically provided by this chapter . . . ."  Aetna's interpretation of it would add an exclusion not listed in the exclusions section of the TPPA, would render language in the Act superfluous, and contradicts legislative intent and contemporaneous statements of insurance industry lobbyists then that the TPPA applied to insurers administering self-funded plans.  Finally, because Aetna pervasively sells stop-loss coverage with its administrative services, it remains an insurer in that instance as well.

Its arguments for deference to the informal position stated by the Texas Department of Insurance ("TDI") fails because it did not result from formal rulemaking following formal proceedings, which is required before deference can be given.

Aetna's arguments for complete and conflict preemption fail as well.  Federal courts in Texas consistently have found no complete preemption of the TPPA claims brought here.  Likewise, no conflict preemption can occur here because neither prong of the Fifth Circuit's two-pronged conflict preemption test is met.  Aetna's cited authorities do not help its arguments.  Moreover, Aetna's invocation of this Court's prior rulings concerning ERISA preemption fails because those cases are distinguishable.

## IV.   ARGUMENT

The express language of the TPPA dictates a ruling that the TPPA applies to these claims, and that ERISA does not preempt them.

### A.   THE TPPA REGULATES AETNA'S LATE-PAYMENT OF ALL CLAIMS MADE BY PROVIDERS WITH WHOM AETNA HAS CONTRACTED

The Legislature enacted the TPPA in 2003.  Because it is "authorized to issue… in this state health insurance policies,"[3] Aetna is an "insurer" under the TPPA.[4]  The TPPA requires an "insurer," within 30 days of electronically receiving a clean claim, to make a determination of whether it is payable and to pay it.[5]  If it fails to timely do so, it is required to pay the penalties and interest provided for in TEX. INS. CODE § 1301.137, and the attorneys' fees and costs provided for in §1301.108.

#### 1.   Aetna Misapplies Section 1301.0041

Intentionally paraphrasing only part of § 1301.0041, Aetna contends that the Code "applies to an '*insurer*' providing benefits 'through the insurer's health *insurance* policy.'"[6]  Aetna misapplies § 1301.0041 for nine reasons.

First, the general language in § 1301.0041(a) should not trump the specific prompt pay provisions contained within Subchapters C and C-1 of Chapter 1301. Texas Supreme Court case law provides that rules of statutory construction require the use of specific statutory provisions over general ones if their provisions conflict.[7]  These cases follow the requirement of § 311.026(b) of the Code Construction Act,[8] providing:

> (b)   If the conflict between the general provision and the special or local provision is irreconcilable, the special or local provision prevail as an exception to the general provision, unless the general provision

---

[3] TEX. INS. CODE ANN. § 1301.001(5) (Vernon).

[4] Aetna is authorized in Texas as an insurer.  *See, e.g.*, Ex. 2 (http://www.tdi.state.tx.us/webinfo /colists.html; TDI web site offering listing of authorized insurers, including Aetna).

[5] TEX. INS. CODE § 1301.103.

[6] Motion, p. 4.

[7] *See In re Lee*, 411 S.W.3d 445, 451 (Tex. 2013) ("in the event that any such conflict [between a general provision and a special or local provision] is irreconcilable, the more specific provision will generally prevai1.") (Ex. 3); *Jackson v. State Office of Administrative Hearings*, 351 S.W.3d 290, 297 (2011), citing *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 637 (Tex. 2010) ("We have recently reiterated the rule that 'a specific statutory provision prevails as an exception over a conflicting general provision'.") (Ex. 4). Because 1301.0041(a) contains the language "except as otherwise specifically provided in this chapter," no such conflict exists, and the two provisions are therefore reconcilable.

[8] Hereinafter referred to as the "CCA."

is the later enactment and manifest intent is that the general provision prevail.[9]

Assuming, as Aetna apparently does, that a conflict exists between the specific provisions utilized by Defendants – §§1301.103, 1301.137 and 1301.108 – and the general "Applicability" section Aetna relies upon – §1301.0041, the CCA requires that specific provisions "prevail as an exception to the general provision" relied upon by Aetna.

Second, while § 1301.0041 is "the later enactment,"[10] it is a non-substantive one. This provision was added with House Bill 2636 in 2007, "An Act relating to *the nonsubstantive revision of statutes* . . ."[11] The Senate Research Center's bill analysis included the "author's/sponsor's statement of intent," as follows:

> The Texas Legislative Council is required by law to carry out a complete nonsubstantive revision of the Texas statutes…. *H.B. 2636 makes nonsubstantive revisions to certain laws concerning the Insurance Code*, including conforming amendments.[12]

For the CCA to allow the general provision within § 1301.0041(a) to trump the specific provisions in §§ 1301.103, 1301.137 and 1301.108, it must have been both "the later enactment" and express a "manifest intent . . . that the general provision prevail." Neither is true. The nonsubstantive addition of § 1301.0041(a) can in no way be construed as expressing a "manifest intent . . . that the general provision prevail."

Third, in 2011, the Legislature amended § 1301.0041(a) to add the language "[e]xcept as otherwise specifically provided by this chapter . . . ."[13] With that language, the Legislature suggested that specific provisions referenced herein in the TPPA should trump the later-enacted general applicability language of §1301.0041(a). Subsequently,

---

[9] TEX. GOV'T CODE ANN. § 311.026 (Vernon).
[10] Section 1301.0041 was enacted by Acts 2007, 80th Leg., ch. 730 (H.B. 2636), §3B.0271(b), effective September 1, 2007; Enacted by Acts 2007, 80th Leg., ch. 921 (H.B. 3167), §9.0271(b), effective September 1, 2007; and amended by Acts 2011, 82nd Leg., ch. 288 (H.B. 1772), § 4, effective September 1, 2011.
[11] Ex. 5, Excerpts from Acts 2007, 80th Leg., ch. 730 (H.B. 2636), effective September 1, 2007.
[12] Ex. 6, H.B. 2636 Senate Research Center Bill Analysis (emphasis added).
[13] TEX. INS. CODE § 1301.0041(a), amended by Acts 2011, 82nd Leg., ch. 288 (H.B. 1772), § 4, effective September 1, 2011.

4

the Legislature used its language "except as otherwise specifically provided by this chapter" as an explicit instruction to follow the specific language it chose inside the TPPA, as opposed to the general applicability language employed in § 1301.0041.[14]

Fourth, Aetna's interpretation would improperly graft onto the statute an "exclusion" that the Legislature did not include. The Legislature knew how to exclude specific areas from the reach of Chapter 1301. First, at the time the TPPA was passed in 2003, the Legislature knew about self-funded plans, as the Legislature had specifically referenced such plans in at least twenty (20) separate bills passed before or during that legislative session.[15] Moreover, on at least twenty-five (25) occasions before or during that legislative session, legislators had proposed to exclude self-funded plans from various bills; those bills did not pass.[16] Finally, the 2003 prompt pay statute that did

---

[14] If the Legislature had intended § 1301.0041(a) to override the specific sections elsewhere in Chapter 1301, it would have added the language "[e]xcept as otherwise specifically provided by this *section*," instead of ""[e]xcept as otherwise specifically provided by this *chapter*." § 1301.0041(c) contained the TPPA's exclusions, where the Legislature specifically excluded Managed Medicaid and CHIP claims, but did not the claims involving treatment of self-funded plan member urged by Aetna here.

[15] *See* H.B. 456 (1993)(re: staff leasing services); S.B. 84 (1993)(re: medical support orders for children); S.B. 555 (1993)(re: HMO mental health & substance abuse services); H.B. 369 (1995)(re: funding small employer health benefit plans); S.B. 1231 (1995)(re: Employees Retirement System of Texas programs); S.B. 1113 (1997)(re: tax refunds/credits for AFDC employers); S.B. 1248 (1999)(re: Medicaid third-party recoveries); S.B. 1156 (2001)(re: state Medicaid program); S.B. 1066 (2001)(re: health benefits coverage of grandchildren); H.B. 1440 (2001)(re: health benefit coverage for children); H.B. 1862 (2001)(re: prompt payment of healthcare providers); H.B. 3038 (2001)(re: enrollment of Medicaid enrollees into CHIP); H.B. 3343 (2001)(re: funding school group employees' coverage); S.B. 990 (2001)(re: Health Insurance Portability & Availability Act); S.B. 984 (2003)(re: Medical and psychiatric records); H.B. 2292 (2003)(re: Health & Human Services Commission); H.B. 2359 (2003)(re: Employees Retirement System of Texas); H.B. 2922 (2003)(excluding self-funded plans with less than 250 people); S.B. 280 (2003)(re: refunds of wages paid); and S.B. 984 (2003)(re: deliberations re: psychiatric records).

[16] *See* S.B. 1065 (1993)(by Parker)(re: Insurance provided by cooperatives); H.B. 2364 (1995)(by Telford)(re: Employee Retirement System of Texas insurance); H.B. 2985 (1995)(by Seidlits)(re: insuring staff leasing services); S.B. 1630 (1995)(by Gallegos)(re: insurance for staff leasing services); S.B. 1706 (1995)(by Lucio)(re: denial of coverage due to pre-existing condition); H.B. 653 (1997)(by Maxey)(re: exempting state self-funded plans from legislation); H.B. 813 (1997)(by Maxey)(re: Small Employer Health Insurance Availability Act); H.B. 1212 (1997)(by Averitt)(re: health insurance portability and availability); H.B. 2090 (1997)(by Averitt)(re: stop loss insurance regulations); S.B. 277 (1997)(by Patterson)(re: HMO mental health & substance abuse services); H.B. 706 (1999)(re: contingency reserves for state insurance program); H.B. 1294 (1999)(by Ehrhardt)(re: statewide group for school district employees); H.B. 2096 (1999)(by Davis)(re: control of health insurance fraud); H.B. 2520 (1999)(by Greenberg)(re: Employees Retirement System of Texas insurance); H.B. 2521 (1999)(by Greenberg)(re: group insurance for school district employees); S.B. 1120 (1999)(re: group insurance for school district employees); S.B. 1130 (1999)(by Armbrister)(re: Employees Retirement System of Texas programs); H.B. 12 (2001)(by Ehrhardt)(re: group insurance for school district employees); H.B. 1189 (2001)(by Telford)(re: group benefits for school district

pass excluded "capitated payments,"[17] but not claims relating to self-funded plans.  In subsequent amendments in 2005 and 2011, the Legislature clarified that the Act did not apply to dental care benefits[18] or to claims involving Medicaid and CHIP,[19] but on neither occasion excluded claims arising from the administration of self-funded plans. Thus, in the ten years since it enacted the TPPA, the Legislature never attempted to exclude self-funded plans from the reach of Chapter 1301.   "[I]f the legislature had intended to place such a restriction . . . it could easily have done so simply by drafting the restriction into . . . the Act."[20]  "When specific exclusions or exceptions to a statute are stated by the Legislature, the intent is usually clear that no others shall apply."[21]

Fifth,  even if one chose to interpret the **_general_** language in § 1301.041(a) as creating some greater limitation to the TPPA than the actual language chosen in its **_specific_** statutory provisions, Aetna's arguments still do not lead to the result it desires. A "health insurance policy" need not be an insurance policy at all under statute, because its provided definition says it includes any one of three different things—

> "Health insurance policy" means [1] a group or individual insurance policy, [2] certificate, <u>or</u> [3] **contract providing benefits for medical or surgical expenses incurred as a result of an accident or sickness**.[22]

Thus, the TPPA's definition of "health insurance policy" requires neither an "insurance policy" nor an "insurance contract"; instead, it also expressly includes any "contract"

---

employees); H.B. 1865 (2001); H.B. 2286 (2001)(by Averitt)(re: small employer health benefit plans); S.B. 135 (2001)(by Carona)(re: group insurance for school district employees); H.B. 2233 (2003)(by Smithee)(re: Health Insurance Portability and Availability Act); H.B. 2556 (2003)(by Davis)(re: controlling insurance fraud); and H.B. 3088 (2003)(by Dukes)(re: benefit appeals committee, re: psychiatric records).
[17] TEX. INS. CODE ANN. § 843.345 (Vernon).
[18] TEX. INS. CODE ANN. § 1301.002 (Vernon).
[19] TEX. INS. CODE ANN. § 1301.0041(c) (Vernon).
[20] *Cameron v. Terrell Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981). *See also SWEPI LP v. R.R. Comm'n of Texas*, 314 S.W.3d 253, 261 (Tex. App.—Austin 2010, pet. denied) ("If the Legislature had intended to place such restrictions on qualified subdivisions, it could have written such restrictions into the statute.") (Ex. 7).
[21] *Uniguard Sec. Ins. Co. v. Schaefer*, 572 S.W.2d 303, 307 (Tex. 1978). *See also Martinez-Partido v. Methodist Specialty & Transplant Hosp.*, 327 S.W.3d 274, 277 (Tex. App.—San Antonio 2010, no pet.) ("If the Legislature had intended to otherwise limit objections, it would have done so.") (Ex. 8).
[22] TEX. INS. CODE ANN. § 1301.001(2) (Vernon) (emphasis added).

providing health care benefits.[23]  Because the Legislature did not provide a statutory definition of the word "benefit," one must interpret it "relying whenever possible on the plain meaning of the words chosen."[24]  Using the plain meaning of the word "benefit," Chapter 1301 applies to claims made under self-funded plans.  First, "[i]t is commonplace for individuals to refer to their retirement or health plans as 'benefits.'"[25]  Second, federal insurance statutes existing prior to the enactment of the TPPA defined "benefit" as including "an employer policy, plan, or practice and includes rights and benefits under . . . a health plan."[26]  Third, whether Aetna acts as an administrator or as an insurer is irrelevant here, as under either scenario its contract with healthcare providers like Defendants conveys the following benefits: (1) administration of claims by Aetna; (2) payments at an agreed-upon, reduced rate to the providers; and (3) access to the network of Aetna's preferred providers at contracted rates for each of the plan's insureds.  These benefits are provided by contract between each defendant and Aetna, an agreement that is a "health insurance policy" as defined under §1301.001(2), in that each is a "contract providing benefits for medical or surgical expenses incurred as a result of an accident or sickness."   Although not "insurance" as classically defined, they are still "contracts providing health benefits" included §1301.0041(a).[27]

---

[23] When considering the object sought to be attained by the TPPA, the circumstances under which it was enacted, its legislative history, and the consequences of a particular construction, "insurance" should not be construed as modifying "contract" in the statutory language of § 1301.001(2).  *See, e.g., S & P Consulting Eng'rs, PLLC v. Baker*, 334 S.W.3d 390 (Tex. App.—Austin 2011, no pet.) (construing "negligent" in "negligent act, error, or omission" in certificate of merit statute to modify only "act," not omission)(Ex. 9).
[24] *Fresh Coat, Inc. v. K-2, Inc.*, 318 S.W.3d 893, 901 (Tex. 2010) (Ex. 10).
[25] *Fischer v. United States*, 529 U.S. 667, 676, 120 S. Ct. 1780, 1786, 146 L. Ed. 2d 707 (2000).
[26] 38 U.S.C. § 4303(2).
[27] *See*  TEX. GOV'T CODE ANN. § 311.011(b) (Vernon) (specifically-provided definition will always take precedence over a word's "common" meaning); *see also Texas Dept. of Ins. v. Am. Nat'l Ins. Co.*, 410 S.W.3d 843, 849 (Tex. 2012) (meaning of words like "insurance" in the Insurance Code are highly variable and context-dependent) (Ex. 11).  Similarly, ERISA's use of the term "insurance" in 29 U.S.C. § 1144(b)(2)(A) encompasses not only traditional, risk-spreading arrangements, but even the ministerial activities of third-party administrators "administering self-insured plans."  *See Kentucky Ass'n of Health Plans v. Miller*, 538 U.S. 329, 336 n.1, 123 S. Ct. 1471, n. 1, 155 L. Ed. 2d 468 (2003).  If ERISA's definition of "insurance"

Sixth, Aetna's argument ignores Chapter 1301's broad definition of "health insurance policy."   Through this definition, the PPO Act's reach extends beyond traditional "insurance" to other "contracts" that confer health benefits, and thereby brings the relationship between preferred providers and payors within its auspices.  It must be presumed that the Legislature's use of this broader language was intentional.[28] By interpreting the TPPA to apply only to narrowly-defined "insurance," Aetna errs by rendering superfluous the Texas legislature's broader language embedded within the Act.[29] If an "insurance policy" and a "contract providing benefits" are the same thing, why would the Legislature provide a duplicitous definition of "insurance policy" and "contract providing benefits" within its definition of "health insurance policy?  It makes no sense that it would double-define "health insurance policy" without a purpose.[30]

Seventh, Aetna's interpretation of §1301.0041 directly contradicts the Legislature's intent as clearly reflected in the legislative history.[31]  Interim hearings demonstrated how the Legislature could regulate contracts between providers and payors, without implicating ERISA.[32]   Aetna's interpretation of §1301.0041(a) is

---

can be construed to include third-party administrators of self-funded plans, there is no reason why the Legislature should be foreclosed from adopting a similar definition within TPPA (where it did so).

[28] *In re Allen*, 366 S.W.3d 696, 706 (Tex. 2012) (Ex. 12).

[29] *In re Bell*, 91 S.W.3d 784, 790 (Tex. 2002) (Ex.13).

[30] Further, Aetna's argument excluding the PPO contracts at issue from being a "contract providing benefits" as used in 1301.0041(a), 1301.001(2) and 1301.001(9) renders two sections of Chapter 1301 mere surplusage.  In both Section 1301.056 (prohibiting silent PPOs, or discounts without a contract) and 1301.060 (prohibiting compensation about the discounted amount agreed to in the PPO contract), these PPO contracts, and arising disbursement therefrom, are specifically regulated.  If the Act did not apply to them, these two sections of Chapter 1301 would be rendered mere surplusage.  Providers rely on prompt payment as a significant factor in providing discounts to insurers like Aetna, yet Aetna wants the benefits of negotiated discounts without the responsibilities of prompt payment, which is why these contracts were included in the regulation implemented, and the definition of "health insurance policy" therein.

[31] In construing statutes, one must determine legislative intent by looking to the purpose of the act and the evil addressed. *See Calvert v. Kadane*, 427 S.W.2d 605 (Tex. 1968).  The Supreme Court of Texas has held that "[e]ven when a statute is not ambiguous on its face, [the court] can consider other factors to determine the Legislature's intent, including: the object sought to be obtained; the circumstance of the statute's enactment; [and] the legislative history," among other factors. *Helena Chemical Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001) (*citing* TEX. GOV'T CODE ANN. § 311.023 (Vernon)) (Ex. 14).

[32] *See* Ex. 15 at 88-91 (excerpts from the November 7, 2001 hearing of the Senate Committee on Prompt Payment of Health Care Providers, Testimony of Asst. Attorney General, David Mattax)(" **ERISA doesn't**

inconsistent with the contemporaneous statements of the insurance industry's own lobbyists.  During the 2003 legislative session, the Texas Association of Health Plans acknowledged that SB 418 would apply to self-funded plans,[33] complaining that "[a]pplying the clean claim statute to self-funded ERISA plans" would impose significant costs on its members.[34]  Finally, when the final version of Senate Bill 418 came out of committee in 2003, the House Research Organization Report[35] reflected that both sides of the debate understood the need to be careful to ensure the TPPA did not implicate ERISA.[36]  Rather than claiming ERISA concerns were avoided simply by excluding self-funded plans, the HRO explained that the bill was safe because it "***would regulate only the relationship between the insurer and the provider.  ERISA covers policies; this bill would cover claims.***"[37]  According to the HRO, the motivation for this was that, "[p]roviders should have *one* set of expectations for all claims, including the time frame for payment.  Exempting certain insurers would be confusing and difficult for providers and would be counter to the goal of uniformity and simplification."[38]  This decision made by the Legislature should not be changed in the courts.

Eighth, Aetna's tortured reading of §1301.0041 of the PPO Act leads to the absurd result that the Legislature intended to regulate late payment of claims by health maintenance organizations[39] administering claims for self-funded plans, but to not regulate late payment of claims by preferred provider organizations[40] involving the very same plan beneficiaries.  There is no definition of "preferred provider benefit plans"

---

**preempt it regardless of whether it's insured or self-funded**… if you view this as regulating the contract between a provider and a plan, you don't have an ERISA preemption problem.") (emphasis added).

[33] *Id.* at 1.

[34] *Id.* at 3.

[35] Hereinafter referred to as the "HRO."

[36] Ex. 17 at 9-10 (S.B. 418 Analysis).

[37] *Id.* at 9 (emphasis added).

[38] Ex. 18 at 6 (H.B. 1862 Analysis) (emphasis added).

[39] Hereinafter referred to as "HMOs."

[40] Hereinafter referred to as "PPOs."

or "health insurance policy" contained within Chapter 843 regarding HMOs, and no such applicability provision. Why would the Texas legislature exclude claims arising from treatment of beneficiaries of self-funded plans only in the PPO context, and not within the HMO context? Simply put, it did not do so.

Ninth, Aetna cites **dicta** from the Texas Supreme Court in *Texas Dept. of Ins. v. Am. Nat'l Ins. Co.*,[41] instead of its true holding that stop-loss products sold by Aetna to employer self-funded plans are covered by the Texas Insurance Code.  In *American Nat'l Ins. Co.*, the Court held that "because the stop-loss policies are purchased by the plans ultimately to cover claims associated with their health-care expenses . . . that stop-loss insurance sold to a self-funded employee health-benefit plan is not reinsurance, but rather direct insurance [in the nature of health insurance] subject to regulation under the Insurance Code."[42]  This result is logical when you look at the relationship between Aetna and providers and the pervasiveness of stop-loss insurance in the Texas marketplace. Aetna voluntarily entered into contracts with Defendants and negotiated discounted rates for goods and services and then marketed Aetna's provider network to plans as incentive for using its insurance products. The negotiated rates apply to all insurance products regardless of whether the product is "self-indured" or "fully insured." The purpose of the TPPA is to regulate these relationships where a negotiated discounted payment arrangement exists. This is apparent by the Legislature's broad definition of "health insurance policy" discussed above. Further, the concomitant marketing of stop-loss insurance and claims administrative services by insurers is pervasive.[43]  When Aetna provides to employer plans its stop-loss coverage together

---

[41] *See* Motion, p. 5.
[42] *Id.*  (insurers may be subject to state law when they contract with self-funded plans).
[43] By 2011, an HRET/Kaiser Survey of Employer-Sponsored Health Benefits demonstrated the pervasiveness of stop-loss coverage in employer plans: 50-199 lives=85% of covered lives; 200-999 lives=

with its administration of their claims,  it remains an insurer covered under the Act.[44]

---

90% of covered lives; 1,000-4,999 lives= 88% of covered lives. *See* Ex. 19 - June 20, 2012 Letter from HCC Life Insurance Co. to U.S. Department of Labor – Office of Health Plan Standards and Compliance Assurance, Employee Benefits Security Administration, in response to its request for information, answering the question: "How common is the use of stop-loss insurance in connection with self-insured arrangements?", p. 2 (http://www.dol.gov/ebsa/regs/cmt-StopLoss.html).   One Blue Cross & Blue Shield entity found that 93% of its state's self-funded groups have stop loss coverage. *See* Ex. 20 - June 8, 2012 Letter from Diann Anderson, Mgr. Group Rating, Acturial Research, Blue Cross Blue Shield of Kansas, p. 1. Another TPA called such stop loss coverage "very common" and "the usual method," while commenting "the vast majority of our clients do choose stop loss as part of their self-funded arrangement." *See* Ex. 21 - Response of Unified Group Services, p. 1 (http://www.dol. gov/ebsa/regs/cmt-StopLoss.html).   Yet another said that "99% of our self-insured clients have purchased stop loss." *See* Ex. 22 - May 21, 2012 Response of Shellie Reitzel, of Avera Health, p. 1 (http://www.dol.gov/ebsa/regs/cmt-StopLoss.html).

[44] Aetna's own marketing of its stop-loss coverage to employer self-funded plans demonstrates that it serves as an insurer for those plans in that instance.

First, Aetna Signature Administrators is a wholly-owned Aetna entity, which "provides Stop Loss insurance coverage for the employer group, handles claims pricing, contracts with plan sponsors to provide access to the PPO network, provides network services and management, resolves contract issues, and oversees large case medical management." Ex. 23 – Aetna News Hub (http://newshub.aetna .com/press-release/corporate-and-financial/aetna-signature-administrators-and-coresource-extend-relations).  ASA "provides access to a national PPO network, medical management services and stop loss or reinsurance coverage to third party administrators and health plans." Ex. 24 – *PR Newswire,* "Assurant Health Contracts With Aetna Signature Administrators® to Provide Consumers With Access to Expanded PPO Network and Medical Management Services," Jan. 17, 2012 (http://www.prnewswire.com/news-releases/assurant-health-contracts-...panded-ppo-network-and-medical-management-services-137475893.html). Aetna's brochure states that "it is Aetna's responsibility to "[p]rovide stop loss insurance coverage." Ex. 25 – Aetna brochure entitled "Aetna Product Benefits," p. 6.  ASA enters into contracts with large TPAs to provide "a total cost solution for self-insured health plans desiring the advantage of a national PPO network," while providing "Stop loss insurance with ASA's competitive (network) rating." Ex. 26 – "Forwarding an important message from Employee Benefit Management Services (EBMS) and Aetna." Once such contracts are executed, the TPA then markets Aetna services, including stop loss coverage, to its plan members.  For example, Nippon Life Benefits markets Aetna's stop loss coverage with "**Protect against the impact of catastrophic claims** Aetna Signature Administrators controls costs through a predetermined liability limit and a fixed monthly premium. Aetna has a proven 25-year track record of controlling costs for self-funded customers through Stop Loss insurance. You can benefit from a self-funded arrangement to protect against financial risk from catastrophic claims." Ex. 27 –Nippon brochure, "Overview: Aetna Signature Administrators (ASA)."

Second, Aetna also recently has purchased its own TPAs to grow its own footprint in the employer self-funded market.  For example, Meritain Health was "one of the country's largest independent providers of services for self-funded health plans," "serv[ing] over 400 self-funded clients nationally, with nearly 500,000 members in more than 30 major industries." Ex. 28 - *Business Wire,* "Meritain Health to Offer Aetna Signature Administrators," November 10, 2006 (http://www.businesswire.com/news/home/20061110005241/en/Meritain-Health-Offer-Aetna-Signature-Administrators). ASA first contracted with Meritain to "allow current Meritain clients and prospective clients immediate access to Aetna's national PPO network and Aetna Stop Loss Insurance." *Id.* Meritain marketed this Aetna stop loss coverage provided to its clients by ASA as "a product designed to protect employers and self-funded health plans from catastrophic loss." Ex. 29 – Meritain Health Website – Stop Loss (http://www.meritain.com/Home/ProductsAndServices/PlanAdministration/StopLoss). Aetna then bought Meritain, and now, "Meritain Health, An Aetna Company" markets a stop loss product known as Meritain EASE to small employers as well.  Additionally, in 2011, Aetna spent $600 million to buy Prodigy Health Group, which sells stop-loss insurance for self-funded plans of employers that employ about 100-5,000 individuals. Ex. 30 – Todd Leeuwerburgh, "Seeing Growth in Self-Funding, Aetna Spends $600M to Grow into ASO Market," July 6, 2011.  In these instances when Aetna owns its own TPA, it serves both as an administrator and a partial insurer for such plans, and is therefore, subject to regulation under the Texas Insurance Code.

2.    Aetna's Arguments for Deference to the TDI Fail

TDI's position is entitled to no deference because the statute is not ambiguous and because TDI's position is not a formal agency position arising from formal proceedings.  There is no agency rule excepting employer plans from the TPPA.  The cases cited by Aetna cannot be considered.

### a. Because TDI's Position Did Not Result from Formal Agency Proceedings, it is Entitled to No Deference

Aetna cites to TDI's website statements that the TPPA does not apply to self-funded plans.  None of these reflect a formal agency opinion adopted after formal proceedings, nor do they purport to interpret ambiguous statutory language.  With respect to agency interpretations, courts give deference only "to *formal* opinions adopted after *formal* proceedings."[45]  The TPPA is not ambiguous. TDI's position did not result from formal proceedings.  Thus, no deference is appropriate.

---

Third, Aetna contracts with TPAs to provide stop-loss coverage to employers with as few as ten (10) employees. Ex. 31 - http://www.assuranthealth.com/corp/ah/HealthPlans/SESelfFunded.htm. Aetna-Meritain promotes its ability to do so because "stop loss carriers are becoming adept at working with smaller companies to mitigate financial risk," and consequently, "businesses having as few as 25 employees can overcome the obstacles that formerly made it difficult for them to self-fund." Ex. 32 – Meritain Health, An Aetna Company, brochure entitled "Self-Funding – Cost Relief to Employers, Regardless of Size – A White Paper by Meritain Health," p. 3. Aetna-Meritain markets its product in classic insurance terms: "**Alleviating risk through Stop Loss coverage [-]** Although companies with fewer than 100 individuals may feel that self-funding is a gamble, there are ways to mitigate risk and ease concerns. One approach is through Stop Loss coverage, which protects self-funded companies from high claims by putting a ceiling on financial risk. Practically speaking, Stop Loss coverage changes a fully self-funded plan into a partially self-funded plan that still offers the same cost control opportunities."  With Aetna's Funding Advantage, Aetna combines into one product its plan administrative services with its stop loss coverage. *Id.*  As Jill Serin, head of Middle Market Business for Aetna noted, "Aetna Funding Advantage allows mid-sized employers to make one monthly payment that includes all administration fees, stop loss premium and claims liability charges, making it easier for employers to self-fund." Ex. 33 – Aetna News Hub, "Aetna Helps Mid-Sized Employers Move to Self-Funding," April 16, 2013 (http://newshub.aetna.com/press-release/products-and-services/aetna-helps-mid-sized-employers move-self-funding). With Aetna's Funding Advantage Option, stop loss coverage is provided wherein "a self-funded plan sponsor pre-funds expenses associated with the termination of their Administrative Services Contract and Stop Loss Policy. These expenses include service fees, claim liability and Stop Loss premium." Ex. 34 - Aetna Stop Loss Variable Form, Stop Loss (GR-96476), p. 2.  In these instances, Aetna has tied together its administrative services with its stop loss coverage, and again is here both an administrator and a partial insurer for such plans, subject to regulation under the Texas Insurance Code. In the vast-majority of so-called employer self-funded plans, Aetna also sells stop-loss coverage, thereby retaining its status as at least a partial insurer, one subject to the provisions of the TPPA.

[45] *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future and Clean Water*, 336 S.W.3d 619, 625 (Tex. 2011) (citing *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 747–48 (Tex. 2006)) (Ex. 35).

### b. TDI Has Adopted No Formal Rule Excepting Self-Funded Plans from the TPPA

That TDI did not adopt a formal rule that purports to place administrators of self-funded plans beyond the TPPA's grasp is significant.  TDI has adopted formal rules specifically excluding Medicaid and CHIP plans provided by an HMO or a preferred provider carrier,[46] but not one excluding employer plans so administered.  Had TDI chosen to adopt a formal opinion concerning the application of the TPPA to self-funded plans, formal rulemaking is where it would have done so.

### c. The Caselaw Cited by Aetna Does Not Support Its Request that TDI's Position Be Given Deference

Aetna first cites *Christensen v. Harris Cnty.*[47]  That court held deference required "a formal adjudication or notice-and-comment rulemaking,"[48] which are lacking here.

Aetna next cites *Fiess v. State Farm Lloyds*,[49] but there the Texas Supreme Court held that deference "applies to formal opinions adopted after formal proceedings, not isolated comments during a hearing or opinions in documents."[50]

Next, Aetna cites *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*,[51] yet there the court held that deference "applies to *a formal* agency construction of a statute, as in an order following a formal adjudication or a regulation."[52]

Finally, Aetna argues the Legislature has not reversed TDI's informal position. Yet, TDI's position is not embedded within formal rulemaking, and the Legislature since has continued to regulate provider-insurer contracts, whether or not they may

---

[46] 28 TEX. ADMIN. CODE § 21.2826 (Ex. 36).  It is instructive to note the TTPA statutory language is so broad that it was necessary to make these exemptions.  If the TPPA is as limited as Aetna speculates, these specific exemptions would not have been necessary, because the law would not have applied.
[47] 529 U.S. 576, 120 S. Ct. 1655, 146 L. Ed. 2d 621 (2000).
[48] *See id.*, 529 U.S. at 587, 120 S. Ct. at 1662.
[49] *Fiess v. State Farm Lloyds*, 202 S.W.3d 744 (Tex. 2006) (Ex. 37).
[50] *Id.* at 747.
[51] *R.R. Comm'n of Tex.*, 336 S.W.3d at 625 (Ex. 35).
[52] *Id.* at 625 (citations omitted) (emphasis added).

cover services rendered under self-funded plans.  In 2013, the Legislature passed SB 822, which creates Chapter 1458 in the Insurance Code.[53]  In a Statement of Legislative Intent, SB 822's sponsor, Rep. Craig Eiland, stated that SB 822 was "designed to better regulate PPO networks and increase the transparency of PPO provider reimbursement practices by making PPOs register with the state."[54]  Chapter 1458 makes no distinction whether care is rendered to patients covered by a self-funded plan or a fully-funded plan.[55]  Rep. Eiland explained that the intent is to "apply to all contracts in this state" and to avoid ERISA preemption issues because "we can regulate the contract between the provider, which is the physician, and the network, and that's what we're doing."[56]

Again, while TDI may not regulate self-funded plans themselves, the TPPA regulates only *the contract* between provider and payor.

3. Aetna's Reliance on This Court's Summary Judgment In *St. Luke's Hosp. v. Principal Life Ins. Co.* is Misplaced Since There The Application of the TPPA Was Never Briefed

Aetna argues that in *St. Luke's Hosp. v. Principal Life Ins. Co.*,[57] "the claims administrator of a self-funded plan moved for summary judgment" and this Court "granted the motion."[58]  Aetna fails to include, however, this Court's statement there that it granted summary judgment because "Plaintiff makes no response to defendants' argument."[59]  Indeed, the response filed there references the prompt pay causes of

---

[53] Ex. 38 (enrolled text of S.B. 822;
http://www.capitol.state.tx.us/tlodocs/83R/billtext/html/SB00822F.htm).
[54] Ex. 39, at 2770 (House Journal, May 8, 2013;
http://www.journals.house.state.tx.us/hjrnl/83r/pdf/83RDAY68FINAL.PDF#page=10)).
[55] TEX. INS. CODE, Chpt. 1458.
[56] Ex. 40, at 2630-31 (House Journal, May 7, 2013, at 2630-31 (emphasis added); http://www.journals.
house.state.tx.us/hjrnl/83r/pdf/83RDAY67FINAL.PDF#page=76).  Note that this language by Rep.
Eiland in 2013 concerning the ability to regulate the contract between the provider and the network is
remarkably consistent with that provided by David Mattax in the 2001 interim hearings.
[57] *St. Luke's Hosp. v. Principal Life Ins. Co.*, CIV.A. H-05-3825, 2007 WL 189375 (S.D. Tex. Jan. 22, 2007)
(Lake, J.) (Ex. 41).
[58] Motion, p. 17.
[59] *St. Luke's*, at *3. *See also id*. at n. 22 ("the plaintiff argues only that the application of the prompt pay
provisions  is not preempted by ERISA, *id*., which defendants do not dispute.").

action in only two paragraphs, never addressing the application of the Act.[60] This case, decided before the enactment of § 1301.0041 upon which Aetna now relies, has no precedential value due to the absence of a response by that plaintiff.

**B.    ERISA DOES NOT PREEMPT THE TPPA CLAIMS BROUGHT BY DEFENDANTS**

There is no complete preemption and no conflict preemption of these contractually-based, in-network late-pay claims under the TPPA.

1.    <u>There is No *Complete* Preemption  by ERISA of the TPPA Claims Brought by Defendants</u>

At least nine federal courts have concluded that ERISA does not completely preempt the contractually-based TPPA late-pay claims brought here, so Aetna cites twelve different cases that are wholly inapposite to the case at bar.

**a.    Federal Courts Have Consistently Held ERISA Does Not Completely Preempt Late-Pay Claims under the TPPA Brought by Providers Against Payors With Whom They Have Contracted**

Both the Fifth Circuit[61] and at least eight federal district courts in Texas,[62] have held that there is no complete preemption of the TPPA by ERISA with respect to late-payment of claims submitted pursuant to a provider contract.

**b.    Aetna's Authorities Are Inapposite to the Facts Here**

With no case on point to which it can point in its scope, Aetna instead sprays

---

[60] *See* Plaintiff's  Response to Defendants' Motion for Summary Judgment in *St. Luke's*, Docket Entry No. 17, pp. 7-8, ¶¶20-21 (Ex. 42).

[61] *Lone Star OB/GYN Assoc. v. Aetna Health, Inc.*, 579 F.3d 525 (5th Cir. 2009).

[62] *Lone Star OB/GYN Assoc. v. Aetna Health, Inc.*, 557 F. Supp. 2d 789, 808 (W.D. Tex. 2008) (Rodriguez, J.), *aff'd*, 579 F.3d 525 (5th Cir. 2009); *Mem'l Hermann Hosp. Sys. v. Aetna Health*, CIV.A. H-06-00828, 2007 WL 1701901, at *5 (S.D. Tex. June 11, 2007) (Miller, J.) (Ex. 43); *Northeast Hosp. Authority v. Aetna Health, Inc.*, CIV.A. H-07-2511, 2007 WL 3036835, at *10 (S.D. Tex. Oct. 17, 2007) (Miller, J.) (Ex. 44); *Halliburton Co. Benefits Comm. v. Mem'l Hermann Hosp. Sys.*, CIV.A. H-04-1848, 2005 WL 2138137, at *5 (S.D. Tex. Sept. 1, 2005) (Rosenthal, J.) (Ex. 45), *aff'd as modified*, 2006 WL 148901, at *6 (S.D. Tex. 2006); *Mem'l Hermann Hosp. Sys. v. Great-W. Life & Annuity Ins. Co.*, CIV.A. H-05-1234, 2005 WL 1562417, at *6 (S.D. Tex. June 30, 2005) (Atlas, J.) (Ex. 46); *S. Texas Spinal Clinic, P.A. v. Aetna Healthcare, Inc.*, CIV.A. SA-03-CA0089FB, 2004 WL 1118712, at *4 (W.D. Tex. Mar. 22, 2004) (Biery, J.) (Ex. 47); *Baylor Univ. Med. Ctr. v. Arkansas Blue Cross Blue Shield*, 331 F. Supp. 2d 502, 509 (N.D. Tex. 2004) (Fish, J.) (Ex. 48); *Foley v. Southwest Texas HMO, Inc.*, 226 F. Supp. 2d 886, 901 (E.D. Tex. 2002) (Cobb, J.) (Ex. 49).

twelve inapposite cases; none of which hit its complete preemption target.

Aetna first cites *Aetna Health, Inc. v. Davila*,[63] which is inapposite here.[64] In finding complete preemption and denying remand, the court specifically referenced Aetna's *denial* of coverage,[65] and concluded that the complaint concerning this *denial* gave rise to ERISA preemption.[66] *Davila* provides no assistance to Aetna in this case where providers seek TPPA remedies only *for payments* that were made, but made late.

Second, Aetna cites *King v. Blue Cross Blue Shield of Ala.*,[67] a case not useful to these facts for four reasons. First, the underlying suit complained of Blue Cross' *denial* of Plaintiff's claim, and its refusal to pay for his hip surgery.[68] Second, the summary judgment being appealed occurred because the plaintiff "failed to submit a response" to Blue Cross' motion.[69] Third, the issue on appeal did not involve ERISA preemption of Blue Cross' denial of his claim,[70] and instead focused solely on the plaintiff's detrimental reliance claim.[71] Fourth, not one word of the *Ellis* opinion relates to claims for late-payment penalties for claims that were in fact paid, as is alleged here.

Third, *Egelhoff v. Egelhoff*[72] is not relevant here. There, the Supreme Court held a Washington statute requiring ERISA plan administrators to "pay benefits to the

---

[63] *Aetna Health, Inc. v. Davila,* 542 U.S. 200, 124 S. Ct. 2488, 159 L. Ed. 2d 312 (2004).
[64] That lawsuit arose from Aetna's refusal to pay for Vioxx prescribed to Davila, and consequent injuries allegedly caused when Davila took covered Naprosyn instead. Davila brought state law claim arising from "petitioners' refusal to cover the requested services." *Id.*, 542 U.S. at 205, 124 S. Ct. at 2493.
[65] *Id.*, 542 U.S. at 211, 124 S. Ct. at 2497 ("It is clear, then, that respondents complain only about denials of coverage promised under the terms of ERISA-regulated employee benefit plans.").
[66] *Id.*, 542 U.S. at 210, 124 S. Ct. at 2496 ("It follows that if an individual brings suit complaining of a denial of coverage for medical care, where the individual is entitled to such coverage only because of the terms of an ERISA-regulated employee benefit plan, and where no legal duty (state or federal) independent of ERISA or the plan terms is violated, then the suit falls "within the scope of" ERISA § 502(a)(1)(B).").
[67] 439 F. App'x 386 (5th Cir. 2011) (Ex. N to Motion).
[68] *Id.* at 387.
[69] *Id.* at 387-88.
[70] *Id.* at 388 ("King abandoned his denial of coverage claim and now agreed with Blue Cross that he was *not* covered by the policy when he underwent hip surgery in January 2009.").
[71] With his detrimental reliance claim, Plaintiff contended that alleged misrepresentations made by Blue Cross when he was no longer covered as an employee health benefit plan beneficiary were not preempted by ERISA. *Id.*
[72] 532 U.S. 141, 121 S. Ct. 1322, 149 L. Ed. 2d 264 (2001).

beneficiaries chosen by state law, rather than to those identified in the plan documents, creating an impermissible connection with ERISA plans,"[73] was preempted by ERISA. By contrast, Defendants here bring suit only by virtue of its provider contract with Aetna, and thus, its claims are not impermissibly connected to the ERISA plan.

Fourth, Aetna cites *Ellis v. Liberty Life Assur. Co.,*[74] inapposite here because it involved first-party claims[75] for the *denial* of long-term disability benefits under an ERISA plan.[76]  The claims here are not brought by plan beneficiaries, nor by providers in their capacity as assignees of the claims held by ERISA beneficiaries against their plans, and do not involve denials of plan benefits.  *Ellis* simply does not apply here.

Fifth, Aetna cites *N. Cypress Med. Ctr. Operating Co. v. CIGNA.*[77]  Unlike Defendants here, the plaintiff-provider in *N. Cypress Med. Ctr.* was an "out-of-network" provider[78] with no independent duty to enforce with its suit.  Such a claim could not even be made under the TPPA without the **contractual privity** existing here.[79]

Sixth, Aetna cites *Schoedinger v. United Healthcare of the Midwest, Inc.,*[80] a case alleging that United "wrongfully denied or reduced health care insurance claims."[81]

---

[73] *Id.,* 532 U.S. at 147, 121 S. Ct. at 1327.

[74] 394 F.3d 262 (5th Cir. 2004).

[75] The only state law statutory claims brought in *Ellis* were for alleged violations of articles 21.21 and 21.55 of the Texas Insurance Code ("TIC") for breaches of good faith and fair dealing.  *Id.,* 394 F.2d at 274 ("She sued Liberty for violations of TIC articles 21.21 and 21.55 and for breaches of the common law duty of good faith and fair dealing. TIC article 21.21 prohibits unfair competition and unfair practices by insurance companies and subjects them to civil liability for violations.  TIC article 21.55 subjects insurance companies to civil liability if they unfairly and untimely process and treat a claim.").  Neither provision, repealed in 2003, would apply here, as they applied only to a "first-party claim." Art. 21.55 §1(3).

[76] *Ellis,* 394 F.3d at 267 ("based on the medical information received, you no longer meet your Long Term Disability Policy's definition of disability.  Therefore, we must close your claim for benefits . . . .").

[77] 782 F. Supp. 2d 294 (S.D. Tex. 2011).

[78] *Id.* at 297 ("The hospital does not maintain contracts with healthcare insurance carriers and, thus, is considered "out-of-network" for purposes of reimbursement for medical treatment and services it renders to patients.").

[79] *See* Motion, Ex. A; *Christus Health Gulf Coast v. Aetna, Inc.,* 397 S.W.3d 651 (Tex. 2013) ("[T]he Prompt Pay provisions presume HMO-provider privity. The Legislature's words, and thus the result, are straightforward: Aetna must have directly contracted with the Hospitals to fall under the [TPPA].")(Ex.50).

[80] *Schoedinger v. United Healthcare of the Midwest, Inc.,* 557 F.3d 872 (9th Cir. 2009).

[81] *Id.* at 873.

The case is distinguishable from this one for two important reasons.  First, unlike here, "Dr. Schoedinger was an 'out-of-network' provider."[82]  Second, he brought suit by virtue of his "patients' assignment of plan benefits."[83] Such facts do not exist here.

Seventh, Aetna cites *Cicio v. Does 1-8*,[84] a case arising from an HMO's *denial* of a request to cover a specific cancer treatment regimen.[85]  As to the New York statute requiring benefit determinations to be made and communicated "within one business day of receipt of the necessary information,"[86] the court found conflict preemption existed because ERISA mandated its own timetables for such determinations, and because the New York law "conflicts with regulations established pursuant to ERISA" and "establishes a different rule from ERISA's."[87]  There is no conflict here between the TPPA requirements for paying healthcare providers and any provision in ERISA.

Eighth, Aetna cites *Schachner v. Blue Cross & Blue Shield of Ohio*,[88] a case that is distinguishable for two reasons.  First, it involved a *denial* of a claim.[89]  Second, Aetna

---

[82] *Id.* at 874-75.

[83] *Id.* at 875 ("United conceded that the patients' assignments of plan benefits provided a contractual basis for the ERISA and non-ERISA claims at issue.").  The court used this status to distinguish Judge Fish's holding in *Baylor* with respect to the TPPA regulating payments to healthcare providers by contract from the Missouri Prompt Pay Act, which involves prompt payment to claimants, including ERISA participants and beneficiaries. *Id.* at 876 ("Plaintiffs rely on the decision in *Baylor Univ. Med. Ctr. v. Ark. Blue Cross Blue Shield,* 331 F. Supp. 2d 502, 511-12 (N.D. Tex. 2004), that the Texas Prompt Pay Law was not completely preempted by ERISA. We are not persuaded. Unlike the Texas statutes at issue in *Baylor,* the MPPA regulates health carrier payments to "claimants," who are broadly defined to include ERISA participants and beneficiaries. Mo.Rev.Stat. § 376.383.1(1). Moreover, the state law claim in *Baylor* was based on a provider agreement, whereas Dr. Schoedinger's ERISA claims are based on patients' assignments of plan benefits.").

[84] 321 F.3d 83 (2d Cir. 2003).

[85] *Id.* at 88 ("Vytra's medical director, the defendant Dr. Spears, denied Dr. Samuel's request, stating only that the procedure sought was "not a covered benefit according to this member's plan which states [that] experimental/investigational procedures are not covered.").  The court found preemption of the Plaintiff's misrepresentation claims because the "claims rest on the allegation that Vytra had an obligation under the terms of the plan to provide benefits that it failed to provide," concluding that "[t]he claims thus seek to vindicate rights accruing under the plan." *Id.* at 96.

[86] N.Y. Pub. Health Law § 4903(3).

[87] *Cicio,* 321 F.3d at 95.

[88] 77 F.3d 889 (6th Cir. 1996).

[89] *Id.* at 891 ("In this Employee Retirement Income Security Act (ERISA) case, Chaim Schachner sued Blue Cross and Blue Shield of Ohio ("BCBSO") after *it refused to pay* for cardiac rehabilitation therapy ("cardiac rehab") he received after undergoing a coronary surgical procedure called angioplasty.")

mis-cites this opinion as one "holding that ERISA preempted a 'negligence claim based on an alleged violation of Ohio's prompt payment statute,'"[90] when in fact that ruling was one of the trial court,[91] a ruling vacated by the Second Circuit.[92]

Ninth, Aetna cites *America's Health Ins. Plans v. Hudgens*.[93] *Hudgens* is inapplicable because that court's finding of preemption occurred as a result of that particular statute directly regulating self-funded plans themselves; provisions which do not exist in the TPPA.[94]  The court in *Hudgens* so held as follows:

> Section 5 of IDEA amends the Prompt Pay Statute itself*.  **The effect of its changes is to extend the Prompt Pay Statute's requirements to** all health insurance and health benefit plans, including non-ERISA plans, insured plans, and, **for the first time, self-funded ERISA plans.**  IDEA achieves this expansion of the Prompt Pay Statute's reach **by amending the statutory definition of "insurer" broadly to include self-funded ERISA plans** and the entities that administer and determine benefits under self-funded ERISA plans.  Section 5 of IDEA specifically deletes the express exemption of self-funded ERISA plans from the former definition of "insurer."  It then adds to the definition a list of numerous types of entities, including "any self-insured health benefit plan"…[95]
>
> **IDEA is not confined to the regulation of TPAs** of self-funded plans.[96]
>
> The Prompt Pay Statute, as amended by IDEA, requires health plans, **including ERISA plans,** to process and to pay provider claims, or to send notices denying the claims, within 15 or 30 days, depending on whether the claim is submitted electronically or in paper.[97]

---

(emphasis added).  The Sixth Circuit addressed preemption only with respect to "a tort claim against an insurer for a bad faith refusal to pay a claim." *Id.* at 897-98.
[90] Motion, p. 13, n. 29.
[91] *Schachner*, 77 F.3d at 896 ("The district court dismissed the following claims brought under state law, finding that ERISA pre-empted the state laws under which the claims were made: 7 (1) a claim for breach of contract, (2) a tort claim for the alleged bad faith refusal to pay an insurance claim, and (3) a negligence claim based on an alleged violation of Ohio's prompt payment statute.").
[92] *See id.* ("We therefore vacate the district court's order dismissing the state law claims . . . .").
[93] 915 F. Supp. 2d 1340 (N.D. Ga. 2012).
[94] *Hudgens* concerned a non-Texas prompt pay statute.  The Georgia statute at issue known as IDEA, unlike the TPPA, purported to regulate self-funded plans themselves, as opposed to merely reaching insurers like Aetna who administer claims for such plans. ("The [Georgia] Prompt Pay Statute . . . requires health plans, including ERISA plans, to process and to pay provider claims . . . within 15 or 30 days, depending on whether the claim is submitted electronically or in paper.") *Id.* at 1359.
[95] *Id.* at 1355 (emphasis added) (citations omitted).
[96] *Id.* at 1356 (emphasis added).
[97] *Id.* at 1360 (emphasis added).

> The Court concludes that the challenged provisions of IDEA – *those which extend the requirements of the Prompt Pay Statute to self-funded plans* – are expressly preempted by Section 514 of ERISA.[98]

Note that the *Hudgens* court referenced the fact that the Georgia statute "is not confined to the regulation of TPAs of self-funded plans," implying that had it been so confined, *it would not have been preempted by ERISA.*

Tenth, Aetna cites *Fort Halifax Packing Co. v. Coyne*,[99] a case relating to a Maine statute requiring one-time severance payment to employees upon a plant closing. The Supreme Court held there that "the Maine statute is not pre-empted by ERISA."[100] *Coyne* bears no relation to the issues here, and provides no guidance in this case.

Eleventh, Aetna cites *Alessi v. Raybestos-Manhatan, Inc.*,[101] stating ERISA preempted "'even indirect state action' affecting ERISA plans."[102] That court merely cited ERISA's provision preempting "directly or indirectly . . . [state regulations] [of[ the terms and conditions of employee benefit plans covered by this subchapter."[103] Because the TPPA regulates only payments from payors and providers with whom they contract, it does not regulate the terms and condition of employee benefit plans themselves.

Twelfth, Aetna cites *Ingersoll-Rand Co. v. McClendon*,[104] a wrongful discharge case, for the proposition that a state law is preempted if it is "specifically designed to affect employee benefit plans."[105] The TPPA does not do so. The TPPA does not regulate the benefits provided under such plans, and is specifically designed not to do so, regulating

---

[98] *Id.* at 1362 (emphasis added).
[99] 482 U.S. 1, 107 S. Ct. 2211, 96 L. Ed. 2d 1 (1987).
[100] *Id.*, 482 U.S. at 6, 107 S. Ct. at 2215.
[101] *Alessi* is a case where the Court ruled that state law may not prohibit the reduction by private pension plans of a retiree's pension benefits by the amount of workers' compensation awards received subsequent to retirement. *Alessi v. Raybestos-Manhatan, Inc.*, 451 U.S. 504, 507, 101 S. Ct. 1895, 1898, 68 L. Ed.2d 402 (1981).
[102] Motion, p. 14.
[103] *Alessi*, 451 U.S. at 525, 101 S. Ct. at 1907 (quoting 29 U.S.C. § 1144(c)(2)).
[104] 498 U.S. 133, 111 S. Ct. 478 (1990).
[105] *Id.*, 498 U.S. at 140, 111 S. Ct. at 483.

only *the payments a payor agreed to make to a provider with whom it has contracted.*

> 2. There is No *Conflict* Preemption  by ERISA of the TPPA Claims Brought by Defendants

In *Mayeaux v. Louisiana Health Serv. & Indem. Co.,*[106] the Fifth Circuit established a two-prong test for conflict preemption, neither prong of which is met here.  Moreover, the cases cited by Aetna do not demonstrate conflict preemption of these TPPA claims.

> a. Neither Prong of the Fifth Circuit's Two-Pronged Conflict Preemption  Test is Met Here

In *Mayeaux*, the Fifth Circuit described its two-pronged test as follows:

> ERISA preempts a state law claim [under 29 U.S.C. § 1144(a)] if a two-prong test is satisfied: (1) The state law claim addresses an area of exclusive federal concern, such as *the right to receive benefits under the terms of an ERISA plan*; and (2) the claim *directly affects the relationships among traditional ERISA entities* – the employer, the plan and its fiduciaries, and the participants and beneficiaries.[107]

In *Baylor Univ. Med. Ctr. v. Arkansas Blue Cross Blue Shield,*[108] Judge Fish looked at these two prongs and explained why the TPPA does not conflict with ERISA. First, the court held that the TPPA does not address "an area of exclusive federal concern":

> ERISA does not preempt generally applicable state laws that impact ERISA plans only tenuously, remotely, or peripherally.  In this case, both state statutes require insurers to promptly pay the claims of physicians and other health care providers. Wall's ERISA plan provides only factual background for Baylor's statutory claims; *the plan is peripheral to the statutory obligation Baylor seeks to enforce in this case, namely, prompt payment of Baylor for services rendered.*[109]

As later established in *Lone Star,* no ERISA preemption arises in the context of late-paid claims under the TPPA because they involve clean claims that the insurer has already

---

[106] 376 F.3d 420, 431-32 & nn.39-40 (5th Cir. 2004).
[107] *Mayeaux*, 376 F.3d at 432 (emphasis added) (finding conflict preemption where doctor's claim questioned denial of coverage under ERISA plan).
[108] 331 F. Supp. 2d 502 (N.D. Tex. 2004).
[109] *Id.* at 511 (emphasis added) (citation omitted); *see also Quintana v. Lightner,* 818 F. Supp. 2d 964, 970 (N.D. Tex. 2011) ("[L]awsuits against ERISA plans for commonplace, run-of-the-mill state-law claims—although obviously affecting and involving ERISA plans—are not preempted by ERISA.").

decided to pay but has failed to timely pay the contracted-for amount.[110]   In sum, the

first prong of the Fifth Circuit's conflict preemption test is not met.[111]

As for the second prong, the *Baylor* court explained that *"Baylor's … claims, thus,*
*do not directly affect the relationship between traditional ERISA entities."*[112]  In *Access*
*Mediquip, L.L.C. v. UnitedHealthcare Insurance Co.,* the Fifth Circuit rejected an argument
that the relationship between a medical provider and a self-funded entity is the type
that satisfies the second prong of the conflict preemption test:

> State law claims of the kind asserted in [*Memorial Hospital System v.*
> *Northbrook Life Ins. Co.*], [*Transitional Hospitals Corp. v. Blue Cross,* 164 F.3d
> 952, 955 (5th Cir. 1999)], and this case concern the relationship between
> the plan and third-party, non-ERISA entities who contact the plan
> administrator to inquire whether they can expect payment for services
> they are considering providing to an insured. *The administrator's*
> *handling of those inquiries is not a domain of behavior that Congress*
> *intended to regulate with the passage of ERISA,* which "imposes no
> fiduciary responsibilities in favor of third-party health care providers
> regarding the accurate disclosure of information, or, indeed, regarding
> any other matter."[113]

The Court further stated that "a one-time recovery for Access on its state-law

misrepresentation claims will not affect the on-going administration or obligations of

the ERISA plans that United administers because the recovery '*in no way expands the*

---

[110] *Lone Star,* 579 F.3d at 530-32 (recognizing the distinction between rate of payment and right to payment).  The TPPA applies only to a "clean claim" that the insurer already has determined to be payable before it paid the claim late. TEX. INS. CODE ANN. §§ 1301.137(a), (d) (Vernon).  If an insurer determines that a clean claim is payable, it is subject to liability under the TPPA for failing to timely pay the claim. *Id.* § 1301.137(a-c) (penalties for late-paid claims).
[111] A TPPA cause of action arises in the context of a claim determined to be payable and, thus, does not depend on recovery of benefits under ERISA, does not interfere with uniform regulation of ERISA plans, and does not collaterally attack any insurer's claim handling.  The exclusive area of federal concern—the *right to benefits* under an ERISA plan—is absent from a valid TPPA claim.  Courts have held that "[l]awsuits against ERISA for commonplace, run-of-the-mill state-law claims-although obviously affecting and involving ERISA plans – are not preempted by ERISA." *See Baylor Univ. Med. Ctr. v. Epoch Group, L.C.,* 340 F. Supp. 2d 749, 758 (N.D. Tex. 2004) (*citing Mackey v. Lanier Collection Agency & Service, Inc.,* 486 U.S. 825, 833, 108 S. Ct. 2182, 2187, 100 L.Ed.2d 836 (1988)).  Accordingly, the Fifth Circuit and federal district courts within Texas have held that state law causes of action are not preempted by ERISA when brought by independent, third-party health care providers.  *Id.*
[112] *Baylor,* 331 F. Supp. 2d at 511-12 (emphasis added)(citation omitted).
[113] *Access Mediquip L.L.C. v. United Healthcare Ins. Co.,* 662 F.3d 376, 385-86 (5th Cir. 2011) (emphasis added), *reinstated on reh'g,* 698 F.3d 229, 230 (5th Cir. 2012) (en banc).

*rights of the patient to receive benefits under the terms of the health care plan.'"*[114]

Defendants' self-funded claims are not preempted because they do not interfere with the relationship between traditional ERISA entities.  Their claims are not premised on its rights under any ERISA plan; rather, they are based on Defendants' contracts with the payors, which the TPPA is designed to enforce here.  The second prong of the Fifth Circuit's test for conflict preemption is not met.

### b. The Cases, Code and Regulation Cited by Aetna Do Not Support Conflict Preemption Here

Aetna next cites five cases to support its argument that the TPPA "also conflicts with ERISA's claims-processing regulations and its exclusive remedies under ERISA §502(a)."  These cases provide no such support.[115]

---

[114] *Id.* at 385 (emphasis added).

[115] First, Aetna cites *Boggs v. Boggs*, 520 U.S. 833, 117 S. Ct. 1754, 138 L. Ed. 2d 45 (1997). The court found the two laws conflicted, and held that "[i]n the face of this direct clash between state law and the provisions and objectives of ERISA, the state law cannot stand." *Id.*, 520 U.S. at 844, 117 S. Ct. at 1762. No such direct clash exists between the TPPA and ERISA.

Second, Aetna cites *Egelhoff v. Egelhoff*, 532 U.S. 141, 121 S. Ct. 1322, 149 L. Ed. 2d 264 (2001). The court found conflict preemption because "the statute at issue here directly conflicts with ERISA's requirements that plans be administered, and benefits be paid, in accordance with plan documents." *Id.*, 532 U.S. at 150, 117 S. Ct. at 1329.  As demonstrated below, there is no such direct conflict between ERISA and the TPPA.

Third, Aetna cites *Hines v. Davidowitz*, 312 U.S. 52, 61 S. Ct. 399, 85 L. Ed. 581 (1941), where the Supreme Court held that Pennsylvania's Alien Registration Act, requiring aliens to "receive an alien identification card and carry it at all times," *Id.*, 312 U.S. at 59, 61 S. Ct. at 400, conflicted with Congress' Alien Registration Act of 1940, *Id.*, 312 U.S. at 72, 61 S. Ct. at 407, under which "aliens need not carry cards." *Id.*, 312 U.S. at 73, 61 S. Ct. at 407.  No such conflict exists here between the TPPA and ERISA.

Fourth, Aetna cites *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 105 S. Ct. 3085, 87 L. Ed. 2d. 96 (1985), which is not a preemption case.  Further, the Supreme Court in *Russell* noted that "[t]he only section that concerns review of a claim that has been denied - § 503 - merely specifies that every plan shall comply with certain regulations promulgated by the Secretary of Labor." *Id.*, 473 U.S. at 143, 105 S. Ct. at 3091 & n. 11, *citing* 29 U.S.C. § 1133. Nothing in *Russell* suggests that conflict preemption exists between ERISA-promulgated regulations concerning the denial of claims and the TPPA's statutory penalties for the late payment of claims that were, in fact, paid.

Fifth, Aetna cites *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S. Ct. 1549, 95 L. Ed. 2d 39 (1987), for the proposition that "Congress clearly expressed an intent that the civil enforcement provisions of ERISA § 502(a) be the exclusive vehicle for actions by ERISA-plan participants and beneficiaries asserting improper processing of a claim for benefits." Motion, p. 16.  Of course, Defendants here are not "ERISA-plan participants [or] beneficiaries." Further, *Dedeaux* is not helpful to Aetna here because it involved a claim "for failure to provide benefits under the insurance policy . . . ." *Id.*, 481 U.S. at 43, 107 S. Ct. at 1551, which could have been brought under Section 502(a) of ERISA, found in 29 U.S.C. § 1132(a).  *Dedeaux* provides no support for Aetna's conflict preemption argument here, when healthcare providers who could not have brought an action under Section 502(a), except as an assignee of the claims, bring suit solely pursuant to their contracts with Aetna, and not as assignees.  The suit here by a healthcare provider having contracted with Aetna, which is limited to claims paid, yet paid late, does not implicate

Aetna also tries to create such a conflict by citing 29 U.S.C. §1133, and the Department of Labor[116] regulations promulgated under that provision, as found at 29 C.F.R. §2560.503-1.[117] Of course, 29 U.S.C. §1133 requires the Plan to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan *has been denied*" and to "afford a reasonable opportunity to any participant whose claim for benefits *has been denied* for a full and fair review by the appropriate named fiduciary of the decision denying the claim."[118] Likewise, the DOL promulgated regulations at 29 C.F.R. 2650.503-1 concerning the denial of claims. The four specific provisions cited by Aetna relate to **denials of claims**. No conflict between the TPPA late-pay provisions and those regulations regarding denials exists.

### c. This Court's Prior Complete Preemption Rulings Arose From Facts Not Involved Here

In *St. Luke's Episcopal Hosp. v. Principal Life Ins. Co.*,[119] this Court did not find ERISA preemption of the Plaintiff's TPPA claims.[120]

This Court's holding in *Quality Infusion Care, Inc. v. Unicare*[121] is inapplicable because the plaintiff there was an "out-of-network" provider[122] bringing claims assigned to it "derived entirely from the rights and obligations established by the Plan."[123] **Here, Defendants do not bring suit in their capacity of assignees of patients'**

---

ERISA preemption, and nothing in *Dedeaux* suggests that it does.
[116] Hereinafter referred to as the "DOL."
[117] Motion, p. 15.
[118] 29 U.S.C. § 1133 (emphasis added).
[119] CIV.A. H-05-3825, 2007 WL 189375 (S.D. Tex. Jan. 22, 2007) (Lake, J.) (Ex. 41).
[120] *See id.* at *3, n. 22 ("Once again, the plaintiff argues only that application of the prompt pay provisions is not preempted by ERISA, *id.,* which defendants do not dispute.").
[121] CIV.A. H-06-1689, 2007 WL 760368 (S.D. Tex. Mar. 8, 2007) (Ex. Q to Motion).
[122] The plaintiff brought claims in his capacity as an assignee of the patient, who "assigned all of his rights, benefits, and claims under the Plan to Quality," and filed suit under the Texas Any Willing Provider ("AWP") statute. The defendant "refused payment, asserting that Quality was an out-of-network provider under the terms of the Plan." *Id.* at *1.
[123] This Court found complete preemption because "[a]s assignee of Robbins' benefits under the Plan, Quality steps into the beneficiary's shoes and can only claim as much as Robbins was entitled to under the Plan . . . . Because UniCare's potential liability under the Texas AWP statute derives entirely from the

*claims against their ERISA plans.*[124]   Because each is an in-network provider with Aetna, by virtue of its respective PPO contracts with Aetna, its state law claims for the timeliness of payments are independent of the federally-regulated ERISA plans.

Likewise, this Court's ruling in *Bhalla v. Aetna Health Plans of Tex. Inc.,*[125] involving a denial of claims, does not apply the late-pay only claims brought here.[126] Here, with no record to support an argument that coverage denials are at issue here, Aetna seeks a sweeping declaratory judgment when one is not justified.

Finally, the holding in *Medvigy v. Metropolitan Life Ins. Co.*[127] arose from a denial of a claim,[128] and provides no support for Aetna's preemption argument with respect to the late-pay only claims here.[129]

## V.   CONCLUSION

For the foregoing reasons, Defendants respectfully move the Court to overrule Aetna's Motion for Summary Judgment.

---

rights and obligations established by the Plan, its state-law claim is not independent of the federally regulated Plan." *Id.* at *3.

[124] *See* Ex. 51 - Affidavit of Charles Brizius, ¶ 12, attached as Exhibit A to Memorandum in Support of Plaintiff's Motion to Remand, Civil Action No. 3:13-CV-4992, In The United States District Court in the Northern District of Texas – Dallas Division and Ex. 52 - Affidavit of James D. Logsdon, ¶ 12, attached as Exhibit A to Memorandum in Support of Plaintiff's Motion to Remand, Civil Action No. 4:13-CV-1013, In The United States District Court in the Northern District of Texas – Ft. Worth Division.

[125] No. H-11-4402 (S.D. Tex. March 2, 2012) (Lake, J.) (Ex. O to Motion).

[126] In *Bhalla,* this Court correctly framed the issue as follows: "Do Bhalla's claims involve denials of coverage so as to bring them under ERISA, thereby creating a federal question and establishing this court's jurisdiction?"   Because the court found that "at least two of Bhalla's payment claims involve coverage determinations," *Id.* at pp. 16-17, it concluded that "[t]hose claims are therefore preempted by ERISA, and the court has subject matter jurisdiction." *Id.* at p. 17.

[127] CIV.A. H-08-2623, 2010 WL 518774 (S.D. Tex. Feb. 2, 2010) (Ex. P to Motion).

[128] The plaintiff filed suit after "MetLife sent Medvigy a letter denying the claim," *Id.* at *1, "because the Plan provides no dependent life coverage for a Plan participant's former spouse." *Id.* at *4.   As the claims dealt with a denial of benefits under an ERISA plan, the Court properly found ERISA preempted them, *Id.* at *2, and concluded that the ERISA claim failed because "MetLife's decision to deny Medvigy life insurance benefits was supported by substantial evidence and was not arbitrary." *Id.* at *4.

[129] Aetna also notes that in its ruling in *Medvigy,* this Court quoted from *Aetna Health, Inc. v. Davila* and *Ellis v. Liberty Life Assur. Co.*   As shown previously, neither is helpful to its preemption argument here.

Dated: January 13th, 2014

Respectfully submitted,

By:    /s/ Mikal C. Watts
Mikal C. Watts
Texas Bar No. 18215300
Fed. ID No. 12419
mcwatts@wattsguerra.com
WATTS GUERRA LLP
Four Dominion Drive,
Bldg. Three, Suite 100
San Antonio, Texas 78257
(210) 447-0500
(210) 447-0501 (fax)

ATTORNEY-IN-CHARGE FOR
DEFENDANTS METHODIST-DALLAS,
MEDICAL CENTER ENT &
TEXAS HEALTH RESOURCES

Of counsel:    LAW OFFICE OF JOSEPH V. GIBSON, PC
Texas Bar No. 24007236
Fed. ID No. 20-2441630
Joseph V. Gibson, IV
10330 Lake Road, Building X
Houston, Texas 77070
(281) 370-1810
(281) 370-1811 (fax)

FRANCIS, ORR & TOTUSEK, LLP
Joe Don Ridgell
Texas Bar No. 24046716
James M. Orr
Texas Bar No. 15313600
Bobby D. Amick
Texas Bar No. 24059377
500 N. Akard, Suite 1830
Dallas, Texas 75201
(214) 740-4250
(214) 740-4266 (fax)

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing instrument was served electronically, on this 13th day of January, 2014 to:

ATTORNEYS FOR DEFENDANT

John B. Shely
jshely@andrewskurth.com
Kendall Gray
kendallgray@andrewskurth.com
Dimitri Zgourides
dzgourides@andrewskurth.com
Mitchell A. Reid
mitchreid@andrewskurth.com
ANDREWS KURTH, LLP
600 Travis, Suite 4200
Houston, Texas  77002


By:     <u>/s/ Mikal C. Watts</u>
        Mikal C. Watts
        ATTORNEY-IN-CHARGE FOR
        DEFENDANTS METHODIST-DALLAS,
        MEDICAL CENTER ENT &
        TEXAS HEALTH RESOURCES