IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| AETNA LIFE INSURANCE COMPANY | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| V. | * | No. 3-14-CV-00347-M-BF |
| | * | |
| METHODIST HOSPITALS OF DALLAS | * | |
| AND TEXAS HEALTH RESOURCES | * | |
| | * | |
| Defendants | * | |

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR
## CROSS-MOTION FOR SUMMARY JUDGMENT

OF COUNSEL:

LAW OFFICE OF
JOSEPH V. GIBSON, P.C.
Joseph V. Gibson, IV
Texas Bar No. 24007236
Email: jgibson@jvglaw.com
17618 Wagner Point Court
Tomball, Texas 77377
(281) 370-1810
(281) 370-1811 (fax)

FRANCIS, ORR & TOTUSEK, LLP
Joe Don Ridgell
Texas Bar No. 24046716
jdridgell@fotllp.com
Bobby D. Amick
Texas Bar No. 24059377
bamick@fotllp.com
500 N. Akard, Suite 1830
Dallas, Texas 75201
(214) 740-4250
(214) 740-4266 (fax)

Mikal C. Watts
Texas Bar No. 18215300
S.D. ID No. 12419
mcwatts@wattsguerra.com
WATTS GUERRA LLP
Four Dominion Drive,
Bldg. Three, Suite 100
San Antonio, Texas 78257
(210) 447-0500
(210) 447-0501 (fax)

ATTORNEY-IN-CHARGE FOR
DEFENDANTS METHODIST
HOSPITALS OF DALLAS  & THR

## TABLE OF CONTENTS

I.  THE TPPA APPLIES TO CLAIMS AETNA ADMINISTERED ................1

    A.  The Unambiguous Text of the Specific Provisions of the TPPA Invoked by Methodist and THR Mandate Summary Judgment in their Favor ......................................................1

        1.  As Specifically Provided in Sections 1301.103, 1301.137 and 1301.108, Aetna is Liable for any Clean Claim it Received from Defendants which Aetna Deemed Payable yet Paid Late ...............................................2

        2.  The General Language of Section 1301.0041(a) Does Not Prevail Over the Requirements Specifically Provided Elsewhere in Chapter 1301 ..........................4

    B.  The Legislature's intent, and the contemporaneous statements of its own lobbyists, reflected in the legislative history, mandates that Summary Judgment be Granted for THR and Methodist .................................5

II.  THESE TPPA CLAIMS ARE NOT PREEMPTED BY ERISA UNDER THE FIFTH CIRCUIT'S TWO-PRONGED TEST .......................19

    A.  No Complete Preemption .......................................................19

    B.  No Express Preemption .........................................................20

        1.  The Fifth Circuit's Two-Pronged Test for Express Preemption under ERISA, Section 514 ...........................21

        2.  The First Prong - the state law claims address an area of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan – is Not Met with Respect to THR's & Methodist's TPPA Claims .................................................22

        3.  The Second Prong - the claims directly affect the relationships among traditional ERISA entities— the employer, the plan and its fiduciaries, and the participants and beneficiaries – is Not Met with Respect to Methodist's and THR's TPPA Claims ........................24

III.  CONCLUSION ...............................................................................29

## TABLE OF AUTHORITIES

### Cases

*Access Mediquip, L.L.C. v. United Healthcare Ins. Co.*, 662 F.3d 376
(5th Cir. 2011)..........................................................................21, 23, 24, 26

*Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319 (11th Cir. 2014)...............26, 27, 28

*Baylor Univ. Med. Ctr. v. Ark. Blue Cross Blue Shield*, 331 F. Supp. 2d
502 (N.D. Tex. 2004)...................................................................20, 29

*Christus Health Gulf Coast v. Aetna, Inc.*, 397 S.W.3d 651 (Tex. 2013).........................2

*City of Waco v. Lopez*, 259 S.W.3d 147 (Tex. 2008)........................................5

*Foley v. Southwest Texas HMO, Inc.*, 226 F. Supp. 2d 886 (E.D. Tex. 2002)...............20

*Halliburton Co. Benefits Comm. v. Mem'l Hermann Hosp. Sys.*,
CIV.A. H-04-1848, 2005 WL 2138137 (S.D. Tex. Sept. 1, 2005)...........................20

*Helena Chemical Co. v. Wilkins*, 47 S.W.3d 486 (Tex. 2001) ...........................................6

*Hermann Hosp. v. MEBA Medical & Benefits Plan*, 845 F.2d 1286
(5th Cir. 1988)...................................................................................29

*Hernandez v. Ebrom*, 289 S.W.3d 316 (Tex. 2009) ...........................................................2

*Hook v. Morrison Milling Co.*, 38 F.3d 776 (5th Cir. 1994) ...........................................21

*In re Lee*, 411 S.W.3d 445 (Tex. 2013)................................................................5

*Jackson v. State Office of Administrative Hearings*, 351 S.W.3d 290 (2011)....................5

*Jones v. LMR Int'l, Inc.*, 457 F.3d 1174 (11th Cir. 2006) .......................................26, 27

*King v. BlueCross BlueShield of Alabama*, 439 F. Appx. 386 (5th Cir. 2011) ...............21

*Lone Star OB/GYN Assoc. v. Aetna Health, Inc.*, 557 F. Supp. 2d 789
(W.D. Tex. 2008) ................................................................................20

*Lone Star OB/GYN Assoc. v. Aetna Health, Inc.*, 579 F.3d 525
(5th Cir. 2009)..................................................................................20, 22, 23

*Mayeaux v. La. Health Serv. & Indemn. Co.*, 376 F.3d 420
(5th Cir. 2004)...................................................................................21

*Mem'l Hermann Hosp. Sys. v. Aetna Health*, CIV.A. H-06-00828,
2007 WL 1701901 (S.D. Tex. June 11, 2007)............................................20

*Mem'l Hermann Hosp. Sys. v. Great-W. Life and Annuity Ins. Co.*,
2005 WL 1562417 (S.D. Tex. June 30, 2005).............................................20

*Mem'l Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236
(5th Cir. 1990)...................................................................................21, 22, 24, 29

*Methodist Hospitals of Dallas v. Aetna Health, Inc.*, Civ.A.No.
3:13-CV-4992-B, 2014 WL 3764879 (N.D. Tex. July 30, 2014) ...............20

*Morstein v. Nat'l Ins. Services, Inc.*, 93 F.3d 715 (11th Cir. 1996) ...............................27

*N. Cypress Med. Ctr. Oper. Co. v. CIGNA Healthcare,* 782 F. Supp. 2d 294 (S.D. Tex. 2011) ...................................................................................................29

*Northeast Hosp. Auth. v. Aetna Health, Inc.,* CIV.A. H-07-2511, 2007 WL 3036835 (S.D. Tex. 2007)...................................................................20

*S. Texas Spinal Clinic, P.A. v. Aetna Healthcare, Inc.,* CIV.A. SA-03-CA0089FB, 2004 WL 1118712 (W.D. Tex. Mar. 22, 2004)......................................20

*Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85 (1983) .........................................................21

*Sommers Drug Co. Employee Sharing Trust v. Corrigan Enterprises, Inc.,* 793 F.2d 1456 (5th Cir. 1986) ......................................................................21

*Texas Health Resources v. Aetna Health, Inc.,* Civ.A.No. 4:13-CV-1013, 2104 WL 553263 (N.D. Tex. Feb. 12, 2014) .................................................20

*U.S. v. Diamond,* 430 F.3d 686 (5th Cir. 1970).................................................................28

*Weaver v. Employers Underwriting, Inc.,* 13 F.3d 172 (5th Cir. 1994)...................21, 25

*Woods v. Texas Aggregates, L.L.C.,* 459 F.3d 600 (5th Cir. 2006) ................................21

**Statutes**

29 U.S.C. § 1132 .............................................................................................................19

29 U.S.C. § 1144 .............................................................................................................20

Tex. Gov't Code § 311.011 ...............................................................................................2

Tex. Gov't Code § 311.023 ...............................................................................................5

Tex. Gov't Code § 311.026 ...............................................................................................5

Tex. Ins. Code § 843.339 ................................................................................................19

Tex. Ins. Code § 1301.001 ............................................................................................2, 3

Tex. Ins. Code § 1301.0041 ..............................................................................................4

Tex. Ins. Code § 1301.103 ................................................................................................1

Tex. Ins. Code § 1301.108 ................................................................................................2

Tex. Ins. Code § 1301.137 ................................................................................................2

COME NOW Defendants METHODIST HOSPITALS OF DALLAS[1] and TEXAS HEALTH RESOURCES,[2] Cross-Movants herein, and file this their Brief in Support of Their Cross-Motion for Summary Judgment.[3]  In support thereof, Cross-Movants respectfully would show the Court as follows:

I.    THE TPPA APPLIES TO CLAIMS AETNA ADMINISTERED
      FOR THIRD-PARTY PLANS

Both the text of the specific provisions of the Texas Prompt Pay Act[4] and the legislative history thereof mandate a summary judgment in favor of Methodist and THR.

      A.    The Unambiguous Text of the Specific Provisions of the TPPA Invoked
            by Methodist and THR Mandate Summary Judgment in their Favor

The express language of Sections 1301.103, 1301.137 and 1301.108 determines when the TPPA is to impose the penalties, interest and attorneys' fees sought by Methodist and THR in their state court suits filed against Aetna.[5]

Section 1301.103 provides, in relevant part,

> "not later than… the 30th day after the date *an insurer receives a clean claim from a preferred provider* that is electronically submitted, *the insurer* shall make a determination of whether the claim is payable and (1) *if the insurer determines the entire claim is payable, pay the total amount of the claim* in accordance with the contract between the preferred provider and the insurer…"[6]

---

[1] Hereinafter referred to as "Methodist."
[2] Hereinafter referred to as "THR."
[3] This brief is filed in compliance with Local Rule 56.5(b).
[4] Hereinafter referred to as the "TPPA."
[5] *See* Ex. 1 (Appx. at 0001) - Plaintiff's Original Petition in *Methodist Hospitals of Dallas v. Aetna Health, Inc.,* Cause No. DC-13-13865, in the 298th Judicial District Court, Dallas County, Texas, ¶2, 10-14. *See* Ex. 2 (Appx. at 0006) - Plaintiff's Original Petition in *Texas Health Resources v. Aetna Health, Inc.,* Cause No. 17-269305-13, in the 17th Judicial District Court, Tarrant County, Texas, ¶2, 10-14.
[6] TEX. INS. CODE § 1301.103 (emphasis added).

Section 1301.137 provides, in relevant part,

> *if a clean claim submitted to an insurer is payable and the insurer does not* determine under Subchapter C that the claim is payable and *pay the claim on or before the date the insurer is required to* make a determination or adjudication of the claim, *the insurer shall pay the preferred provider making the claim the contracted rate owed on the claim plus a penalty*…[7]

Section 1301.108 provides that *"[a] preferred provider may recover reasonable attorney's fees and court costs* in an action to recover payment under this subchapter."[8]

> 1.  As Specifically Provided in Sections 1301.103, 1301.137 and 1301.108, Aetna is Liable for any Clean Claim it Received from Defendants which Aetna Deemed Payable yet Paid Late

These three statutory sections specifically provide for TPPA liability if a "preferred provider" submits a "clean claim" to an "insurer" which deems the claim "payable," and then pays it late.  The definition of each of these terms is provided by the Legislature and such definitions must be used here.[9]

Methodist and THR are "preferred providers" by virtue of their respective contracts with Aetna to "provide medical care."[10] These very contracts are required for Methodist and THR to have standing to bring suit under the TPPA.[11]  Aetna does not deny such contractual privity exists here.  The fact that such contracts require Methodist and THR to provide medical care to both insureds covered by an Aetna health insurance policy and beneficiaries of plans Aetna administers for others does not exempt Aetna from the TPPA in one instance while regulating it in the other instance.

---

[7] TEX. INS. CODE § 1301.137 (emphasis added).

[8] TEX. INS. CODE § 1301.108 (emphasis added).

[9] *Hernandez v. Ebrom*, 289 S.W.3d 316, 318 (Tex. 2009)("If the Legislature provides definitions for words it uses in statutes, then we use those definitions in our task."). *See also* TEX. GOV'T CODE § 311.011(b)("Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly.").

[10] TEX. INS. CODE § 1301.001(8)(defining a "preferred provider" as one who contracts with an insurer to provide medical care or health care to insureds covered by a health insurance policy.").  The contracts Methodist and THR have with Aetna meet this definition.

[11] *Christus Health Gulf Coast v. Aetna, Inc.*, 397 S.W.3d 651, 654 (Tex. 2013)("we agree . . . that the Prompt Pay Statute contemplates contractual privity . . ."); *Id.* at 656 ("The Prompt Pay Statute by its terms decides this case, and it requires HMO-provider contractual privity before the . . . payment deadline applies.").

Methodist and THR submitted "clean claims" to Aetna. Aetna's Motion is devoid of any contention that summary judgment should be granted, either fully or partially, because Defendants' claims were not clean. Indeed, at trial, Methodist and THR will demonstrate their internal processes and procedures ensure that they submit "clean claims," and that the claims submitted for which late-payment penalties are sought were, in fact, "clean claims."

Aetna is an "insurer," a defined term in Chapter 1301. Section 1301.001(5) defines an "insurer" as

> *a* life, health, and accident insurance company, health and accident insurance company, *health insurance company*, or other company operating under Chapter 841, 842, 884, 885, 982, or 1501, *that is authorized to issue*, deliver, or issue for delivery *in this state health insurance policies*.[12]

Aetna is such an "insurer," and is listed by the Texas Department of Insurance[13] as such a licensed insurer in the state of Texas.[14]

Neither Section 1301.103 nor Section 1301.137 requires a health insurance policy. Instead, the payment deadlines of Section 1301.103 require only that a preferred provider submit clean claims to an insurer, as defined in Section 1301.001(5), and if such insurer fails to pay the claims timely, Section 1301.137 provides the penalties and interest, and Section 1301.108 provides the reasonable attorneys' fees and court costs, that are owed to a preferred provider.

The statute is unambiguous, and the inquiry starts and stops with these three specific provisions. Because Methodist and THR, preferred providers, electronically submitted clean claims to Aetna, an insurer, the payment deadlines of Section 1301.103

---

[12] TEX. INS. CODE § 1301.001(5)(emphasis added).
[13] Hereinafter referred to as "TDI."
[14] Aetna is authorized in Texas as an insurer. *See, e.g.,* Ex. 3 (Appx. at 0014) - http://www.tdi.state.tx.us/webinfo/colists.html; TDI web site offering downloadable file of authorized insurers including Aetna).

apply here, and the remedies for Aetna's late payment of such clean claims provided by Section 1301.137 apply as well.  Furthermore, Section 1301.108 permits Methodist and THR to recover from Aetna their reasonable attorneys' fees and court costs in this action.

> 2.    The General Language of Section 1301.0041(a) Does Not Prevail Over the Requirements Specifically Provided Elsewhere in Chapter 1301

In Section V.A.1. of its Motion,[15] Aetna argues that 1301.0041(a) mandates that the Act only "applies to an '*insurer*' providing benefits 'through the insurer's *health insurance policy*.'"  Aetna is wrong for three reasons.

First, this general applicability language existed in the PPO Act since 1997, but did not exist within the legislation creating the TPPA, Senate Bill 418.[16]  Indeed, when the TPPA was codified into Subchapters C[17] and C-1[18] of Chapter 1301, the chapter did not contain the language of Section 1301.0041(a), which was added in 2007.[19]

Second, after Section 1301.0041(a) was added in 2007 as part of a non-substantive revision of the prior PPO Act,[20] the Legislature subsequently amended it in 2011 to add eight words, "[e]xcept as otherwise specifically provided by this chapter."  Thus, with these words, the Legislature caused the specific provisions of Sections 1301.103, 1301.137 and 1301.108 – found within the TPPA in Subchapters C and C-1 of Chapter

---

[15] Plaintiff Aetna Life Insurance Company's Motion for Summary Judgment (hereinafter referred to as "Motion"), §V.A.1., pp. 4-6 (emphasis in original).
[16] Ex. 4 (Appx. at 0015), Senate Bill 418 engrossed version.
[17] *See* TEX. INS. CODE, "Subchapter C. Prompt Payment of Claims," §§ 1301.101-109.
[18] *See* TEX. INS. CODE, "Subchapter C-1. Other Provisions Relating to Payment of Claims," §§1301.131-139.
[19] TEX. INS. CODE § 1301.0041(a), added by Acts 2007, 80th Leg., R.S., Ch. 730, Sec. 3B.0271(b), eff. September 1, 2007. Added by Acts 2007, 80th Leg., R.S., Ch. 921, Sec. 9.0271(b), eff. September 1, 2007.
[20] This provision was added with House Bill 2636 in 2007, a bill entitled "An Act relating to *the nonsubstantive revision of statutes . . .*" Ex. 5 (Appx. at 0068), Acts 2007, 80th Leg., ch. 730 (H.B. 2636), effective September 1, 2007 (emphasis added). Indeed, the Senate Research Center's bill analysis included the "author's/sponsor's statement of intent" that "H.B. 2636 makes nonsubstantive revisions to certain laws concerning the Insurance Code, including conforming amendments." Ex. 6 (Appx. at 0072), H.B. 2636 Senate Research Center Bill Analysis.

1301 – to prevail over the general applicability language found outside the TPPA in Section 1301.0041(a) with respect to other legislation in Chapter 1301.[21]

Third, instead of using language expressing a manifest intent that the provision should prevail over other language in the chapter, the Legislature begins Section 1301.0041(a) with "[e]xcept as otherwise specifically provided by this chapter."  The Texas Code Construction Act establishes that the specific provisions within the TPPA should prevail over the general language of a section found outside the TPPA.[22] Indeed, because the first eight words of Section 1301.0041(a) express a manifest intent that specific language elsewhere should prevail over its general language, Aetna's argument fails.

**B.     The Legislature's intent, and the contemporaneous statements of its own lobbyists, reflected in the legislative history, mandates that Summary Judgment be Granted for THR and Methodist**

The Texas Code Construction Act, found in Section 311.023 of the Texas Government Code, states that "whether or not a statute is ambiguous on its face, a court may consider among other factors, the . . . legislative history."[23]  Thus, in construing statutes, the Supreme Court of Texas has held that "[e]ven when a statute is not ambiguous on its face, [the court] can consider other factors to determine the

---

[21] *See* Chapter 1301, "Subchapter B. Relations with Physicians or Health Care Providers," §§ 1301.051-069; "Subchapter D. Relations Between Insureds and Preferred Providers," §§ 1301.151-163; "Subchapter E. Certain Health Care Providers," §§ 1301.201-202.

[22] *See In re Lee*, 411 S.W.3d 445, 451 (Tex. 2013) ("[I]n the event that any such conflict [between a general provision and a special or local provision] is irreconcilable, the more specific provision will generally prevail."); *Jackson v. State Office of Administrative Hearings*, 351 S.W.3d 290, 297 (2011) (citing *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 637 (Tex. 2010) ("We have recently reiterated the rule that 'a specific statutory provision prevails as an exception over a conflicting general provision.'"); *City of Waco v. Lopez*, 259 S.W.3d 147, 153 (Tex. 2008) ("In determining legislative intent, we are thus guided by the principle that a specific statute will ordinarily prevail over a general statute when the two cannot be reconciled."); *see also* TEX. GOV'T CODE § 311.026(b) ("If the conflict between the general provision and the special or local provision is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general provision is the later enactment and the manifest intent is that the general provision prevail.").

[23] TEX. GOV'T CODE § 311.023.

Legislature's intent, including: the object sought to be obtained; the circumstance of the statute's enactment; [and] the legislative history," among other factors.[24]

The first prompt pay bill in Texas passed in 1995, but was vetoed by Governor George W. Bush. In 1997, the Governor signed the first such bill into law. An effort to strengthen prompt payment regulations occurred in 1999 with the enactment of House Bill 610. These bills were confined to fully-funded insurance products provided by insurers and HMOs, so Texas doctors and hospitals continued to suffer the consequence of a large percentage of their bills being untimely paid by insurers and HMOs.

In 2001, Rep. Craig Eland carried HB 1862 which, for the first time, sought to regulate not merely fully-funded insurance products, but also claims administered by insurers and HMOs for others. Supporters of the bill argued:

> Prompt payment regulations should apply to all insurers. Providers should have one set of expectations for all claims, including the time for payment. Exempting certain insurers would be confusing and difficult for providers and would be counter to the goal of uniformity and simplification.
>
> The federal regulations contained in the Employee Retirement Income Security (ERISA) program are concerned with the relationship between insurer and enrollee. This bill would regulate only the relationship between insurer and provider. ERISA covers policies; this bill would cover claims.[25]

Opponents of the bill argued that because it applied to claims administered for self-funded ERISA plans, it was "unlikely to stand up to an ERISA challenge in court."[26] The bill passed overwhelmingly out of both houses of the Legislature, but was vetoed

---

[24] *Helena Chemical Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001)(citing TEX. GOV'T CODE § 311.023; *Ken Petroleum Corp. v. Questor Drilling Corp.*, 24 S.W.3d 344, 350 (Tex. 2000)).
[25] *See* Ex. 7 at 6 (Appx. at 0078) - House Research Organization Bill Analysis of H.B. 1862 ("H.B. 1862 Analysis"); http://www.hro.house.state.tx.us/pdf/ba77r/hb1862.pdf#navpanes=0 (emphasis added).
[26] *Id.* at 9 (Appx. at 0081).

by Governor Perry because the bill did not allow for insurers and providers to insert an arbitration clause into their contracts.[27]

Following the veto of HB 1862 in 2001, Lt. Governor Ratliff appointed an Interim Special Senate Committee on the Prompt Payment of Claims. The Committee, chaired by Sen. Jane Nelson, conducted six hearings across the state, and took testimony to learn the extent of the problem.  Six weeks before the first hearing, the TDI published public comments in the Texas Register, stating:

> the department does not have jurisdiction over claims involving self-funded ERISA plans; workers' compensation; self-funded government, school and church health plans, including self-funded plans for the Employees Retirement System of Texas, the Teacher Retirement System of Texas, the University of Texas and the Texas Association of School Boards; out-of-state insureds; Medicaid/Medicare; federal employee plans; and TRICARE Standard (CHAMPUS).[28]

In the first hearing, held on November 7, 2001, the Committee sought answers concerning the above statement from the first witness, the TDI Commissioner, Jose Montemayor. Commissioner Montemayor repeated the TDI's longstanding position that the prior version of prompt pay legislation did "not apply to 'self-funded ERISA plans.'"[29] When pressed on the impact of that position, Commissioner Montemayor conceded that claims for "something like 6 or 7 million Texans" did "not have to comply with [the] Texas Prompt Payment statute,"[30] and volunteered that "most of these are typically funded by an employer and administered directly through a PPA or third-party administrator," and that "many of them are also administered by the traditional HMOs as well on behalf of the employers."[31]  After another witness testified

---

[27] *See* Ex. 8 at 8-9 (Appx. at 0094-95) - House Research Organization Bill Analysis of S.B. 418 ("S.B. 418 Analysis").
[28] Ex. 9 (Appx. at 0102) - 26 Tex. Reg. 7542, 7545.
[29] *See* Ex. 10, p. 10, lines 18-20 (Appx. at 0145) - Excerpts from the November 7, 2001 hearing of the Senate Committee on Prompt Payment of Health Care Providers.
[30] *Id.*, p. 11, lines 10-17 (Appx. at 0146).
[31] *Id.*, p. 10, lines 20-24 (Appx. at 0145).

that this resulted in many physicians "thinking about leaving the practice; that because they cannot get paid, perhaps they will no longer be a doctor,"[32] the Chair of the Committee, Senator Nelson responded "[a]nd that is why we need to fix it," and stated that "this committee needs to consider something to recommend to the next legislature that we even haven't considered . . ." and "I think we need to be a lot more proactive in addressing these problems."[33]

Assistant Attorney General David Mattax, an expert on ERISA issues, then testified in part as follows:

> About 80 percent of all insurance in this country is through employers.[34] . . . So you start off with basically saying 30 to 40 percent of your health insurance in this state is provided by a self-funded or self-insured ERISA plan. And all self-funded or self-insured ERISA plans will say to the state of Texas you cannot regulate me at all on anything because that was the whole point of ERISA, was to take away the state's ability to regulate employers so the employers could continue to provide the insurance.[35] . . . But I would suggest that there shouldn't be a fundamental difference between the payment of a self-funded ERISA plan or an insured ERISA plan.[36]

> I would differ in saying that we can't do anything on self-funded plans. And let me explain why. And this goes with two of the cases that I previously provided to the committee.[37]... The basis of ERISA preemption is that if the State regulates the benefit plan. There are cases that talk about regulating the contract between the provider and the plan. That is the state law that regulates those contracts, do not regulate the ERISA plans[38] . . . a very recent case of just a couple of months ago in San Antonio District Court said we are talking about a contract between a provider and a plan. **ERISA doesn't preempt it regardless of whether it's insured or self-funded[39]** ... what I'm saying is that if you view this as regulating the contract between a provider and a plan, you don't have an ERISA preemption problem[40] . . . And that's what this new development in the case law is showing, is that if you can go into a court and argue, it has nothing with the plan relationship with the beneficiary. This has to do with my

---

[32] *Id.*, p. 68, lines 18-21 (Appx. at 0203).
[33] *Id.*, p. 69, lines 14-21 (Appx. at 0204).
[34] *Id.*, p. 83, lines 20-21 (Appx. at 0218).
[35] *Id.*, p. 85, lines 5-13 (Appx. at 0220).
[36] *Id.*, p. 86, lines 3-6 (Appx. at 0221).
[37] *Id.*, p. 88, line 22–p. 89, line 1 (Appx. at 0223-24).
[38] *Id.*, p. 89, lines 3-7 (Appx. at 0224).
[39] *Id.*, p. 89, lines 16-20 (Appx. at 0224)(emphasis added).
[40] *Id.*, p. 90, lines 21-23 (Appx. at 0225).

8

relationship as the provider with the -- I mean, with my relationship with the provider with the payer, whoever that is. Then you don't get into that ERISA issues. If you don't have any type of contractual relationship like that and you're trying to impose that on them through regulations, you are most likely going to be limited to only trying to do that with insured plans.[41]

I think we're on very strong ERISA grounds to say that when you're talking about imposing regulations between the provider and the payer on their contracts, I think that the ERISA concerns -- I think I can win an ERISA case on that with the developing case law right now.[42]

I'm saying to the committee today that there is some developing case law that you might be able to push that envelope a little more into the self-funded ERISA plans, which no one is regulating right now, by virtue of looking at the relationship -- the contractual relationship of provider and plan as opposed to beneficiary and plan.[43]

Legislators received the transcripts of such hearings, heeded this advice, and focused their new prompt pay legislation on the contract between the provider and the payor, and only dealt with payments that a plan has already determined it would pay. Among other things, this version of Senate Bill 418, for the first time, focused on the contract between the provider and the insurer or HMO with whom the provider contracted, providing as follows:

(1) if the insurer determines the entire claim is eligible for payment, pay the total amount of the claim *in accordance with the contract* between the preferred provider and the insurer[44];

(2) An insurer that pays a clean claim after the date the insurer is required to pay the claim in accordance with Section 3A of this article and before the 46th day after that date shall pay to the physician or provider the contracted rate owed by the insurer for the claim *plus a penalty* in the amount of the lesser of: (1) 50 percent of the difference between the billed charge *and the contracted rate*; or (2) $100,000[45];

(3) if the health maintenance organization determines the entire claim is eligible for payment, pay the total amount of the claim *in accordance with the contract* between the physician or provider and the health maintenance organization[46]; and

---

[41] *Id.*, p. 94, lines 2-13 (Appx. at 0229).
[42] *Id.*, p. 94, line 23 – p. 95, line 3 (Appx. at 0229-0230).
[43] *Id.*, p. 98, lines 3-9 (Appx. at 0233).
[44] Ex. 11 (Appx. at 0283) - SB 418, as introduced, §3A(c)(1)(emphasis added).
[45] *Id.*, §3I(b) (Appx. at 0293)(emphasis added).
[46] *Id.*, §7(1) (Appx. at 0309)(emphasis added).

***(4)*** A health maintenance organization that pays a clean claim after the date the health maintenance organization is required to pay the claim in accordance with this subchapter and before the 46th day after that date ***shall pay to the physician or provider the contracted rate owed*** by the health maintenance organization for the claim ***plus a penalty*** in the amount of the lesser of: (1) 50 percent of the difference between the billed charge ***and the contracted rate***; or (2) $100,000.[47]

A committee substitute of Senate Bill 418, CSSB418, was reported out of this Senate committee, and the Texas Association of Health Plans, the lobbying arm for the insurance companies, of which Aetna is a member, subsequently opposed the committee substitute of Senate Bill 418 for the very reason that it would apply to the administration of claims for self-funded ERISA plans:



This opposition, contained in the TAHP bill analysis, clearly recognized at the time of the 2001 bill, House Bill 1862, the 2003 bill, Senate Bill 418, and its committee substitute bill, all applied to claims administered by insurers for self-funded plans.[48]  As the bill passed the Senate, the TAHP complained it would "add significant costs to employer, employees and health plans"[49]:

---

[47] *Id.*, §14(b) (Appx. at 0321)(emphasis added).
[48] *See* Ex. 12 at 1 (Appx. at 0333) - Tex. Ass'n of Health Plans bill analysis.
[49] *See id.* at 3 (Appx. at 0335).

---

**Top Concerns with SB418**

**Application to self-funded ERISA plans -** Applying the clean claims statute to self funded ERISA plans (employers) will add significant costs to employers, employees and health plans. ERISA was developed with national standards which are **not subject to state mandates.** This is how self-funded ERISA plans have managed to keep costs reasonable. **Health care costs are directly paid by the employer.**

Problems with SB418 as originally filed and in committee substitute

**Application to self-funded ERISA plans -** Applying the clean claims statute to self funded ERISA plans (employers) will add significant costs to employers, employees and health plans. ERISA was developed with national standards which are **not subject to state mandates.** This is how self-funded ERISA plans have managed to keep costs reasonable.   **Health care costs are directly paid by the employer**

These statements by the Texas Association of Health Plans were distributed to members of the Senate on the day the committee substitute bill was to be debated on the Senate floor.  Thus, Aetna's lobbyist opposed the bill at the time because it knew that the bill would apply to the very claims Aetna now contends 11 years later were not covered by the bill!

As shown below, none of the amendments on the Senate Floor removed any provisions from the Committee Substitute bill in a way that would reflect an intent by the Senate to cause the Committee Substitute bill to not apply to late-paid claims administered by either insurers or HMOs on behalf of self-funded plans:

(1) Initially, on March 25, 2003, the Senate adopted Senator Brimer's amendment relating to the penalties relating to underpaid claims[50];

(2) Next, on March 25, 2003, the Senate adopted Senator Van de Putte's amendment, inserting the words "the" and "claim" in various sections of the bill[51];

(3) Next, on March 25, 2003, the Senate adopted Senator Van de Putte's amendment, inserting the phrase "for an electronic claim" in two places in the bill[52];

(3) Next, on March 25, 2003, the Senate adopted Senator Van de Putte's amendment, relating to an insurer's or HMO's right to decline to determine payment eligibility[53];

---

[50] Ex. 13 (Appx. at 0341) – Brimer Amendment, adopted on March 25, 2003.
[51] Ex. 14 (Appx. at 0342) – Van de Putte Amendment, adopted on March 25, 2003.
[52] Ex. 15 (Appx. at 0343) - Van de Putte Amendment, adopted on March 25, 2003.
[53] Ex. 16 (Appx. at 0344) - Van de Putte Amendment, adopted on March 25, 2003.

(5) Next, on March 25, 2003, the Senate adopted Senator Van de Putte's amendment, striking the phrase "or 21.58A" in two places in the bill[54];

(6) Next, on March 25, 2003, the Senate adopted Senator Ratliff's amendment substituting language concerning consistency "with nationally recognized, noncommercial system of bundling edits and logic, if available.[55]

The committee substitute for Senate Bill 418, as amended on the Senate floor, passed the Senate, and was sent to the House for its consideration.  Again, at this time, no changes to the bill had been made from the version opposed by the Texas Association of Health Plans for the very reason that it would apply to claims administered by Texas insurers and HMOs for employer self-funded plans.

The House Insurance Committee then considered the companion bill, House Bill 1810. The transcript of the House Insurance Committee makes it clear that its members were consulting with David Mattax to ensure the bill would apply to claims involving employer self-funded ERISA plans without being preempted by ERISA. The companion bills to SB 418, House Bill 720 by Rep. Eiland and House Bill 1810 by Rep. Smithee, were considered by the House Insurance Committee first in the morning[56] and then in the afternoon of March 17, 2003.[57] The following portions of the committee hearing reflect the fact that the bill applied to these employer self-funded ERISA plan claims:

(1)   First, in support of the bill, Spencer Berthelson, representing the Texas Medical Association, testified in part as follows:

> I'm still Spencer Berthelson from Houston.   I'm still representing the Texas Medical Association on the House legislation, and I do greatly appreciate the opportunity to speak to you on the prompt pay legislation. I do speak in favor of the legislation.  It is the culmination of nine years of intensive work studying the serious problem of delayed, denied and

---

[54] Ex. 17 (Appx. at 0345) - Van de Putte Amendment, adopted on March 25, 2003.
[55] Ex. 18 (Appx. at 0346) - Ratliff Amendment, adopted on March 25, 2003.
[56] Ex. 19 (Appx. at 0347-50) – Transcript of March 17, 2003 Morning Hearing of House Insurance Committee relating to House Bills 720 and 1810.
[57] Ex. 20 (Appx. at 0351-427) – Transcript of March 17, 2003 Afternoon Hearing of House Insurance Committee relating to House Bills 720 and 1810.

incomplete payments to physicians and other providers for services to health plan members.[58]

There's been a lot of work in the interim with the clean claims working group sponsored by the Department of Insurance, Commissioner Bomer's stakeholders group, and the Senate special committee on prompt pay to healthcare providers.   We believe that House Bill 1810 brings clarity to what should be a fairly straightforward process of paying for services rendered.     The simple process of payment for services has been made overly complex by a system of payment, which has placed actual payment to providers seemingly at its lowest priority.   This has had a serious effect on providers and cash flow. At a recent TMA survey, 71 percent of physicians described severe cash flow problems to the extent of even requiring taking out loans or using personal resources to keep their practice viable.[59]

***The proposed legislation would apply to the broadest range of payer-provider relationships.[60]***

It would also establish a payment deadline.  Providers would provide for rule-making by the Department of Insurance to define the elements of the clean claim, and it would put reasonable limits on requests for additional information to process the paperwork requested by the health plan payer.

It specifies also a nationally recognized standard for submitting and interpreting codes for services provided, referred to as the National Clean Claims Initiative, and it requires payers to stand by their representation of preauthorization and eligibility for 30 days after giving that representation.      It's also important to note what it does not do in some enhancements from the previous bill, 1862, from the last session, which were a result of collaborative working relationship that was engaged in over the interim.    It does not require perfection in claims payment, but allows for a safe harbor of 98 percent.     If 98 percent of claims are paid in accordance with the law, then those payers would be exempt from administrative fines that are related to the 2 percent of erroneous claims.

In addition, it allows for graduated penalties associated with late payment rather than an all-penalty or no-penalty threshold after the 45th day.[61]

In summary, physicians really cannot be expected and cannot continue to subsidize healthcare services after those services have been engaged and purchased.     This legislation brings order and fairness to a system that desperately needs these corrections.[62]

---

[58] Ex. 19, p. 3, lines 1-10 (Appx. at 0347).
[59] *Id.*, p. 3, lines 11-p. 4, line 2 (Appx. at 0347).
[60] *Id.*, p. 4, lines 3-5 (Appx. at 0347)(emphasis added).
[61] *Id.*, p. 4, line 5–p. 5, line 6 (Appx. at 0347).
[62] *Id.*, p. 5, lines 7 – 12 (Appx. at 0348).

(2)   Second, in support of the bill, Amy Shornick, director of contracting for Texas

Health Resources, testified as follows:

> House Bill 1810 provides solutions for many of the challenges faced by
> providers and physicians in the State of Texas. This testimony is intended
> to provide support for the passage of House Bill 1810 and information to
> document the challenges faced under the current law. And I'm going to
> move quickly through these three examples. One, as you'll see in the
> testimony I've provided, is the challenge with the ERISA plans. Due to
> large populations of employers covered under ERISA plans in North
> Texas area -- and I made a couple of phone calls and was able to get this
> estimate is around 50 to 55 percent -- the nonapplication of prompt pay
> legislation has caused significant challenges in the collection of penalties.
> Hospitals have to administer a separate process for ERISA claims when
> they're unable to negotiate prompt pay for ERISA plans in their contracts
> with the insurers. As provided for in House Bill 1810, application of a
> consistent prompt pay law for both fully insured and ERISA plans would
> create consistency in that policy.[63]

(3)   Third, Patty McCanlis with Unicare, argued that the bill went beyond TDI

recommendations in three ways, the first of which is applying its requirements to self-

funded ERISA plan claims:

> the first issue has to do with whether or not this bill attempts to regulate
> self-funded ERISA plans. We think that's still unclear. Based on the some
> of the testimony, we believe the provider community still thinks that it
> may apply to self-funded ERISA plans, at least those administered by an
> insurance company or HMO.[64]

She, therefore, concluded "[t]here's some good things in this bill and some good things

in the interim recommendations that we'd like to see but right now we have a problem

with House Bill 1810."[65]

(4)   Fourth, Dr. Gary Goldstein, CEO for Humana Health Insurance in Texas, testified

against the bill as follows:

> The final thing I would like to comment on is ERISA. And I'm sure you're
> all are wondering about that and how that might affect. I would just put a
> tone of carefulness on ERISA. We are the insurance company but we are
> the administrator for a large employer whether that be Dell Insurance or

---

[63] Ex. 20, p. 92, lines 1-21 (Appx. at 0373).
[64] *Id.*, p. 115, line 20 – p. 116, line 1 (Appx. at 0379).
[65] *Id.*, p. 121, lines 18-21 (Appx. at 0381).

EDS in our area here. We have a contractual relationship with a company. It's not our money. It's their money. We're paying for them. So when we bring in penalties and other regulations in ERISA, which may be fine, I'm not here to comment on whether they should or shouldn't be fine, I'm saying that brings in a whole new level of complexity, a whole new level of coverage, and perhaps a whole new audience of people that would be needed.[66]

(5)     Fifth, Will Davis, of the Texas Association of Life and Health Insurers, testified

against the bill, threatening an ERISA preemption lawsuit as follows:

MR. DAVIS: I'm saying you can't pass a bill here that relates to employee/employer relations on a fully self-funded plan. If you attempt to do so, the federal law preempts it and it's as if it doesn't exist.

COMMITTEE MEMBER: So we're wasting our time arguing whether it applies to ERISA or not, ERISA plans.

MR. DAVIS: Yes, I think you are wasting your time because you don't want to pass a law that's preempted by the federal act.

COMMITTEE MEMBER: It wouldn't be the first time.

MR. DAVIS: Well, you can pass it if you want to but I think it would be foolish to pass a law if you are questioning whether or not ERISA is applicable because if it is applicable, the law is very clear. You cannot pass a state law that impacts self-funded plans, noninsurer's plans that relate to employee benefits.

COMMITTEE MEMBER: As former Commission Bomer knows, the courts have been very good about telling us when we do that.[67]

(6)     Sixth, House Insurance Committee members disagreed with Davis that the bill's

regulation of the contract between a provider and a payor, and penalties on late-pay

claims arising therefrom relating to employer self—funded ERISA plans, were

preempted by ERISA:

MR. DAVIS: I encourage you not to do it if you want to keep it on the books.

COMMITTEE MEMBER: Sometimes in a way, it's not all that clear. You know, it's –

---

[66] *Id.*, p. 135, lines 3-17 (Appx. at 0384).
[67] *Id.*, p. 151, line 19 – p. 152, line 9 (Appx. at 0388).

> MR. DAVIS: The thing -- my point is if you set out to do it deliberately –
>
> COMMITTEE MEMBER: No.
>
> MR. DAVIS: If you set out deliberately to pass a law that's going to try to impact ERISA plans, you're dead.
>
> COMMITTEE MEMBER: I don't think anybody -- well, no, I disagree. I think you can do things on the State level to impact ERISA plans but I think you're limited in what you can do. Do you disagree with that? Because for instance –
>
> MR. DAVIS: Well, if you set out to deliberately impact ERISA plans, the bill has been preempted, that law has been preempted by the federal law. Get Mr. Maddax up here, Dave Maddax.
>
> COMMITTEE MEMBER: He was here this morning. He had to leave. We've been talking to him.[68]

The bill was favorably recommended out of the House Insurance Committee, and eventually placed on the House calendar for debate and amendments.   The bill, as passed by the Senate, and as recommended by the House Insurance Committee, was received by the House for floor debate on March 26, 2003, and the House Research Organization published its report with respect to the bill, acknowledging the bill would regulate claims administered by insurers for self-funded employer plans:

> SUPPORTERS SAY: The bill would not conflict with federal laws governing the Employee Retirement Income Security Act (ERISA) program. Federal regulations for ERISA address the relationship between insurers and enrollees. SB 418 would regulate only the relationship between insurer and provider. ERISA covers policies; this bill would cover claims . . . .
>
> OPPONENTS SAY: It is not clear that the changes proposed in SB 418 would stand up to an ERISA challenge. Federal regulations could bar some of SB 418's provisions.[69]

This discussion is only necessary if the bill applied to late-pay claims arising from employer self-funded ERISA plans.

---

[68] *Id.*, p. 152, line 10 – p. 153, line 9 (Appx. at 0388).
[69] Ex. 8 at 8-9 (Appx. at 0094-95) – S.B. 418 Analysis.

As shown below, none of the amendments on the House Floor removed any provisions from the Committee Substitute bill in a way that would reflect an intent by the House to cause SB 418 to not apply to late-paid claims administered by either insurers or HMOs on behalf of self-funded plans:

(1) Initially, on May 8, 2003, the House adopted Representative Hopson's amendment twice inserting the phrase "pay the total amount of the claim"[70];

(2) Next, on May 8, 2003, the House adopted Representative Eiland's amendment regarding investigation, determination and coordination of payment[71];

(3) Next, on May 8, 2003, the House adopted Representative Eiland's second amendment adding the phrase "physician or" to twelve provisions of the bill relating to notice[72];

(4) Next, on May 8, 2003, the House adopted Representative Eiland's third amendment relating to bundling edits and logic[73];

(5) Next, on May 8, 2003, the House adopted Representative Taylor's amendment regarding deductibles, copayments and coinsurance for which insureds and enrollees are responsible[74];

(6) Next, on May 8, 2003, the House adopted Representative Smithee's amendment regarding hold-harmless provisions and termination of or discrimination against physicians or providers[75];

(7) Next, on May 8, 2003, the House adopted Representative Truitt's amendment regarding penalties for underpaid claims[76];

(8) Next, on May 8, 2003, the House adopted Representative Reyna's amendment regarding the Government Code and the advisory committee established by the Act[77];

(9) Next, on May 8, 2003, the House adopted Representative Stick's amendment regarding the technical advisory committee[78];

---

[70] Ex. 21 (Appx. at 0428) – Hopson Amendment, adopted on May 8, 2003.
[71] Ex. 22 (Appx. at 0429) – Eiland Amendment, adopted on May 8, 2003.
[72] Ex. 23 (Appx. at 0434) – Eiland Amendment, adopted on May 8, 2003.
[73] Ex. 24 (Appx. at 0436) – Eiland Amendment, adopted on May 8, 2003.
[74] Ex. 25 (Appx. at 0437) – Taylor Amendment, adopted on May 8, 2003.
[75] Ex. 26 (Appx. at 0438) – Smithee Amendment, adopted on May 8, 2003.
[76] Ex. 27 (Appx. at 0440) – Truitt Amendment, adopted on May 8, 2003.
[77] Ex. 28 (Appx. at 0441) – Reyna Amendment, adopted on May 8, 2003.
[78] Ex. 29 (Appx. at 0442) – Stick Amendment, adopted on May 8, 2003.

(10) Next, on May 9, 2003, the House adopted Representative Wolgemuth's amendment regarding waiver of provisions if the commissioner of insurance determines that provisions will cause a negative fiscal impact on the state with respect to benefits or services relating to Social Security benefits[79]; and

(11) Finally, on May 9, 2003, the House adopted Representative Smithee's amendment relating to an insurer's or HMO's right to decline to determine payment eligibility.[80]

A list of all the amendments considered and/or adopted by both the House and Senate is available at the Texas Legislature Online website.[81]

After these amendments to the bill in the House, the House passed SB 418 on May 9, 2013. No action of the Conference Committee sought to exclude late-pay claims against an insurer or HMO administering claims on behalf of employer self-funded ERISA plans from the prompt pay act. Senators Nelson, Duell, Ellis, Janek and Van de Putte, and Representatives Smithee, Eiland, Isett, Jones and Truitt, served on the Conference Committee concerning these bills and negotiated agreements to resolve the differences between the House and Senate versions of the bill. Additionally, the Conference Committee report took no steps to exclude late-pay claims against an insurer or HMO administering claims on behalf of employer self-funded ERISA plans from the prompt pay act. The Conference Committee's agreements were accepted by both the House and Senate, and the enrolled bill was signed by both the House and the Senate on June 1, 2003, sent to the Governor the next day, and signed into law on June 17, 2003.

In short, the clear purpose, intent, and logical construction of the TPPA is to apply prompt pay penalties to insurers and HMOs whenever they offer their network

---

[79] Ex. 30 (Appx. at 0443) – Wolgemuth Amendment, adopted on May 9, 2003.
[80] Ex. 31 (Appx. at 0444) – Smithee Amendment, adopted on May 9, 2003.
[81] Ex. 32 (Appx. at 0446) – http://www.capitol.state.tx.us/BillLookup/Amendments.aspx?LegSess=78R&Bill=SB418.

physicians' services, including through a self-funded plan.[82]   Aetna's proffered interpretation would defeat the very goal attained by the TPPA, ignore the circumstances under which it was enacted, and contravene its legislative history. Indeed, Aetna's argument presumes the Texas Legislature could not figure out how to accomplish what it knew it wanted to do (and what the law says that it could do).  That presumption is unreasonable.[83]

## II.   THESE TPPA CLAIMS ARE NOT PREEMPTED BY ERISA UNDER THE FIFTH CIRCUIT'S TWO-PRONGED TEST

There is no ERISA preemption of THR's and Methodist's TPPA claims against Aetna. ERISA contains two provisions relating to preemption, neither of which preempt these claims.

### A.   No Complete Preemption

The first provision relating to preemption is found at 29 U.S.C. § 1132, which provides under subsection (a) that anyone who qualifies as a "participant or beneficiary" of an employee benefit plan may sue to enforce rights conferred upon them by ERISA.[84]  This provision *impliedly* preempts claims brought in state court that could have been brought under ERISA's provisions, and under the doctrine of *complete preemption*, gives rise to federal question jurisdiction and the right to remove a state court case to federal court.  Solely because two courts have suggested that "a

---

[82] Aetna's position is also inconsistent with the statement of the insurance industry's own lobbyists. During the 2003 legislative session, the Texas Association of Health Plans recognized that SB 418 would apply to self-funded plans (Ex. 12 at 1 (Appx. at 0333) - TAHP Bill Analysis), complaining that "[a]pplying the clean claim statute to self-funded ERISA plans" would impose significant costs on its members.  *Id.* at 3 (Appx. at 0335).  Having lost that battle at the Legislature, they should not be allowed to prevail on it now through the back door.

[83] The Legislature, in fact, continues to regulate provider-insurer contracts without regard to whether they may cover services rendered under self-funded plans.  *See* TEX. INS. CODE § 843.339(a), (b); Ex. 33 (Appx. at 0447) - Enrolled text of S.B. 822; http://www.capitol.state.tx.us/tlodocs/83R/billtext /html/SB00822F.htm). Ultimately, all revisions to Chapter 1301 since the TPPA was enacted have consistently followed the intent of the Legislature in 2003—to have the TPPA cover all claims.

[84] 29 U.S.C. § 1132.

state cause of action falling within the scope of § 502 for complete preemption purposes" also is preempted under ERISA § 514,[85] Methodist and THR alert the Court to the fact that both the Fifth Circuit[86] and federal district courts in Texas on twelve occasions[87] have held that there is no complete preemption by ERISA of TPPA late-payment claims submitted by a medical provider pursuant to a provider contract.

## B.   No Express Preemption

The second ERISA preemption provision is found at 29 U.S.C. § 1144(a), which is the ***express preemption*** provision, and preempts all state laws insofar as they "relate to" an employee benefit plan[88] and are not exempted from that preemption by a savings clause in § 1144(b)(A) which exempts state laws that regulate insurance, banking or securities.[89]   Specifically, ERISA's express preemption clause states that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...."[90]

---

[85] *See Mem'l Hermann Hosp. Sys. v. Great-W. Life and Annuity Ins. Co.,* 2005 WL 1562417, at *7, n. 11 (S.D. Tex. June 30, 2005)(Atlas, J.) (citing *Aetna Health, Inc. v. Davila,* 542 U.S. 200, 124 S. Ct. 2488, 2498 n. 4, 159 L. Ed. 2d 312 (2004)).

[86] *Lone Star OB/GYN Assoc. v. Aetna Health, Inc.,* 579 F.3d 525 (5th Cir. 2009).

[87] *Methodist Hospitals of Dallas v. Aetna Health, Inc.,* Civ.A.No. 3:13-CV-4992-B, 2014 WL 3764879 (N.D. Tex. July 30, 2014) (Boyle, J.); *Texas Health Resources v. Aetna Health, Inc.,* Civ.A.No. 4:13-CV-1013, 2104 WL 553263 (N.D. Tex. Feb. 12, 2014) (McBryde, J.); *Plano Orthopedics & Sports Med. Ctr., P.A. v. Aetna U.S. Healthcare of North Texas, Inc.,* Civ.A. No. 3:09-CV-2124-L (October 30, 2012) (Lindsay, J.); *Plano Orthopedics & Sports Med. Ctr., P.A. v. Aetna U.S. Healthcare of North Texas, Inc.,* Civ.A.No. 3:09-CV-2124-L (April 12, 2011) (Lindsay, J.); *Lone Star OB/GYN Assoc. v. Aetna Health, Inc.,* 557 F. Supp. 2d 789, 808 (W.D. Tex. 2008) (Rodriguez, J.), *aff'd,* 579 F.3d 525 (5th Cir. 2009); *Mem'l Hermann Hosp. Sys. v. Aetna Health,* CIV.A. H-06-00828, 2007 WL 1701901, at *5 (S.D. Tex. June 11, 2007) (Miller, J.); *Northeast Hosp. Auth. v. Aetna Health, Inc.,* CIV.A. H-07-2511, 2007 WL 3036835, at *10 (S.D. Tex. 2007) (Miller, J.); *Halliburton Co. Benefits Comm. v. Mem'l Hermann Hosp. Sys.,* CIV.A. H-04-1848, 2005 WL 2138137, at *5 (S.D. Tex. Sept. 1, 2005) (Rosenthal, J.), *aff'd as modified,* 2006 WL 148901, at *6 (S.D. Tex. 2006); *Mem'l Hermann Hosp. Sys. v. Great-W. Life & Annuity Ins. Co.,* 2005 WL 1562417, at *6 (Atlas, J.); *S. Texas Spinal Clinic, P.A. v. Aetna Healthcare, Inc.,* CIV.A. SA-03-CA0089FB, 2004 WL 1118712, at *4 (W.D. Tex. Mar. 22, 2004) (Biery, J.); *Baylor Univ. Med. Ctr. v. Ark. Blue Cross Blue Shield,* 331 F. Supp. 2d 502, 509 (N.D. Tex. 2004) (Fish, J.); *Foley v. Southwest Texas HMO, Inc.,* 226 F. Supp. 2d 886, 901 (E.D. Tex. 2002) (Cobb, J.).

[88] 29 U.S.C. § 1144 (ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan.").

[89] The savings clause analysis in Section 1144(b)(A) only comes into play if express preemption under Section 1144(a) is found to exist.  To be clear, THR and Methodist contend their claims are not preempted in the first place under § 1144(a); therefore, no discussion of the savings clause in § 1144(b)(A) nor of the deemer clause in § 1144(b)(B) is necessary here.

[90] 29 U.S.C. § 1144(a).

In *Shaw v. Delta Air Lines, Inc.*,[91] the Supreme Court held a state law relates to an employee benefit plan "if it has a connection with or reference to such a plan,"[92] yet indicated it will not extend the "relate to" language to its outer limit.  In *Shaw*, the Supreme Court also noted, "[s]ome state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan."[93]  The Fifth Circuit has since observed, "ERISA was not meant to consume everything in its path."[94]

<div align="center">

1.      The Fifth Circuit's Two-Pronged Test for Express Preemption under ERISA, Section 514

</div>

For twenty-eight years,[95] the Fifth Circuit has consistently applied a two-prong test to determine whether a state law "relates to" an ERISA plan for purposes of ERISA express preemption:

> "[a] defendant pleading preemption under 29 U.S.C. § 1144(a) must prove that: (1) the state law claims address an area of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan; and (2) the claims directly affect the relationships among traditional ERISA entities—the employer, the plan and its fiduciaries, and the participants and beneficiaries."[96]

Both prongs must be demonstrated by Aetna for ERISA to expressly preempt the TPPA claims made here by THR and Methodist.

---

[91] 463 U.S. 85, 97-99, 103 S. Ct. 2890, 2900-01, 77 L. Ed. 2d 490 (1983).

[92] *Id.* at 97, 103 S. Ct. 2900.

[93] *Id.* at 100 n. 21, 103 S. Ct. at 2901 n. 21.

[94] *Hook v. Morrison Milling Co.*, 38 F.3d 776, 786 (5th Cir. 1994)(holding that "a common law negligence claim which alleges only that an employer failed to maintain a safe workplace does not 'relate to' an ERISA plan merely because the employer has inserted a waiver of the right to bring such a claim into its ERISA plan").

[95] *Sommers Drug Co. Employee Sharing Trust v. Corrigan Enterprises, Inc.*, 793 F.2d 1456, 1467-68 (5th Cir. 1986), *cert. denied*, 479 U.S. 1034, 107 S. Ct. 884, 93 L.Ed.2d 837 (1987); *Mem'l Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 245 (5th Cir. 1990); *Weaver v. Employers Underwriting, Inc.*, 13 F.3d 172, 176 (5th Cir. 1994); *Hook*, 38 F.3d at 781; *Mayeaux v. La. Health Serv. & Indemn. Co.*, 376 F.3d 420, 432 (5th Cir. 2004); *Woods v. Texas Aggregates, L.L.C.*, 459 F.3d 600, 602 (5th Cir. 2006); *King v. BlueCross BlueShield of Alabama*, 439 F. Appx. 386, 389 (5th Cir. 2011); *Access Mediquip, L.L.C. v. United Healthcare Ins. Co.*, 662 F.3d 376, 382 (5th Cir. 2011).

[96] *Access Mediquip*, 662 F.3d at 382 (citing *Northbrook Life Ins. Co.*, 904 F.2d at 245).

<div align="center">21</div>

<u>2.</u>      <u>The First Prong - the state law claims address an area of exclusive</u>
<u>federal concern, such as the right to receive benefits under the</u>
<u>terms of an ERISA plan – is Not Met with Respect to THR's &</u>
<u>Methodist's TPPA Claims</u>

With respect to the first characteristic - an area of exclusive federal concern, such

as the right to receive benefits under the terms of an ERISA plan - the Court in *Memorial*

*Hospital System v. Northbrook Life Ins. Co.* noted the defendants "have not adequately

explained how insulating plan fiduciaries from the consequences of their commercial

dealings with third-party providers would further any of ERISA's goals."[97]

In *Lone Star OB/GYN v. Aetna*,[98] the Fifth Circuit in 2009 found no complete

preemption under ERISA, Section 502(a), of TPPA claims made solely for the late-

payment of claims deemed payable by an insurer administering claims for an ERISA

self-funded plan.  Its analysis included the following:

> A claim that implicates the *rate* of payment as set out in the Provider
> Agreement, rather than the *right* to payment under the terms of the
> benefit plan, does not run afoul of *Davila* and is not preempted by ERISA.
> *See Blue Cross v. Anesthesia Care Assocs. Med. Group, Inc.*, 187 F.3d 1045,
> 1051 (9th Cir.1999). Though the plan and the Provider Agreement cross-
> reference each other, the terms of the plan-in particular, those related to
> coverage-are not at issue in a dispute over whether Aetna paid the
> correct rate for covered services as set out in the Provider Agreement.
> While Aetna is correct that any determination of benefits under the terms
> of a plan-i.e., what is "medically necessary" or a "Covered Service"-does
> fall within ERISA, Lone Star's claims are entirely separate from coverage
> and arise out of the independent legal duty contained in the contract and
> the TPPA.[99]
>
> The TPPA allows a physician or provider to collect the contracted rate
> plus penalties for "payable" claims that are not paid within a statutorily
> specified amount of time. A TPPA remedy only overlaps with the ERISA
> enforcement scheme if there is a dispute over whether a claim is
> "payable"-whether there has been a denial of benefits because there is a
> lack of coverage. Again, where claims do not involve coverage

---

[97] *Northbrook Life Ins. Co.*, 904 F.2d at 247.
[98] 579 F.3d 525 (5th Cir. 2009).
[99] *Id.* at 530-31.

> determinations, but have already been deemed "payable," and the only remaining issue is whether they were paid at the proper contractual rate, ERISA preemption does not apply.[100]

While its holding was that no *complete* preemption has occurred, its reasoning supports the argument that the first prong of the Fifth Circuit's test for *express* preemption cannot be met with respect to in-network TPPA claims, like those brought by THR and Methodist here.

In 2011, the Fifth Circuit, in *Access Mediquip, L.L.C. v. United Healthcare Ins. Co.,*[101] found no preemption by determining the first element was not met, reasoning as follows:

> a one-time recovery for Access on its state-law misrepresentation claims will not affect the on-going administration or obligations of the ERISA plans that United administers, because the recovery "in no way expands the rights of the patient to receive benefits under the terms of the health care plan." State law claims of the kind asserted in *Memorial, Transitional,* and this case concern the relationship between the plan and third-party, non-ERISA entities who contact the plan administrator to inquire whether they can expect payment for services they are considering providing to an insured. The administrator's handling of those inquiries is not a domain of behavior that Congress intended to regulate with the passage of ERISA, which "imposes no fiduciary responsibilities in favor of third- party health care providers regarding the accurate disclosure of information, or, indeed, regarding any other matter."[102]

Just as the Court had observed in *Lone Star,* no reference to the terms of the ERISA plan itself would be necessary to calculate Access Mediquip's damages:

> It is difficult to see how consultation of the plan's terms would be necessary to determine the amount of Access's recovery, given that the compensatory recovery Access seeks can be measured by the cost of the services it alleges United induced it to provide. If consultation of the plans is necessary, United concedes that this, without more, does not require preemption. [*Northbrook Life Ins. Co.*] (explaining that the need to consult an ERISA plan in order to determine damages shows only an "incidental

---

[100] *Id.* at 532.
[101] 662 F.3d 376 (5th Cir. 2011).
[102] *Id.* at 385-86 (citations omitted).

relation ... insufficient on these facts to require a finding of preemption.").[103]

Here, THR and Methodist have brought TPPA claims only for those claims deemed payable by Aetna and paid late. To calculate the penalties, one needs only THR's and Methodist's charged rate, the reduced contractual rate, the date of the clean claim submission, and the date the claim was paid. No reference to an ERISA plan is required to calculate Methodist's and THR's TPPA remedies; therefore, pursuant to *Access Mediquip*, no ERISA express preemption of these claims has occurred.

<u>3.</u>   <u>The Second Prong - the claims directly affect the relationships among traditional ERISA entities—the employer, the plan and its fiduciaries, and the participants and beneficiaries – is Not Met with Respect to Methodist's and THR's TPPA Claims</u>

With respect to the second prong - the claims directly affect the relationship among the traditional ERISA entities - the Court noted in *Northbrook Life Ins. Co.* that a suit under ERISA's exclusive civil remedy provision, 29 U.S.C. 1132, by a plan beneficiary was part of the bargain that Congress struck for plan beneficiaries, but that "Memorial Hospital and the countless other health care providers in this country were not a party to this bargain."[104]   Noting that "a health care provider does not even have independent standing to seek redress under ERISA," the Court concluded, "[w]e cannot believe that Congress intended the preemptive scope of ERISA to shield welfare plan fiduciaries from the consequences of their acts toward non-ERISA health care providers when a cause of action based on such conduct would not relate to the terms or conditions of a welfare plan, nor affect - or affect only tangentially - the ongoing administration of the plan."[105]

---

[103] *Id.* at 386.
[104] *Northbrook Life Ins. Co.*, 904 F.2d at 249.
[105] *Id.* at 250.

The Court, therefore, held the second characteristic - the claims directly affect the relationship among the traditional ERISA entities - had not been met, and that ERISA did not preempt state insurance code claims for deceptive and unfair trade practices brought by a hospital against a group health insurer administering claims for an employer self-funded benefits plan.

Four years later (in 1994), the Fifth Circuit held in *Weaver v. Employers Underwriting, Inc.*[106] that an independent contractor's claims were not preempted by ERISA, since Weaver was neither a participant nor beneficiary of the plan. The Court held, "[w]e do not agree that the claims of an independent contractor 'directly affect the relationship between the traditional ERISA entities—the employer, the plan and its fiduciaries, and the participants and beneficiaries.'"[107]  In doing so, the Court reasoned as follows:

> Weaver is not a participant in the Rodrigues plan.... If Weaver is not an employee, then he is not an ERISA "participant."…. Nor is Weaver an ERISA "beneficiary." ERISA defines "beneficiary" as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." The parties agree the Rodrigues plan did not designate Weaver as a beneficiary; therefore, Weaver is not a "beneficiary" within the meaning of ERISA."… The claims by a nonparticipant and nonbeneficiary to a plan do not affect the relationship between the traditional ERISA entities. Therefore, such claims are not preempted.[108]

Here, neither Methodist nor THR is a "participant" or a "beneficiary" of any ERISA plan with claims at issue in this case.  Therefore, their TPPA late-pay claims with respect to Aetna's administration of claims for other self-insured plans are not expressly preempted by ERISA.[109]

---

[106] 13 F.3d 172 (5th Cir. 1994).
[107] *Id.* at 176.
[108] *Id.* at 176-77.
[109] In its Notice of New Authority, Aetna suggests that the *Hudgens* decision is dispositive on this point. However, as discussed in Defendants' responsive briefing thereto, *Hudgens* can never be relevant here as it does not address the second prong of the Fifth Circuit's test for express preemption.  Simply put, because neither THR nor Methodist bring claims as assignees of plan beneficiaries, neither is a traditional

Assuming *arguendo* that the uniformity concerns discussed in *Hudgens* meet the first prong of the Fifth Circuit's two-pronged test, the *Hudgens* court completely bypassed the Fifth Circuit's second requirement for express preemption – "the claims directly affect the relationships among traditional ERISA entities—the employer, the plan and its fiduciaries, and the participants and beneficiaries." [110]   When the Commissioner of Insurance argued in *Hudgens* that "there can be no 'connection with' ERISA because IDEA's focus is on the regulation of non-fiduciary TPAs and medical providers," which he purports are not "ERISA entities," the *Hudgens* court dismissed this argument in three ways.

First, the *Hudgens* court stated, "[t]his argument holds no water, as we have held that ERISA's overarching purpose of uniform regulation of plan benefits overshadows this distinction.  *See Jones v. LMR Int'l, Inc.*, 457 F.3d 1174, 1180 (11th Cir. 2006)."[111]  Yet *Jones*, unlike here, involved a claim for the "wrongful termination of benefits"[112] by plan participants who "were employees of Defendant LMR International," against LMR, which offered a self-funded plan, and Great West Life & Annuity Insurance Company, which provided claims processing services for the plan.  In the present scenario, neither Methodist nor THR is an ERISA participant, nor an ERISA beneficiary.  Accordingly, *Hudgens* is distinguishable and under the Fifth Circuit's holding in *Weaver*, the second prong of the Fifth Circuit's test is not met here.

Second, the *Hudgens* court then stated:

> Going even further, we noted [in *Jones v. LMR Int'l, Inc.*] the irrelevancy of whether one of the defendants was an "ERISA entity," stating that state law claims that would "affect relations among principal ERISA

---

ERISA entity, the Fifth Circuit's second prong is not met, and Aetna's express preemption claim fails under the Fifth Circuit's holding in *Weaver*.
[110] *Access Mediquip*, 662 F.3d at 382 (citing *Northbrook Ins. Co.*, 904 F.2d at 245).
[111] *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1331 (11th Cir. 2014).
[112] *Jones*, 457 F.3d at 1180.

entities" give rise to preemption. *Id.; accord Morstein v. Nat'l Ins. Servs., Inc.*, 93 F.3d 715, 722 (11th Cir.1996) ("when a state law claim brought against a non-ERISA entity does not affect relations among principal ERISA entities as such, then it is not preempted by ERISA").[113]

In fact, the Court in *Jones* merely held that a court does not only look at the specific defendant to determine if a principal ERISA entity is affected but to whether the claim affects relations among principal ERISA entities.[114]   Here, there is no employer plan in this suit, no plan participants, no plan beneficiaries, and no principal relations among principal ERISA entities would be affected.  Further, while the *Hudgens* court cited its statement in *Morstein v. Nat'l Ins. Servs., Inc.* that "when a state law claim brought against a non-ERISA entity does not affect relationships among principal ERISA entities as such, then it is not preempted by ERISA,"[115] it ignored its holding in *Morstein* concluding there was no ERISA preemption of claims against an insurance agency and an insurance agent.  In truth, the *Morstein* court found no ERISA preemption because the suit did not involve traditional ERISA entities:

> Morstein is a plan beneficiary who is bringing a suit against the insurance agency and agent, who she alleges fraudulently induced her to change benefit plans. The insurance agent and agency are not ERISA entities. ERISA entities are the employer, the plan, the plan fiduciaries, and the beneficiaries under the plan…. These same agents currently face the threat of state tort claims if they make fraudulent misrepresentations to individuals and entities not governed by ERISA. To hold these agents accountable in the same way when making representations about an ERISA plan merely levels the playing field… We conclude that these claims do not fall within ERISA's broad preemptive scope, as they do not have a sufficient connection with the plan to "relate to" the plan.[116]

Third, the *Hudgens* court then stated,

Additionally, IDEA is not limited to TPAs, but rather applies to self-funded health plans without regard to the specific entity addressing the

---

[113] *Hudgens*, 742 F.3d at 1331-32.
[114] *Jones*, 457 F.3d at 1177 ("Plaintiffs brought claims against LMR, Great West, Lillie Thomas (an employee of LMR), and Custom Services International, Inc."").
[115] *Hudgens*, 742 F.3d at 1331-32 (citing *Morstein*, 93 F.3d at 722).
[116] *Morstein v. Nat'l Ins. Services, Inc.*, 93 F.3d 715, 722-24 (11th Cir. 1996).

> claim.  Thus, our decision is not influenced by whether the IDEA provisions affect ERISA entities, or whether the TPAs are fiduciaries of the plan, since the enactment of IDEA would affect self-funded plans and the relations amongst principal ERISA entities.[117]

This statement is important in distinguishing *Hudgens* from the Fifth Circuit's test for ERISA preemption for two reasons.  First, the *Hudgens* court effectively is saying because IDEA applies to self-funded plans themselves, its enactment would affect self-funded plans, a traditional ERISA entity.  However, this ignores the Fifth Circuit requirement that the party bringing the claim be a traditional ERISA entity as well; health care providers like THR and Methodist are not traditional ERISA entities.[118] Second, because the Fifth Circuit does require traditional ERISA entities for preemption to occur, the fact that IDEA (unlike the TPPA) regulates self-funded plans themselves is the very reason why *Hudgens* cannot be used to find express preemption of the TPPA under Fifth Circuit case law.[119]

Pursuant to the consistent holdings of the United States Court of Appeals for the Fifth Circuit over the past quarter century, there is no express preemption of Methodist's and THR's TPPA late-pay claims.  First, the first prong – the right to receive payments – is not met because the TPPA is limited to claims deemed "payable."  Second, the second prong - the claims directly affect the relationship between the traditional ERISA entities, i.e., the employer, the plan and its fiduciaries, and the participants and beneficiaries – is not met because THR and Methodist bring their

---

[117] *Hudgens,* 742 F.3d at 1332.
[118] An exception applies when a provider brings suit under an assignment of benefits for the payment of health benefits under the beneficiary's plan, which neither THR nor Methodist are doing in this case.
[119] *See U.S. v. Diamond*, 430 F.3d 686, 692 (5th Cir. 1970)("Even if authority from our respected sister Circuit were binding rather than persuasive, close reading of the *Sparrow* case reveals a rule of law no different than that prevailing in this Circuit.").

claims pursuant to their own contractual privity with Aetna, not as assignees of the claims of plan beneficiaries.[120]

## III.   CONCLUSION

By the specific language found in the TPPA, it is clear the statute applies to claims administered for self-funded plans.  There is no case in the history of American jurisprudence that has found an in-network prompt payment case for the late payment of claims brought by a medical provider against a payor with whom it contracted to be preempted by ERISA.  For these two reasons, summary judgment should be granted that ERISA does not preempt the TPPA claims brought by Methodist and THR.

---

[120] A health care provider "does not even have independent standing to seek redress under ERISA." *Northbrook Ins. Co.*, 904 F.2d at 249; *Hermann Hosp. v. MEBA Medical & Benefits Plan*, 845 F.2d 1286, 1288-90 (5th Cir. 1988)(stating that a health care provider may not sue under ERISA as a non-enumerated party unless it claims an assignment of rights).  That Methodist and THR could have sued as assignees is of no import. *Baylor Univ. Med. Ctr.*, 331 F. Supp. 2d at 510 (finding no ERISA preemption because "Baylor has not sued on an assignment of benefits but on a contract."). *See generally N. Cypress Med. Ctr. Oper. Co. v. CIGNA Healthcare*, 782 F. Supp. 2d 294 (S.D. Tex. 2011) (finding preemption only with respect to out-of-network claims, while specifically holding that claims made between entities having a contract are not preempted, noting that "[b]ecause the Discount Agreements create a legal duty apart from the ERISA plans and resolution of the claim does not necessarily require interpretation of the plan, North Cypress' breach of contract claim is not preempted by ERISA.").  Indeed, in *North Cypress*, Judge Ellison recognized this distinction, finding claims involving the existence of a Discount Agreement contract were not preempted, while finding out-of-network claims were preempted.  First noting, "[t]he hospital does not maintain contracts with healthcare insurance carriers and, thus, is considered 'out-of-network' for purposes of reimbursement for medical treatment and services it renders to patients," Judge Ellison found such out-of-network claims  preempted.  In doing so, he noted the Fifth Circuit's holding in *Lone Star*, then distinguished the *North Cypress* case by virtue of the fact that it was an out-of-network provider:

> The *Lone Star* court, however, based its decision, in part, on the fact that coverage determinations under the plan were unnecessary because the provider maintained a Provider Agreement with the relevant insurance company. The plaintiff's prompt payment claims were based on the defendant's failure to compensate the plaintiff at the rates agreed to in the Provider Agreement. Thus, it was unnecessary for the court to construe the ERISA plan language in order to resolve the plaintiff's claims. The defendant's independent contractual duty to pay at the agreed upon rate was necessary to the court's conclusion that the plaintiff's claims were saved from preemption.  It is not clear that the court's conclusion would apply to the situation presented here, where the legal duty to pay the insurance claims in the first instance arises from the plan itself. *Id.* at 315.

Respectfully submitted,

By:    /s/ Mikal C. Watts
Texas Bar No. 18215300
S.D. ID No. 12419
mcwatts@wattsguerra.com
WATTS GUERRA LLP
Four Dominion Drive,
Bldg. Three, Suite 100
San Antonio, Texas 78257
(210) 447-0500
(210) 447-0501 (fax)

ATTORNEY-IN-CHARGE FOR
DEFENDANTS METHODIST
HOSPITALS OF DALLAS  AND
TEXAS HEALTH RESOURCES

Of counsel:    LAW OFFICE OF JOSEPH V. GIBSON
Joseph V. Gibson, IV
Texas Bar No. 24007236
jgibson@jvglaw.com
17618 Wagner Point Court
Tomball, Texas 77377
(281) 370-1810
(281) 370-1811 (fax)

FRANCIS, ORR & TOTUSEK, LLP
Joe Don Ridgell
Texas Bar No. 24046716
jdridgell@fotllp.com
Bobby D. Amick
Texas Bar No. 24059377
bamick@fotllp.com
500 N. Akard, Suite 1830
Dallas, Texas 75201
(214) 740-4250
(214) 740-4266 (fax)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing instrument was served electronically on this 13th day of August, 2014 to:

ATTORNEYS FOR PLAINTIFF

| | | |
|---|---|---|
| John B. Shely | - | jshely@andrewskurth.com |
| Kendall M. Gray | - | KendallGray@andrewskurth.com |
| Dimitri Zgourides | - | DZgourides@andrewskurth.com |
| Mitchell A. Reid | - | MitchReid@andrewskurth.com |
| Mark A. Shoffner | - | markshoffner@andrewskurth.com |

By:   /s/ Mikal C. Watts
ATTORNEY-IN-CHARGE FOR
DEFENDANTS METHODIST
HOSPITALS OF DALLAS  AND
TEXAS HEALTH RESOURCES

31